1   Sarah R. Gonski (# 032567)
    PERKINS COIE LLP
2   2901 North Central Avenue, Suite 2000
    Phoenix, Arizona 85012-2788
3   Telephone: (602) 351-8000
    Facsimile: (602) 648-7000
4   SGonski@perkinscoie.com

5   Marc E. Elias (WDC# 442007)*
    Elisabeth C. Frost (WDC# 1007632)*
6   John M. Geise (WDC# 1032700)*
    PERKINS COIE LLP
7   700 Thirteenth Street NW, Suite 600
    Washington, D.C. 20005-3960
8   Telephone: (202) 654-6200
    Facsimile: (202) 654-6211
9   MElias@perkinscoie.com
    EFrost@perkinscoie.com
10  JGeise@perkinscoie.com

11  Abha Khanna (WA# 42612)*
    PERKINS COIE LLP
12  1201 Third Avenue, Suite 4900
    Seattle, WA 98101-3099
13  Telephone: (206) 359-8000
    Facsimile: (206) 359-9000
14  AKhanna@perkinscoie.com

15  *Motions for Pro Hac Vice Forthcoming

16
                 UNITED STATES DISTRICT COURT
17
                     DISTRICT OF ARIZONA
18

19  Brian Mecinas; C.V., *ex rel.* Carolyn Vasko;      No. _____
20  DNC Services Corp., d/b/a Democratic
    National Committee; DSCC; and Priorities
21  USA,
                                                        **COMPLAINT FOR**
22              Plaintiffs,                              **DECLARATORY AND**
                                                        **INJUNCTIVE RELIEF**
23              v.

24  Katie Hobbs, in her official capacity as the
    Arizona Secretary of State,
25
                Defendant.
26

27

28

Plaintiffs Brian Mecinas, C.V., *ex rel.* Carolyn Vasko, DNC Services Corp., d/b/a Democratic National Committee (the "DNC"), DSCC, and Priorities USA, file this Complaint for Declaratory and Injunctive Relief against Defendant Katie Hobbs, in her official capacity as the Arizona Secretary of State, and allege as follows:[1]

## NATURE OF THE CASE

1.     It is now well established that the candidate whose name appears first on a ballot in a contested race receives an electoral benefit *solely* due to her first position. Politicians and parties long strongly suspected as much, but this particular piece of political mythology has been confirmed by academics again and again, persuasively and, in recent years, definitively. The ballot order effect is the result of a well-studied and proven phenomenon known as "position bias."[2]

2.     Multiple federal and state courts that have had the opportunity to consider the question have come to the same conclusion: ballot order matters, and when it is unfairly or arbitrarily assigned, it can raise concerns of constitutional magnitude. *See, e.g.*, *Mann v. Powell*, 333 F. Supp. 1261, 1267 (N.D. Ill. 1969), *aff'd* 398 U.S. 955 (1970) (affirming preliminary injunction requiring ballot order be determined by nondiscriminatory means); *McLain v. Meier*, 637 F.2d 1159, 1167 (8th Cir. 1980) (holding unconstitutional statute requiring party of candidate receiving most votes in prior congressional election be listed first); *Sangmeister v. Woodard*, 565 F.2d 460, 468 (7th Cir. 1977) ("This court will not accept a procedure that invariably awards the first position on the ballot to . . . the incumbent's party.") (citation omitted); *Graves v. McElderry*, 946 F. Supp. 1569, 1581-82 (W.D. Okla. 1996) (finding system always listing one party first unconstitutional); *Netsch v. Lewis*, 344 F. Supp. 1280 (N.D. Ill. 1972) (holding statute prescribing ballot order by past

---

[1] This Complaint refers to Brian Mecinas and C.V., *ex rel.* Carolyn Vasko collectively as the "Voter Plaintiffs" and the entity plaintiffs as the "Organizational Plaintiffs."

[2] Other terms for this phenomenon include the "primacy effect," or, in elections specifically, "ballot order effect" and "candidate name order effect."

electoral success violated equal protection); *Gould v. Grubb*, 14 Cal. 3d 661, 664 (1975) (holding statute always placing incumbents first unconstitutional); *Holtzman v. Power*, 313 N.Y.S.2d 904, 908-09 (N.Y. Sup. Ct. 1970) (holding system requiring incumbent at top of ballot unconstitutional), *aff'd*, 311 N.Y.S.2d 824 (1970).

3. The Arizona Supreme Court came to a similar conclusion in *Kautenberger v. Jackson*, 85 Ariz. 128, 131, 333 P.2d 293, 295 (1958), when it invalidated a law that concerned the ballot order of candidates in primary elections. Although Arizona rotated the order of candidates on paper ballots in primaries, the law in question established a different rule for machine ballots—on those types of ballots, candidates were to be listed in alphabetical order. In finding the law violated the State Constitution, the Arizona Supreme Court found that the randomization of candidate order was necessary due to the "well-known fact" that, "where there are a number of candidates for the same office, the names appearing at the head of the list have a distinct advantage," and without name rotation, candidates whose names are never listed first are "disadvantage[d]." *Id.* at 131.

4. To this day, Arizona law still requires that, in primary elections, candidate's names must be rotated on a precinct-by-precinct basis. *See* A.R.S. § 16-464 (2018) (names of candidates shall be rotated so that "the name of each candidate shall appear substantially an equal number of times at the top, at the bottom" of ballots across the jurisdiction). Arizona does not, however, apply the same rule to ensure fairness in the State's general elections.

5. Instead, Arizona law mandates that *all* of the ballots in any given county *must* list first, in every partisan election, *only* those candidates who affiliate with a single party. Specifically, A.R.S. § 16-502(E) (2018) (the "Ballot Order Statute"), requires that all candidates who belong to the same political party as the gubernatorial candidate who won the most votes in that county during the last general election (the "favored party") must be listed first *for every race* on that county's general election ballots.[3]

_____

[3] Candidates are listed "in descending order according to the votes cast for governor

6. Remarkably, even in the midst of this inequitable general election system, Arizona appears to recognize the value of name rotation by providing for equal rotation among candidates who belong to the same political party. A.R.S. § 16-502(H). Arizona law thus acknowledges and accounts for the effects of position bias whenever partisanship is not involved, seeking fairness in candidate ordering through rotation in primary elections and between candidates of the same political party.

7. Yet, the order of candidates from similarly situated but different political parties who are running against each other in the general election is *never* rotated on a single ballot within a county. Instead, the Ballot Order Statute mandates that every single ballot list the candidates from the favored party first. The disfavored party—even if similarly (or, for all meaningful purposes, identically) situated—has no opportunity for any of its candidates to be listed first on even a single ballot within the county. There are no exceptions.

8. Thus, because Republican Doug Ducey won the majority of Maricopa County's votes for Governor during the 2018 election, the Ballot Order Statute requires that Republican candidates must be listed first (and before their Democratic opponents) in each and every race on every single ballot voted by every voter in the County through at least 2022. Yet, because of A.R.S. § 16-502(H), if there is more than one Republican candidate

_____

for that county in the most recent election for the office of governor." A.R.S. § 16-502(E). The remaining portions of A.R.S. § 16-502(E), which are not challenged here, mandate that, "[i]n the case of political parties that did not have candidates on the ballot in the last general election, such parties shall be listed in alphabetical order below the parties that did have candidates on the ballot in the last general election," followed by independent candidates. The U.S. Supreme Court has recognized that differential treatment of major and minor party candidates is constitutionally appropriate. *See Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 367 (1997) (allowing states to "enact reasonable election regulations that may, in practice, favor the traditional two-party system"). It has not done the same for similarly situated major parties. In fact, courts have repeatedly stricken ballot order systems that prioritize one similarly situated major party over another. *See Graves*, 946 F. Supp. at 1580-81; *McLain*, 637 F.2d 1159, 1166.

running for a given office, *their* names *will* be rotated equitably on ballots within the County so that each gets first billing on ballots in roughly the same number of precincts.

9.      Although theoretically the Ballot Order Statute's county-specific application could mean that the benefits of the first position are distributed equitably among the major party candidates, that is not, and has never been, the case. Arizona's population is not equitably divided among its counties—not even close. Nor have election results varied significantly enough from county to county in past gubernatorial races to result in even a rough equalization in distribution.

10.      In 2020, the Ballot Order Statute will operate in Arizona to the almost exclusive benefit of Republican candidates. Applying the results of the 2018 gubernatorial election, the Statute will require that, on every general election ballot in *all but four* of Arizona's 15 counties, voters will be presented with ballots that list Republican candidates first in every single partisan race. Those counties are home to over 80% of Arizona's total population.

11.      As a result, Republican candidates will have a significant, state-mandated advantage, up and down the slate of partisan races, which in 2020 will include a highly competitive race for U.S. Senate, all of Arizona's nine congressional districts, and the entire State Senate and House of Representatives. In the U.S. congressional races, voters in six of Arizona's nine districts will see only Republican candidates listed first; the same is true for voters in 21 of Arizona's 30 state legislative districts.

12.      The heavy favoring of the Republican Party that the Ballot Order Statute will mandate in 2020 is far from an anomaly. To reach this conclusion, one need look no further than the case of Maricopa County, which alone is home to nearly two-thirds of Arizona's total population. With the exceptions of 1982 and 2006, a Republican candidate has received a majority of the vote in the governor's race in Maricopa County for the last several decades. The Ballot Order Statute has thus ensured that the majority of Arizona's populace has consistently received general election ballots with Republican candidates appearing first on all partisan races. In the nearly 40 years that the Statute has been in place, the median

elector year has seen 70 percent of the state's population receive a ballot with one party's candidates in the top position. For 31 of those years, the party to receive that benefit has been the Republican Party.

13.     Plaintiffs in this case include two individual Arizona voters who have supported and plan to continue to support Democrats for public office in Arizona, in 2020 and beyond; the DNC, the official national party committee for the Democratic Party, which supports the election of Democrats up and down the ticket across the country, including in Arizona; the DSCC, a political committee whose central mission is to support Democratic candidates to the U.S. Senate, including the Arizona Senate seat up for election in 2020; and Priorities USA, a voter-centric progressive advocacy and service organization whose mission is to build a permanent infrastructure to engage Americans in the progressive movement, including specifically in Arizona. Each of these Plaintiffs has been and will continue to be severely injured as a direct result of the Ballot Order Statute which, election after election, has overwhelmingly favored the Republican Party and, absent an order from this Court, is guaranteed to do so again in 2020.

14.     At its most basic, the Ballot Order Statute injures Plaintiffs and the candidates they support, as well as the voters who affiliate with them, by treating them differently from the similarly-situated Republican Party and its candidates, solely because a Republican candidate won the most votes for Governor in their respective county—in an entirely unrelated election. The Ballot Order Statute also dilutes the vote of Arizonans including the Voter Plaintiffs, each of whom consistently supports Democratic candidates in Arizona elections and all of whose votes must compete with the overwhelming majority of Arizonans who vote in counties where the favored party is the Republican Party. The resulting disparate treatment and burden on Plaintiffs' right to vote are not justified by any legitimate, much less compelling, state interest.

15.     Simply put, the Ballot Order Statute offends the First and Fourteenth Amendments to the U.S. Constitution because it confers an unfair political advantage on candidates solely because of their partisan affiliation and the fact that a different candidate,

also affiliated with their party, won the majority of votes in a specific county in an unrelated, previous election. The advantage of appearing first on a ballot is statistically significant and its persistent accrual to the statutorily-favored party undermines the integrity of Arizona's elections. The Court should accordingly declare the Statute invalid, enjoin its operation, and require Arizona to use a ballot order system that gives similarly situated major-party candidates an equal opportunity to be listed first on the ballot. *See Mann*, 333 F. Supp. 1261, *aff'd* 398 U.S. 955.

## JURISDICTION AND VENUE

16.     Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation under color of state law of rights secured by the United States Constitution.

17.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343, because the matters in controversy arise under the Constitution and laws of the United States.

18.     This Court has personal jurisdiction over the Defendant, the Secretary of State, who is sued in her official capacity only.

19.     Venue is proper in the Phoenix Division of the U.S. District Court in the District of Arizona pursuant to 28 U.S.C. § 1391(b)(2) because, *inter alia*, the Defendant Secretary of State resides in this judicial district, and a substantial part of the events that gave rise to Plaintiffs' claims occurred there.

20.     This Court has the authority to enter a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

## PARTIES

21.     Plaintiff Brian Mecinas is a resident of the State of Arizona. He has been a resident of Arizona and of Maricopa County for the past 12 years, and is a freshman at Arizona State University. Mr. Mecinas turned 18 years old on May 31, 2019 and has already registered to vote. Mr. Mecinas considers himself to be a member of the Democratic Party. He regularly supports Democratic candidates in Arizona elections and intends to vote for Democratic Party candidates in the upcoming November 2020 general election. If the Court

1    does not enjoin the Ballot Order Statute prior to then, Republican Party candidates will be

2    listed in the first position on the ballot in all partisan races in which he will be voting, and

3    they will continue to receive an artificial and unfair advantage purely as a result of their

4    ballot position. As a result, Mr. Mecinas will suffer serious, irreparable injury because of

5    the Ballot Order Statute, both due to the dilution of his vote and the burden on his efforts to

6    help elect Democratic Party candidates. His vote for Democratic Party candidates will be

7    diluted relative to that of voters who cast their ballots for Republican Party candidates,

8    because its weight and impact will be decreased—and the weight and impact of votes cast

9    for Republican candidates increased—by the votes accruing to Republican candidates

10   solely due to their first position on the ballot. Mr. Mecinas has also been actively engaged

11   in efforts to help elect Democratic Party candidates in Maricopa County, including by

12   interning for a Democratic candidate's congressional campaign—efforts which the Ballot

13   Order Statute makes significantly more difficult. He plans to continue these activities in

14   regard to the upcoming 2020 election. The Ballot Order Statute, if it is not enjoined, will

15   burden Mr. Mecinas's ability to engage in effective efforts to elect Democratic Party

16   candidates by requiring substantially more time and resources to achieve his mission.

17        22.    Plaintiff C.V., *ex rel.* Carolyn Vasko, is a resident of the State of Arizona. She

18   has been a resident of Glendale for the past 17 years. C.V. will turn 18 years old on January

19   11, 2020 and plans to register to vote in time to vote in the upcoming 2020 election. C.V.

20   considers herself to be a member of the Democratic Party. She regularly supports

21   Democratic candidates in Arizona elections and intends to vote for Democratic Party

22   candidates in the upcoming November 2020 general election. If the Court does not enjoin

23   the Ballot Order Statute prior to then, Republican Party candidates will be listed in the first

24   position on the ballot in all partisan races in which she will be voting, and they will continue

25   to receive an artificial and unfair advantage purely as a result of their ballot position. As a

26   result, C.V. will suffer serious, irreparable injury because of the Ballot Order Statute, both

27   due to the dilution of her vote and the burden on her efforts to help elect Democratic Party

28   candidates. Her vote for Democratic Party candidates will be diluted relative to that of

voters who cast their ballots for Republican Party candidates, because its weight and impact will be decreased—and the weight and impact of votes cast for Republican candidates increased—by the votes accruing to Republican candidates solely due to their first position on the ballot. C.V. has also been actively engaged in efforts to help elect Democratic Party candidates in Maricopa County, including during her mother's 2014 candidacy for the Arizona State Legislature—efforts which the Ballot Order Statute makes significantly more difficult. She plans to continue these activities in regard to the upcoming 2020 election. The Ballot Order Statute, if it is not enjoined, will burden C.V.'s ability to engage in effective efforts to elect Democratic Party candidates by requiring substantially more time and resources to achieve her mission.

23.     Plaintiff DNC is the national committee of the Democratic Party as defined by 52 U.S.C. § 30101(14). Its mission is to elect local, state, and national candidates of the Democratic Party to public office throughout the United States, including in Arizona. The DNC works to accomplish that mission by, among other things, working closely with Democratic candidates and assisting state parties by making expenditures on candidates' behalves, providing Get Out the Vote ("GOTV") assistance, and actively supporting the development of programs benefiting Democratic Party candidates. The DNC has previously engaged in, and plans to continue to engage in, expenditures on behalf of Democratic Party candidates, GOTV assistance, and the development of programs to elect Democratic Party candidates in Arizona. The DNC has members and constituents across the United States, including in Arizona, where the DNC's members and constituents include Democratic Party candidates, elected officials, and voters. The Ballot Order Statute directly harms the DNC by frustrating its mission and efforts to elect Democratic Party candidates in Arizona by giving an unfair, arbitrary, and artificial electoral advantage to Republican Party candidates in counties that house an overwhelming percentage of Arizona's population. The DNC has had to and will have to expend and divert funds that otherwise would have supported GOTV and other mission-critical efforts in order to combat the effects of the Ballot Order Statute to assist in getting Democratic candidates elected in Arizona, including specifically in

anticipation of the 2020 general election. The Ballot Order Statute further harms the DNC because it treats the DNC's candidate members in Arizona differently than similarly situated Republican Party candidates in partisan elections by mandating that all Republican candidates must be listed first on the ballot in the vast majority of Arizona's counties, for no other reason than a Republican garnered the most votes in the last gubernatorial election in that county. As a result, unless the Ballot Order Statute is enjoined, Republican candidates will enjoy a significant, state-mandated advantage in 2020 (and beyond). The DNC's voter members and its constituency of Democratic voters also have suffered and will continue to suffer serious, irreparable injury as a result of the Ballot Order Statute, because their votes for Democratic Party candidates have been and will continue to be diluted by operation of the Ballot Order Statute.

24.     Plaintiff DSCC is the national senatorial committee of the Democratic Party as defined by 52 U.S.C. § 30101(14). Its mission is to elect candidates of the Democratic Party to the U.S. Senate, including in and from Arizona. The DSCC works to accomplish its mission by, among other things, making expenditures for and contributions to Democratic candidates for U.S. Senate and assisting state parties throughout the country, including in Arizona. In 2018, the DSCC made contributions and expenditures in the tens of millions of dollars to persuade and mobilize voters to support Democratic Senate candidates. In 2020, there will be a Senate election in Arizona, and the DSCC will work to elect the Democratic candidate. As a result, the DSCC again intends to make substantial contributions and expenditures to support the Democratic candidate for U.S. Senate in Arizona in 2020. The Ballot Order Statute directly harms the DSCC by frustrating its mission, giving an unfair, arbitrary, and artificial electoral advantage to Republican Party candidates, including in elections for U.S. Senate. Most immediately, the DSCC will have to expend and divert additional funds and resources on GOTV, voter persuasion efforts, and other activities in Arizona, at the expense of its efforts in other states, to combat the effects of the Ballot Order Statute in the 2020 general elections for U.S. Senate in Arizona.

1       25.   Plaintiff PRIORITIES USA ("Priorities") is a 501(c)(4) nonprofit, voter-

2   centric progressive advocacy and service organization. Priorities' mission is to build a

3   permanent infrastructure to engage Americans in the progressive movement by running a

4   permanent digital campaign to persuade and mobilize citizens around issues and elections

5   that affect their lives. To further this purpose, Priorities works to help elect Democratic

6   Party candidates across the country, including in Arizona. In 2018, Priorities made

7   contributions and expenditures in the tens of millions of dollars to persuade and mobilize

8   voters to support Democratic candidates—some of which was spent for those purposes in

9   Arizona. In 2020, Priorities again expects to make contributions and expenditures in the

10  millions of dollars to persuade and mobilize voters to support Democratic candidates in

11  state and federal elections around the country, including in Arizona elections. The Ballot

12  Order Statute directly harms Priorities by frustrating its mission of, and efforts in, electing

13  Democratic Party candidates in Arizona by giving an unfair and artificial electoral

14  advantage to Republican Party candidates. Priorities is aware of the Ballot Order Statute

15  and will have to expend and divert additional funds and resources in GOTV, voter

16  persuasion efforts, and other activities in Arizona, at the expense of its efforts in other states,

17  in order to combat the effects of the Ballot Order Statute in getting Democratic candidates

18  elected in Arizona, including in regard to the 2020 general election.

19      26.   Defendant Katie Hobbs is the Secretary of State of Arizona and is named as

20  a Defendant in her official capacity. She is Arizona's chief state election officer and, as

21  such, is responsible for the administration and implementation of election laws in Arizona,

22  including the Ballot Order Statute. *See* A.R.S. § 16-142. The Secretary, personally and

23  through the conduct of her employees, officers, agents, and servants, acted under color of

24  state law at all times relevant to this action.

25                   **STATEMENT OF FACTS AND LAW**

26      27.   It is by now well-established that the candidate whose name is listed first on

27  the ballot receives the advantage of additional votes solely due to her position on the ballot.

28  *See Holtzman*, 313 N.Y.S.2d at 907 (recognizing "there is a distinct advantage to the

1    candidate whose name appears first on a ballot" and this phenomenon is "so widespread
2    and so universally accepted as to make it almost a matter of public knowledge"); Nuri Kim
3    et al., *Moderators of Candidate Name-Order Effects in Elections: An Experiment*, 36
4    Political Psychology 525, 526 (2015) ("The body of research on name-order effects
5    indicates that candidates often received more votes when their names were listed first than
6    when their names were listed after the names of one or more candidates with whom they
7    competed."); Josh Pasek et al., *Prevalence and Moderators of the Candidate Name-Order
8    Effect*, 78 Public Opinion Quarterly 416, 417 (2014) ("Most studies reported evidence of
9    primacy effects, whereby candidates received more votes when listed first than when listed
10   later."); *see also McLain*, 637 F.2d at 1166 (affirming "finding of ballot advantage in the
11   first position"); *Sangmeister*, 565 F.2d at 468 ("[T]he trial court's conclusion that 'top
12   placement on the ballot would be an advantage to the plaintiff' is supported by substantial
13   evidence[.]"); *Graves v. McElderry*, 946 F. Supp. 1569, 1576 (W.D. Okla. 1996) (finding
14   "some measure of position bias exists in Oklahoma's" elections); *Akins v. Sec'y of State*,
15   154 N.H. 67, 71 (N.H. 2006) (affirming finding that "the primacy effect confers an
16   advantage in elections"); *Gould*, 14 Cal. 3d at 664 (describing finding of position bias as
17   "consistent with parallel findings rendered in similar litigation throughout the country");
18   *State ex rel. Roof v. Bd. of Comm'rs*, 39 Ohio St. 2d 130, 136 (Ohio 1974) (recognizing "it
19   is generally agreed" that "candidates whose names appear at the beginning of the list receive
20   some votes attributable solely to the positioning of their names").

21          28.    The Arizona Supreme Court has similarly long recognized that ballot ordering
22   schemes raise equal protection concerns because of position bias. In 1958—long before
23   contemporary social science research enabled statistical confirmation of what had been
24   suspected and largely accepted—the Court recognized that, "where there are a number of
25   candidates for the same office, the names appearing at the head of the list have a distinct
26   advantage." *Kautenberger*, 85 Ariz. at 131. For that very reason, that Court held that the
27   State Constitution's equal protection clause did not allow candidate's names to be placed

28

1   "in alphabetical order according to the first letter of the surnames of the candidates," during

2   certain primary elections. *Id*. at 129.[4]

3      29.   The challenger in *Kautenberger* was a primary candidate whose last name

4   came near the middle of the alphabet, meaning that, if the law was upheld, "his name would

5   never appear first on the machine ballot." *Id*. at 130. He argued that "places him at a

6   disadvantage with the voting public," likely "decreas[ing] the number of votes which would

7   otherwise be cast for him, . . . amount[ing] to discrimination and creat[ing] privileges for

8   other candidates which he was denied." *Id*. The Court agreed and invalidated the law. *See*

9   *generally id*.

10     30.   Notwithstanding *Kautenberger*, Arizona's present-day Ballot Order Statute

11   mandates that candidates appear in a specific order according to their partisan affiliation:

> The lists of the candidates of the several parties shall be arranged with
> the names of the parties in descending order according to the votes cast
> for governor for that county in the most recent general election for the
> office of governor, commencing with the left-hand column. In the case
> of political parties that did not have candidates on the ballot in the last
> general election, such parties shall be listed in alphabetical order below
> the parties that did have candidates on the ballot in the last general
> election. The names of all candidates nominated under § 16-341 shall
> be placed in a single column below that of the recognized parties.

A.R.S. § 16-502(E).

31.   Thus, the Ballot Order Statute, on its face, treats similarly situated political

parties differently, automatically granting the advantageous first position on every single

ballot for every single partisan race in each county to candidates who affiliate with the same

political party as the candidate who won the most votes in that county during the last

gubernatorial election.

---

[4] Although the *Kautenberger* court referred to the relevant state constitutional provision as the "privileges and immunities clause," the clause has been long recognized as the State's correlative of the federal Equal Protection Clause and is also referred to frequently as Arizona's "equal protection clause." *See, e.g.*, *Kenyon v. Hammer*, 142 Ariz. 69, 77, 688 P.2d 961, 969 (1984) (en banc).

32.     Candidates who affiliate with the favored party thus enjoy an artificial, arbitrary, and unfair electoral advantage based solely on the performance of a different candidate who affiliated with their party in an entirely different election that occurred years earlier.

33.     This mandated and perpetual preference to the candidates who affiliate with the favored party in Arizona's general elections stands in stark contrast to the ballot order system that the State employs in other contexts.

34.     In primary elections, Arizona rotates the names of candidates on a precinct-by-precinct basis. The result is that each candidate's name appears in the top position on a roughly equal number of ballots. *See* A.R.S. § 16-464 (2018).

35.     Even in the general elections, a different provision of the Ballot Order Statute appears to implicitly recognize that position bias plays a role, because it mandates that candidates who belong to the same political party must be rotated so that each such candidate may be listed first among their partisan fellows on an equal basis. *See* A.R.S. § 16-502(H).

36.     As a direct result of the Ballot Order Statute, position bias has severely injured and, unless enjoined, will continue to injure Plaintiffs in Arizona elections.

37.     This harm will be particularly felt in 2020, when Arizona is projected to have numerous highly competitive races.

38.     As of the date of this filing, the Cook Political Report has three congressional races in Arizona on its list of competitive races (Congressional District 1, Congressional District 2, and Congressional District 6).

39.     The *Washington Post* has identified Senator McSally's seat as competitive and among the ten Senate seats most likely to flip in 2020, ranking it the third most likely to change hands from Republican to Democratic.

40.     At the state level, Republicans currently have only a two-seat majority in the Arizona State House, the closest divide since 1966, opening up the very real prospect that majority control of the Arizona State House will be up for grabs in the 2020 election.

41.     Unless the Ballot Order Statute is enjoined, Republican candidates will enter the 2020 election with a state-mandated thumb on the scale in their favor, because over 80% of Arizona's voters will be presented with ballots in which the names of Republican candidates are listed first for every single partisan race. This is so for no other reason than that a *different* Republican candidate won the majority of that county's votes for a *different* office during a *different* election year.

42.     The result will be severe and irreparable harm to the Plaintiffs, the candidates they support, and the voters who support them.

43.     Neither political favoritism of one political party and its voters, nor purported election administration concerns, can sustain the Ballot Order Statute against legal challenge. *See Dunn v. Blumstein*, 405 U.S. 330, 351 (1972) ("States may not casually deprive a class of individuals of the vote because of some remote administrative benefit to the State."); *see also Graves*, 946 F. Supp. at 1580 (finding no legitimate state interest in always placing one major political party first on the ballot).

44.     Nor can the state justify its arbitrary and unfair treatment of similarly situated major political parties, their candidates, and voters over the other by a claim of administrative necessity.

45.     As discussed, Arizona already mandates name rotation during primary races and amongst partisan equals in general elections. Those systems were put in place precisely because of the concern that to do otherwise "would result [in] disadvantage to some candidates." *Kautenberger*, 85 Ariz. at 131. Implementing a similar rotational system in the general election would alleviate the burdens imposed by the Ballot Order Statute, as well as the arbitrary differential treatment that it presently mandates.

46.     This has been the conclusion of several courts that have considered challenges to similarly flawed ballot order statutes. *See, e.g.*, *McLain*, 637 F.2d at 1169 ("[T]he fairest remedy for a constitutionally defective placement of candidates would appear to be some form of ballot rotation whereby 'first position' votes are shared equitably by all candidates," and "[o]ur preliminary research suggests that the most effective rotation system is one

1    which rotates names from one ballot to the next."); *Gould*, 14 Cal. 3d at 676 (stating "a
2    number of state courts have specifically ordered election officials to implement a ballot
3    rotation method, thereby largely eliminating the potential distorting effect of positional
4    preference").

5         47.    Even if applying Arizona's already-existing rotational scheme for candidates
6    of the same party to candidates of similarly situated parties would impose some minimal
7    administrative burden, that burden cannot justify the disparate treatment that the current
8    Ballot Order Statute mandates or outweigh the burden on the rights of political parties,
9    candidates, and the voters who support them. *See, e.g.*, *Mann*, 333 F. Supp. at 1261; *Meier*,
10   637 F.2d at 1166; *Sangmeister*, 565 F.2d at 468; *Graves*, 946 F. Supp. at 1580; *Netsch*, 344
11   F. Supp. at 1280; *Gould*, 14 Cal. 3d at 664; *Holtzman*, 313 N.Y.S.2d at 909.

**CLAIMS FOR RELIEF**

**COUNT I**

**First and Fourteenth Amendments**
**U.S. Const. Amend. I and XIV, 42 U.S.C. § 1983, 28 U.S.C. §§ 2201, 2202**
**Undue Burden on the Right to Vote**

17        48.    Plaintiffs reallege and incorporate by reference all previous paragraphs, as
18   though fully set forth herein.

19        49.    A court considering a challenge to a state election law must carefully balance
20   the character and magnitude of injury to the First and Fourteenth Amendment rights that
21   the plaintiff seeks to vindicate against the justifications put forward by the State for the
22   burdens imposed by the rule. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson*
23   *v. Celebrezze*, 460 U.S. 780, 789 (1983).

24        50.    This is a "flexible" sliding scale, where the rigorousness of scrutiny depends
25   upon the extent to which the challenged law burdens voting rights. *Pub. Integrity All., Inc.*
26   *v. City of Tucson*, 836 F.3d 1019, 1024 (9th Cir. 2016); *see also Akins*, 154 N.H. at 67
27   (applying *Anderson-Burdick* and holding that strict scrutiny was correct test to determine
28   constitutionality of ballot order system that prioritized candidate names alphabetically).

51.     Courts need not accept a state's justifications at face value, particularly where they are "speculative," otherwise it "would convert *Anderson-Burdick*'s means-end fit framework into ordinary rational-basis review wherever the burden a challenged regulation imposes is less than severe." *Soltysik v. Padilla*, 910 F.3d 438, 448–49 (9th Cir. 2018) (citing *Pub. Integrity All., Inc. v. City of Tucson*, 836 F.3d 1019, 1024-25 (9th Cir. 2016)); *see also Crawford Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling op.) ("However slight th[e] burden may appear, . . . it must be justified by relevant and legitimate state interests *sufficiently weighty to justify the limitation*.") (quotation marks omitted) (emphasis added).

52.     The Ballot Order Statute, which provides an unfair, arbitrary, and artificial advantage to all candidates whose political party received the most votes in each county in the last gubernatorial election, burdens the right to vote of those voters—including the Voter Plaintiffs and the members and constituencies of the Organizational Plaintiffs—who support candidates who affiliate with the non-favored party in each county, by diluting their vote relative to the votes for candidates who associate with the similarly situated, but statutorily-favored party. *See McLain*, 637 F.2d at 1163 (describing system of listing first candidates of party that received the most votes in last North Dakota congressional election as "burden[ing] the fundamental right to vote possessed by supporters of the last-listed candidates, in violation of the fourteenth amendment"); *see also Gould*, 14 Cal. 3d at 670 (describing statute that prioritized ballot order by incumbency as "inevitably dilut[ing] the weight of the vote of all those electors who cast their ballots for a candidate who is not included within the favored class").

53.     The weight and impact of the Voter Plaintiffs' votes (as well as the Organizational Plaintiffs' membership and constituencies) are consistently decreased—and the weight and impact of the votes for the candidates who associate with the favored party, increased—by the votes accruing to the first-listed candidates solely due to their first position on the ballot as a result of the Ballot Order Statute.

54.     The Ballot Order Statute is not justified by any legitimate state interest, let alone a compelling state interest, that is sufficiently weighty to justify the burden on the right to vote. *See McLain*, 637 F.2d at 1167 (holding state's asserted interest in "making the ballot as convenient and intelligible as possible for the great majority of voters" was not a legitimate state interest to justify listing first on the ballot candidates of the political party that received the most votes in the last congressional election and constituted "favoritism"); *Gould*, 14 Cal. 3d at 675 (rejecting argument that state interests in promoting "efficient, unconfused voting" justified an incumbent-first ballot order system and holding that interest "in promoting speed in the voting booth" was not a "compelling" state interest); *Holtzman*, 62 Misc. 2d at 1024 (holding no rational basis for "favoritism to a candidate merely on the basis of his having been successful at a prior election" in terms of ballot order).

55.     Thus, the burdens imposed by the Ballot Order Statute on the fundamental right to vote outweigh any alleged benefits of the law.

56.     Injunctive and declaratory relief are needed to resolve this existing dispute, which presents an actual controversy between the Secretary of State and Plaintiffs, who have adverse legal interests, because the Ballot Order Statute subjects Plaintiffs to serious, concrete, and irreparable injuries to their fundamental right to vote, including, most immediately, in the upcoming general elections in 2020.

**COUNT II**
**Fourteenth Amendment**
**U.S. Const. Amend. XIV, 42 U.S.C. § 1983, 28 U.S.C. §§ 2201, 2202**
**Disparate Treatment in Violation of the Right to Equal Protection**

57.     Plaintiffs reallege and incorporate by reference all the above paragraphs, as though fully set forth herein.

58.     The Equal Protection Clause of the Fourteenth Amendment prohibits states from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1.

59.     This constitutional provision requires "that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985);

1   *see also Bush v. Gore*, 531 U.S. 98, 104-05 (2000) (holding Equal Protection Clause applies

2   to "the manner of [the] exercise [of voting]" and "once granted the right to vote on equal

3   terms, the State may not, by later arbitrary and disparate treatment, value one person's vote

4   over that of another").

5        60.    The Ballot Order Statute treats otherwise similarly situated major-party

6   candidates differently. In doing so, it grants a consistent, unfair, and arbitrary electoral

7   advantage to one party based solely on the county-level performance of that party's

8   candidate in the last gubernatorial election. This preferential treatment consistently and

9   meaningfully disadvantages Plaintiffs and the candidates, members, constituencies, voters,

10   and organizations who support them, in violation of the Equal Protection Clause of the

11   Fourteenth Amendment. *See McLain*, 637 F.2d at 1166 (holding statute requiring political

12   party of the candidate who received the most votes in prior North Dakota congressional

13   election to be listed first on ballots unconstitutional, in violation of the Fourteenth

14   Amendment's Equal Protection Clause); *see also Mann*, 333 F. Supp. at 1267 (enjoining

15   ballot order system of placing candidates at top of ballot based on prior electoral success—

16   due to "seniority" or "incumbency"—and stating that "[t]he Fourteenth Amendment

17   requires all candidates, newcomers and incumbents alike, to be treated equally"), *aff'd by*

18   398 U.S. 955 (1970); *Netsch*, 344 F. Supp. at 1281 (holding statute prescribing ballot order

19   by past electoral success violated Fourteenth Amendment because it denied "the right to

20   equal protection"); *Holtzman*, 62 Misc. 2d at 1024 (holding system requiring placement of

21   incumbent at top of ballot unconstitutional because it violated Equal Protection Clause); *see*

22   *also Sangmeister*, 565 F.2d at 468 ("This court will not accept a procedure that invariably

23   awards the first position on the ballot to . . . the incumbent's party.") (citation omitted).

24        61.    The Ballot Order Statute does not further any legitimate state interest, much

25   less a compelling state interest, that is sufficiently weighty to justify its favoritism and the

26   serious and irreparable injury that results to the Plaintiffs because of that favoritism. *See,*

27   *e.g.*, *McLain*, 637 F.2d at 1167 (holding state's asserted interest in "making the ballot as

28   convenient and intelligible as possible for the great majority of voters" did not justify a

1    ballot order statute listing first on the ballot the candidates of the political party that won

2    the last congressional race); *Holtzman*, 62 Misc. 2d at 1024 (holding no rational basis for

3    "such favoritism to a candidate merely on the basis of his having been successful at a prior

4    election" in terms of ballot order).

5         62.    Injunctive and declaratory relief is needed to resolve this existing dispute,

6    which presents an actual controversy between the Secretary of State and Plaintiffs, who

7    have adverse legal interests, because the Ballot Order Statute subjects Plaintiffs to serious,

8    concrete, and irreparable injuries due to disparate treatment in violation of the Equal

9    Protection Clause, including, most immediately, in the upcoming 2020 general election.

10        **WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment:

11   (a)   declaring, under the authority granted to this Court by 28 U.S.C. § 2201, that

12         the Ballot Order Statute violates the First and Fourteenth Amendments to the

13         U.S. Constitution;

14   (b)   preliminarily and permanently enjoining the Secretary of State, her respective

15         agents, officers, employees, and successors, and all persons acting in concert

16         with each or any of them, from implementing, enforcing, or giving any effect

17         to the Ballot Order Statute under the authority granted to this Court by Federal

18         Rule of Civil Procedure 65(a) and 28 U.S.C. § 2202;

19   (c)   awarding Plaintiffs their costs, disbursements, and reasonable attorneys' fees

20         incurred in bringing this action pursuant to 42 U.S.C. § 1988 and other

21         applicable laws; and

22   (d)   granting such other and further relief as the Court deems just and proper,

23         including requiring the Secretary of State to use a ballot order system that

24         gives similarly situated major-party candidates an equal opportunity to be

25         listed first on the ballot.

26

27

28

Dated:  November 1, 2019

*/s Sarah R. Gonski*
Sarah R. Gonski (# 032567)
PERKINS COIE LLP
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788
Telephone: (602) 351-8000
Facsimile: (602) 648-7000
SGonski@perkinscoie.com

Marc E. Elias (WDC# 442007)*
Elisabeth C. Frost (WDC# 1007632)*
John M. Geise (WDC# 1032700)*
PERKINS COIE LLP
700 Thirteenth Street NW, Suite 600
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-6211
MElias@perkinscoie.com
EFrost@perkinscoie.com
JGeise@perkinscoie.com

Abha Khanna (WA# 42612)*
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone: (206) 359-8000
Facsimile: (206) 359-9000
AKhanna@perkinscoie.com

*Attorneys for Plaintiffs*

1

**CERTIFICATE OF SERVICE**

2         I hereby certify that on November 1, 2019, I electronically transmitted the attached

3   document to the Clerk's Office using the ECF System for filing and transmittal of a Notice

4   of Electronic Filing to the ECF registrants.

5

6                                              */s Daniel R. Graziano*_____

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28