Mark Brnovich
Attorney General
Firm Bar No. 14000

Linley Wilson (027040)
Deputy Solicitor General
Kara Karlson (029407)
Assistant Attorney General
2005 North Central Avenue
Phoenix, AZ  85004-1592
(602) 542-4951
kara.karlson@azag.gov
linley.wilson@azag.gov
adminlaw@azag.gov

Mary R. O'Grady (011434)
Kimberly I. Friday (035369)
Emma J. Cone-Roddy (034285)
OSBORN MALEDON, P.A.
2929 North Central Avenue, Suite 2100
Phoenix, Arizona 85012–2793
(602) 640-9000
mogrady@omlaw.com
kfriday@omlaw.com
econe-roddy@omlaw.com

*Attorneys for Defendant Arizona Secretary
of State Katie Hobbs*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Brian Mecinas, et al.,<br><br>　　　　　Plaintiffs,<br><br>v.<br><br>Katie Hobbs, in her official capacity as Arizona Secretary of State,<br><br>　　　　　Defendant. | Case No:  CV-19-05547-PHX-DJH<br><br>**ARIZONA SECRETARY OF STATE'S MOTION TO DISMISS**<br><br>**(Oral Argument Requested)[1]** |

---

[1] Because of the substantial overlap in issues, the Secretary requests oral argument on this Motion concurrent with the argument on Plaintiffs' Motion for Preliminary Injunction scheduled for March 5, 2019 at 9:30 a.m.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ ii

INTRODUCTION ........................................................................................... 1

BACKGROUND .............................................................................................. 1

ARGUMENT ................................................................................................. 3

I.      Plaintiffs Lack Standing to Challenge the Ballot Order Statute ............................ 3

        A.      The Voter Plaintiffs Lack Standing ............................................... 5

        B.      The Committee Plaintiffs Lack Standing ........................................ 6

        C.      Plaintiffs' Claims Are Not Redressable through this Lawsuit ................... 8

II.     The Eleventh Amendment Bars Plaintiffs' Requested Relief ............................... 9

III.    Plaintiffs' Claims Are Nonjusticiable Under *Rucho* ..................................... 11

IV.     Plaintiffs Fail to State a Claim Upon Which Relief Can Be Granted ................... 14

        A.      Count I Fails as a Matter of Law Because the Ballot Order Statute
                is Not an Undue Burden on the Right to Vote ................................ 14

        B. Count II Fails to State a Valid Equal Protection Claim ............................ 16

CONCLUSION ............................................................................................ 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACORN v. Fowler*,
    178 F.3d 350 (5th Cir. 1999) ........................................................... 8

*Akins v. Sec. of State*,
    904 A.2d 702 (N.H. 2006) ............................................................... 4

*Allen v. Wright*,
    468 U.S. 737 (1984).......................................................................... 9

*Anderson v. Celebrezze*,
    460 U.S. 780 (1983)........................................................................ 15

*Bd. of Election Comm'rs v. Libertarian Party*,
    591 F.2d 22 (7th Cir. 1979) ........................................................... 16

*Becker v. FEC*,
    230 F.3d 381 (1st Cir. 2000).......................................................... 5

*Black Faculty Ass'n of Mesa Coll. v. San Diego Cmty. Coll. Dist.*,
    664 F.2d 1153 (9th Cir. 1981) ........................................................ 6

*Burdick v. Takushi*,
    504 U.S. 428 (1992)........................................................................ 15

*Clough v. Guzzi*,
    416 F. Supp. 1057 (D. Mass. 1976) ......................................... 14, 17

*Coal. to Defend Affirmative Action v. Brown*,
    674 F.3d 1128 (9th Cir. 2012) .................................................. 9, 10

*Confederated Tribes & Bands of the Yakama Indian Nation v. Locke*,
    176 F.3d 467 (9th Cir. 1999) ......................................................... 10

*Crist v. Comm'n on Presidential Debates*,
    262 F.3d 193 (2d Cir. 2001) ........................................................... 5

*Culinary Workers Union, Local 226 v. Del Papa*,
    200 F.3d 614 (9th Cir. 1999) ........................................................... 9

*Culliton v. Bd. of Election Comm'rs of DuPage Cty*,
    419 F. Supp. 126 (N.D. Ill. 1976) ................................................... 4

*Drake v. Obama*,
    664 F.3d 774 (9th Cir. 2011) ........................................................................ 8

*Dunn v. Blumstein*,
    405 U.S. 330 (1972) ..................................................................................... 5

*Gill v. Whitford*,
    138 S.Ct. 1916 (2018) .................................................................................. 5

*Gould v. Grubb*,
    14 Cal. 3d 661 (1975) ................................................................................... 4

*Graves v. McElderry*,
    946 F. Supp. 1569 (W.D. Okla. 1996) ......................................................... 4

*Holtzman v. Power*,
    311 N.Y.S.2d 37 (N.Y. App. 1970), ........................................................... 5

*Holtzman v. Power*,
    313 N.Y.S.2d 904 (N.Y. Sup. Ct. 1970) ..................................................... 5

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977) .................................................................................. 6, 7

*Idaho v. Coeur d'Alene Tribe of Idaho*,
    521 U.S. 261 (1997) ............................................................................... 10, 11

*Kautenburger v. Jackson*,
    333 P.2d 293 (Ariz. 1958) ............................................................................ 4

*La Asociacion de Trabajadores de Lake Forest v. Lake Forest*,
    624 F.3d 1083 (9th Cir. 2010) ...................................................................... 7

*Lance v. Coffman*,
    549 U.S. 437 (2007) ..................................................................................... 6

*Leonard v. Clark*,
    12 F.3d 885 (9th Cir. 1993) .......................................................................... 4

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) ..................................................................................... 9

*Libertarian Party of Va. v. Alcorn*,
    826 F.3d 708 (4th Cir. 2016) ........................................................... 14, 15, 16

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ..................................................................................... 9

*Mann v. Powell,*
    314 F. Supp. 677 (N.D. Ill. 1969) ................................................................. 4, 6

*Mann v. Powell,*
    333 F. Supp. 1261 (N.D. Ill. 1969) ................................................................. 4

*Maya v. Centex Corp.,*
    658 F.3d 1060 (9th Cir. 2011) ....................................................................... 3

*McLain v. Meier,*
    637 F.2d 1159 (8th Cir. 1980) ....................................................................... 4

*Mitchell v. L.A.s Cmty. Coll. Dist.,*
    861 F.2d 198, 201 (9th Cir. 1988) ................................................................. 9

*Munro v. Socialist Workers Party,*
    479 U.S. 189 (1986) ....................................................................................... 15

*Nat'l Council of La Raza v. Cegavske,*
    800 F.3d 1032 (9th Cir. 2015) ....................................................................... 8

*Ne. Ohio Coal. For Homeless and Serv. Emps. Int'l Union, Local 1199 v.*
    *Blackwell,*
    467 F.3d 999 (6th Cir. 2006) ......................................................................... 7

*Netsch v. Lewis,*
    344 F. Supp. 1280 (N.D. Ill. 1972) ............................................................... 4

*New Alliance Party v. N.Y. State Bd. of Elections,*
    861 F. Supp. 282 (S.D.N.Y. 1994) ........................................................... 2, 16

*Rodriguez v. Popular Democratic Party,*
    457 U.S. 1 (1982) ........................................................................................... 17

*State ex rel. Roof v. Bd. of Comm'rs,*
    314 N.E.2d 172 (Ohio 1974) ......................................................................... 5

*Rubin v. City of Santa Monica,*
    308 F.3d 1008 (9th Cir. 2002) ....................................................................... 15

*Rucho v. Common Cause,*
    139 S.Ct. 2484 (2019) ..................................................................... 1, 11, 12, 13

*Sangmeister v. Woodard,*
    565 F.2d 460 (7th Cir. 1977) ......................................................................... 4

*Smith v. Ark. State Highway Emps.,*
    441 U.S. 463 (1979) ....................................................................................... 16

*Smith v. Pac. Props. and Dev. Corp.*,
    358 F.3d 1097 (9th Cir. 2004) ....................................................................... 7

*Spokeo, Inc. v. Robins*,
    136 S.Ct. 1540 (2016) ................................................................................... 8

*Storer v. Brown*,
    415 U.S. 724 (1974) .................................................................................... 15

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ................................................................................. 3, 7

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ..................................................................................... 3

*Timmons v. Twin Cities Area New Party*,
    520 U.S. 351 (1997). .............................................................................. 2, 15

*Tohono O'odham Nation v. Ducey*,
    130 F. Supp. 3d 1301 (D. Ariz. 2015) ........................................................ 10

*Townley v. Miller*,
    722 F.3d 1128 (9th Cir. 2013) ...................................................................... 8

*Ulland v. Growe*,
    262 N.W.2d 412 (Minn. 1978) ................................................................... 14

*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*,
    535 U.S. 635 (2002) ..................................................................................... 9

*Weisberg v. Powell*,
    417 F.2d 388 (1969) ..................................................................................... 4

*Ex parte Young*,
    209 U.S. 123 (1908) ......................................................................... 9, 10, 11

**Statutes and Rules**

A.R.S. § 16–503 ............................................................................................. 10

A.R.S. § 16-502 ....................................................................................... 1, 2, 3

Ariz. Sess. Laws 1979, Ch. 209, § 3 .............................................................. 2

Ariz. Sess. Laws 1983, Ch. 33, § 1 ................................................................ 2

Ariz. Sess. Laws 2000, Ch. 249, § 25 ............................................................ 3

v

Federal Rules of Civil Procedure 12(b)(1) and (6)...................................................... 1

**Constitutional Provisions**

U.S. Const. amend. I.............................................................................................. 1, 16

U.S. Const. amend. XI........................................................................................ 1, 9, 10

U.S. Const. amend. XIV..................................................................................... 14, 15

U.S. Const. art. I, §4................................................................................................ 6

U.S. Const. art. III .................................................................................... 1, 3, 5, 6, 8, 9

U.S. Const. art. III, § 2 ............................................................................................ 3

**Other Authorities**

44th Leg., 2nd Reg. Sess. (May 12, 2000) ............................................................... 3

44th Leg., 2nd Reg. Sess. (April 10, 2000) ............................................................... 3

**INTRODUCTION**

In this lawsuit, Plaintiffs ask this Court to enjoin A.R.S. § 16–502(E) ("Ballot Order Statute") and replace it with a system "that gives similarly situated major-party candidates an equal opportunity to be listed first on the ballot." (Doc. 13, ¶¶ 15, 63.)  The Ballot Order Statute already does that.  It requires each county to organize the names of general election candidates by party affiliation and list them "in descending order according to the votes cast for governor for that county in the most recent general election for . . . governor."  A.R.S. § 16-502(E).  Plaintiffs are various groups and individuals who support Democratic candidates, and they argue that relying on votes cast for governor to determine ballot order for a general election is unconstitutional because it favors Republicans.  Their complaint, which is essentially about the nature of Arizona politics over the past 40 years, fails for multiple reasons and should be dismissed.

First, none of the Plaintiffs have standing because they do not allege a cognizable injury under Article III and their claims are not redressable by this action.

Second, Plaintiffs' requested relief is barred by the Eleventh Amendment.

Third, this lawsuit's claims of unfairness are not justiciable based on the Supreme Court's recent decision in *Rucho v. Common Cause*, 139 S.Ct. 2484, 2500 (2019). Plaintiffs' claims here are based solely on the historical political effect of the statute, and they should be dismissed under *Rucho.*

Fourth, even if the claims were justiciable, they fail as a matter of law.  The Ballot Order Statute imposes no burden on any individual's right to vote, and the State has a well-established right to establish ballot order requirements as part of its responsibilities for the administration of elections.  The statute does not violate due process, the First Amendment, or equal protection.  For these reasons, the Complaint should be dismissed pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6).

**BACKGROUND**

It is well-established that states "have an interest in protecting the integrity, fairness, and efficiency of their ballots and election processes as means for electing

public officials." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 364–65 (1997). Arizona's Ballot Order Statute establishes logical, efficient, and manageable rules that determine the order in which candidates' names appear on a general election ballot. *See New Alliance Party v. N.Y. State Bd. of Elections*, 861 F. Supp. 282, 296 (S.D.N.Y. 1994) (recognizing "the compelling nature of [a] State's interest in organizing a comprehensible and manageable ballot"—"one where the parties, offices and candidates are presented in a logical and orderly arrangement"). For each general election contest, names are organized within the candidates' party affiliation "in descending order according to the votes cast for governor for that county in the most recent general election for the office of governor[.]" A.R.S. § 16–502(E).[2] Political parties that did not have candidates on the ballot in the last general election are "listed in alphabetical order below the parties that did have candidates on the ballot in the last general election." *Id.* Names of other candidates who were nominated but are not registered with a recognized political party appear below the names of the recognized parties. *Id.*[3] Next to each name is a three-letter abbreviation that identifies the candidate's party affiliation. *Id.*

The Arizona Legislature enacted the Ballot Order Statute in 1979 as part of a comprehensive new elections code, which "was a result of agreement between both major political parties and the County Recorders Association." *See* Ariz. H.R. Comm. Min., H.B. 2028 (Mar. 5, 1979); *see also* Ariz. House Journal, 611, 644–45 (Apr. 20, 1979) (reflecting that H.B. 2028 passed 28-2 in the Senate and 40-11-9 in the House). The 1979 statute originally provided for left-hand and right-hand columns of candidate names. *See* Ariz. Sess. Laws 1979, Ch. 209, § 3; A.R.S. §16–502(H) (1980).[4] In 2000,

---

[2] The names of candidates of the same political party for the same office are alternated to ensure that "the name of each candidate shall appear substantially an equal number of times in each possible location." A.R.S. § 16–502(H).

[3] Recognized political parties in Arizona currently include the Democratic Party, Republican Party, and the Libertarian Party. *See* https://azsos.gov/elections/information-about-recognized-political-parties (last visited December 18, 2019).

[4] In 1983, this provision was relocated from subsection (H) to its current location in subsection (E). *See* Ariz. Laws 1983, Ch. 33, § 1.

the Legislature amended the Ballot Order Statute to organize the candidates' names in one column instead of two.   Ariz. Laws 2000, Ch. 249, § 25.   The Senate Bill that prompted this change (among many revisions to Arizona's election laws) came "from all 15 County Recorders and all 15 Election Directors."   Ariz. H.R. Comm. Min., S.B. 1372 (Mar. 1, 2000).   The changes were aimed at "help[ing] the County Recorders and Election Directors do a better job and save public money."   *Id.*; *see also* Ariz. Senate Fact Sheet, S.B. 1372, 44th Leg., 2nd Reg. Sess. (May 12, 2000) ("State and county election officials regularly identify areas of election law to be modified to promote efficiency. . .").   Indeed, the Senate Bill passed with broad, bipartisan support in both chambers.   *See* Final Reading Votes, S.B. 1372, 44th Leg., 2nd Reg. Sess. (April 10, 2000) (showing the bill passed the Senate 27-2-1 and the House 43-15-2).

## ARGUMENT

### I.       Plaintiffs Lack Standing to Challenge the Ballot Order Statute.

The standing doctrine functions to ensure that courts apply the judicial power only to "[c]ases" and "[c]ontroversies" and not to abstract legal questions.   U.S. Const. art. III, § 2, cl. 1.   Thus, a "lack of Article III standing requires dismissal for lack of subject matter jurisdiction[.]"   *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011).   In order to demonstrate standing to seek injunctive relief under Article III,

> a plaintiff must show that he is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury.

*Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).   The "injury-in-fact" requirement "helps to ensure that the plaintiff has a 'personal stake in the outcome of the controversy.'"   *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).

In the Amended Complaint, Plaintiffs allege that "ballot order matters, and when it is unfairly or arbitrarily assigned, it can raise concerns of constitutional magnitude."

(Doc. 13, ¶ 2.)   Notably, nearly *all* of the federal and state cases that Plaintiffs rely on (*see id.*, ¶¶ 2–3, 28, 44, 47–48, 61–62) are actions in which *candidates* brought suit challenging the constitutionality of election statutes.   *See McLain v. Meier*, 637 F.2d 1159, 1160 (8th Cir. 1980) (plaintiff was an independent candidate challenging an "incumbent first" ballot format statute violated); *Sangmeister v. Woodard*, 565 F.2d 460, 463, 463 (7th Cir. 1977) (consolidated appeal where one case was brought by plaintiffs who "were all candidates for office" and the other case was initiated by a candidate, *see Culliton v. Bd. of Election Comm'rs of DuPage Cty*, 419 F. Supp. 126 (N.D. Ill. 1976)); *Graves v. McElderry*, 946 F. Supp. 1569, 1572 (W.D. Okla. 1996) (plaintiffs were "candidates for public office"); *Netsch v. Lewis*, 344 F. Supp. 1280 (N.D. Ill. 1972) (although not explicitly stating plaintiffs were candidates, holding plaintiffs' constitutional rights were violated under *Weisberg v. Powell*, 417 F.2d 388 (1969) (suit by candidates)), and *Mann v. Powell*, 314 F. Supp. 677 (N.D. Ill. 1969) (issuing injunction in an action brought by incumbent seeking reelection and a registered voter)[5]; *Mann v. Powell*, 333 F. Supp. 1261, 1264–65 (N.D. Ill. 1969) (holding candidate had "a sufficient personal stake to maintain th[e] suit" while dismissing registered voter for lack of standing, reasoning the voter cannot "maintain this action on behalf of candidates in the primary election"); *Kautenburger v. Jackson*, 333 P.2d 293, 294-95 (Ariz. 1958) (constitutional challenge by a "primary candidate for justice of the peace" who sought to enjoin the board of supervisors from using voting machines unless candidates' names were rotated); *Gould v. Grubb*, 14 Cal. 3d 661, 664-65 (1975) ("nonincumbent candidates" brought action challenging constitutionality of "incumbent first" election ballot procedure); *Akins v. Sec. of State*, 904 A.2d 702, 703 (N.H. 2006) (petitioners were "individuals who ran as . . . candidates in the 2004 New Hampshire general election")[6];

---

[5] As noted above, in *Mann v. Powell*, the district court later dismissed the voter from the lawsuit for lack of standing.  *See Mann,* 333 F. Supp. at 1264–65.

[6] *Akins* involved candidates and the state Democratic party, but this fact is inconsequential because generally, "once the court determines that one of the plaintiffs has standing, it need not decide the standing of the others."  *Leonard v. Clark*, 12 F.3d 885, 888 (9th Cir. 1993)

1  *Holtzman v. Power*, 313 N.Y.S.2d 904, 908–09 (N.Y. Sup. Ct. 1970) (referring to prior

2  appellate decision, *Holtzman v. Power*, 311 N.Y.S.2d 37, 38 (N.Y. App. 1970), which

3  held petitioners had standing where "each had actually filed a petition").   Plaintiffs'

4  citations to cases where individual voters have standing are entirely inapposite.  *See State*

5  *ex rel. Roof v. Bd. of Comm'rs*, 314 N.E.2d 172 (Ohio 1974) (Ohio taxpayer had standing

6  in lawsuit alleging that use of voting machines violated the state constitution, which

7  required candidate-name rotation); *Dunn v. Blumstein*, 405 U.S. 330, 351 (1972) (new

8  resident's challenge to lengthy residency duration requirement that prevented him from

9  registering to vote).

10        As discussed below, Plaintiffs lack Article III standing to sue the Secretary

11  because they have not suffered cognizable injuries in fact.  In addition, their claims are

12  not redressable through this lawsuit against the Secretary.

13        **A.      The Voter Plaintiffs Lack Standing.**

14        In their Complaint, Plaintiffs Mecinas, Vasko, and Serrano state that they intend to

15  vote for Democratic Party candidates in the upcoming November 2020 general election

16  and that the Ballot Order Statute harms their "ability to engage in effective efforts to elect

17  Democratic Party candidates[.]"  (Doc. 13, ¶¶ 21–23).  But the Ballot Order Statute does

18  not prevent Plaintiffs from voting for Democratic candidates, or persuading others to do

19  so.  These voting plaintiffs lack standing because their complaints about election results

20  are generalized grievances common to all voters who share their partisan beliefs, not

21  injuries in fact.  *See Gill v. Whitford*, 138 S.Ct. 1916, 1933 (2018) ("[T]his Court is not

22  responsible for vindicating generalized partisan preferences.");  *Crist v. Comm'n on*

23  *Presidential Debates*, 262 F.3d 193, 195 (2d Cir. 2001) ("Several other Circuit Courts

24  have also concluded that a voter fails to present an injury-in-fact when the alleged harm

25  is abstract and widely shared or is only derivative of a harm experienced by a

26  candidate.");  *Becker v. FEC*, 230 F.3d 381, 390 (1st Cir. 2000) (when a "preferred

27  candidate . . . has less chance of being elected," the "harm" is not "a restriction on voters'

28  rights and by itself is not a legally cognizable injury sufficient for standing").

1    And Plaintiffs' allegations that their votes are "diluted relative to that of voters

2  who cast their ballots for Republican Party candidates" (Doc. 13, ¶¶ 21–23) does not

3  establish injury under a vote-dilution theory.  Plaintiffs' votes are not devalued or wasted

4  when more votes cast for other candidates lead to success for those candidates.  Simply

5  put, Plaintiffs' votes are not devalued because other voters hypothetically cast theirs in an

6  irrational way.   The lack of an entirely rational electorate is not an "injury-in-fact"

7  necessary to invoke Article III standing.  *See Mann*, 333 F. Supp. at 1264–65 (dismissing

8  registered voter for lack of standing, reasoning that plaintiff's allegation that the "state

9  action may cause other voters to act irrationally" is "an insufficient personal interest to

10  state a cause of action").  *Cf. Lance v. Coffman*, 549 U.S. 437, 441-42 (2007) (holding

11  "four Colorado voters" lacked Article III standing to allege that a provision of the

12  Colorado Constitution violated the Elections Clause of the U.S. Constitution "by

13  depriving the state legislature of its responsibility to draw congressional districts,"

14  reasoning that the only injury plaintiffs allege is an "undifferentiated, generalized

15  grievance").

16    **B.    The Committee Plaintiffs Lack Standing.**

17    The Committee Plaintiffs do not have associational standing, organizational

18  standing, or competitive standing.   Associational standing is a narrow and limited

19  exception to the general rule that litigants must assert their own rights in order to have

20  standing.  *Black Faculty Ass'n of Mesa Coll. v. San Diego Cmty. Coll. Dist.*, 664 F.2d

21  1153, 1156 (9th Cir. 1981).  As stated by the Supreme Court:

22    [A]n association has standing to bring suit on behalf of its members when:
      (a) its members would otherwise have standing to sue in their own right; (b)
23    the interests it seeks to protect are germane to the organization's purpose;
      and (c) neither the claim asserted nor the relief requested requires the
24    participation of individual members in the lawsuit.

25

26  *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

27    Here, the Committee Plaintiffs have not identified any members who are actually

28  harmed (see Doc. 13, ¶¶ 24–26), and have alleged nothing more than a "statistical

probability that some of its members" might be injured, which the Supreme Court has rejected as a basis for standing. *Summers*, 555 U.S. at 499 ("[T]he Court has required plaintiffs claiming an organizational standing to identify members who have suffered the requisite harm."). Moreover, Plaintiffs DSCC and Priorities USA do not even allege that they are membership organizations. (Doc. 13, ¶¶ 25–26.) Not having members is fatal to associational standing. *See Hunt*, 432 U.S. at 344.

Plaintiff DNC alleges that its members "include Democratic Party candidates, elected officials, and voters" and that the Ballot Order Statute "harms the DNC because it treats the DNC's candidate members in Arizona differently than similarly situated Republican Party candidates in partisan elections[.]" (Doc. 13, ¶ 24.) As discussed above, the case law Plaintiffs cite in their Complaint reveals that *candidates* themselves may have standing to bring the equal protection claim alleged in Count II. But the DNC cannot bring an equal protection claim on candidates' behalf because this fact-intensive claim requires "the participation of individual members." *Hunt*, 432 U.S. at 343. Moreover, the beneficiaries of a plaintiff's services do not qualify as members for purposes of associational standing. *See Ne. Ohio Coal. For Homeless and Serv. Emps. Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1010 n.4 (6th Cir. 2006).

Nor can the Committee Plaintiffs establish organizational standing, under which a plaintiff may establish injury-in-fact by alleging: "(1) frustration of its organizational mission; and (2) diversion of its resources" to mitigate the effects of the challenged action. *Smith v. Pac. Props. and Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004). An organization "cannot manufacture the injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all. It must instead show that it would have suffered some other injury if it had not diverted resources to counteracting the problem." *La Asociacion de Trabajadores de Lake Forest v. Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010).

Here, the Committee Plaintiffs have not alleged that the Secretary's actions or the Ballot Order Statute caused it to expend additional resources and that, "but for" those

actions, it would have used those resources to accomplish other aspects of its mission. *See Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1040–41 (9th Cir. 2015). Their general allegations of expending resources on "Get Out the Vote ("GOTV") assistance," "voter persuasion efforts," and making "contributions and expenditures in the tens of millions of dollars to persuade and mobilize voters to support Democratic Senate candidates" (Doc. 13, ¶¶ 24–26) do not establish the above requirements.  *See ACORN v. Fowler*, 178 F.3d 350, 359 (5th Cir. 1999) (expenditures must be "caused by an[] action by" the defendant that the organization "claims is illegal, as opposed to part of the normal, day-to-day operations of the group" to confer standing) (citation omitted).

Nor does the DNC or the other Committee Plaintiffs have standing under a competitive standing theory, which under limited circumstances allows political parties to assert injuries based on threatened loss of political power. *Drake v. Obama*, 664 F.3d 774, 782-83 (9th Cir. 2011).  Competitive standing allows political parties to assert an injury when candidates are impermissibly placed on the ballot; it does not allow parties to generally assert that a ballot structure will cause voters to vote for some other candidates. *Cf. Townley v. Miller*, 722 F.3d 1128, 1135-36 (9th Cir. 2013) (rejecting "vote siphoning" injury based on existence of none-of-these-candidates voting option and noting competitive standing has been limited to the "*inclusion* of a candidate on the ballot."). Here, the claimed injury is an allegation that the Ballot Order Statute "frustrat[es] its mission and efforts to elect Democratic Party candidates" by allegedly diverting more votes to Republicans than Democrats.  (Doc. 13, ¶ 24).  This is the same sort of vote siphoning injury rejected as a basis for standing in *Townley*.

## C.    Plaintiffs' Claims Are Not Redressable through this Lawsuit.

Finally, even assuming Plaintiffs could establish an injury in fact, they still lack standing because their alleged injury is not "fairly traceable to the challenged conduct" of the Secretary.  *See Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1547 (2016).  Causation for Article III standing requires that "the injury [] be fairly…trace[able] to the challenged action of the defendant, and not…th[e] result [of] the independent action of some third

party not before the court." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The "line of causation" between a defendant's actions and a plaintiff's alleged harm must be more than "attenuated." *Allen v. Wright*, 468 U.S. 737, 757 (1984), *overruled in part on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.* 572 U.S. 118 (2014). Here, the causation between the Secretary's actions and a plaintiff's alleged harm is attenuated at best. As discussed below, the boards of supervisors in Arizona's fifteen counties are responsible for implementing and enforcing the ballot order statute. For similar reasons that Plaintiffs lack Article III standing, the Secretary is not the proper defendant to this action under Eleventh Amendment immunity. *See Culinary Workers Union, Local 226 v. Del Papa*, 200 F.3d 614, 619 (9th Cir. 1999) (noting that the "case and controversy" analysis is similar to the Eleventh Amendment inquiry).

## II.    The Eleventh Amendment Bars Plaintiffs' Requested Relief.

Sovereign immunity also bars the relief Plaintiffs seek. State officials are entitled to Eleventh Amendment immunity from federal civil rights suits when sued in their official capacities. *Mitchell v. L.A.s Cmty. Coll. Dist.*, 861 F.2d 198, 201 (9th Cir. 1988). In *Ex parte Young*, the Supreme Court recognized that a suit for prospective injunctive relief provides a narrow but well-established exception to Eleventh Amendment immunity. 209 U.S. 123 (1908). In considering whether the *Ex parte Young* doctrine provides an exception to Eleventh Amendment immunity, "a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997)).

The *Ex parte Young* exception is limited to prohibitory injunctions "prevent[ing] [a state official] from doing that which he has no legal right to do." *Ex parte Young*, 209 U.S. at 159. And the state official "must have some connection with the enforcement of the act." *Coal. to Defend Affirmative Action v. Brown*, 674 F.3d 1128, 1134 (9th Cir. 2012) (quoting *Ex Parte Young*, 209 U.S. at 157). That connection "must be fairly direct;

a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision will not subject an official to suit." *Id.* (citation omitted).  Here, Plaintiffs seek an order from the Court "requiring the Secretary of State to use a ballot order system that gives similarly situated major-party candidates an equal opportunity to be listed first on the ballot." (Doc. 13, ¶ 63(d).)  The Secretary is entitled to Eleventh Amendment immunity because her only connection to the Ballot Order Statute is an indirect one—her role as Arizona's chief state election officer.  (*See* Doc. 13, ¶ 27.)  Under Arizona law, Arizona's fifteen counties—and not the Secretary of State—are statutorily responsible for preparing, providing, and printing general election ballots.  *See* A.R.S. § 16–503.  The Secretary's "general supervisory power" over the process is insufficient to permit an exception to Eleventh Amendment immunity under *Ex parte Young*.  *See Tohono O'odham Nation v. Ducey*, 130 F. Supp. 3d 1301, 1308–11 (D. Ariz. 2015) (stating, "*Ex parte Young*'s required connection between the defendant and a challenged law can be established when the law specifically grants the defendant enforcement authority," and granting motion to dismiss the Governor and Attorney General in the absence of a "fairly direct" connection to the statute) (citing *Coal. to Defend Affirmative Action*, 674 F.3d at 1134); *see also Confederated Tribes & Bands of the Yakama Indian Nation v. Locke*, 176 F.3d 467, 469-70 (9th Cir. 1999) (holding action, which alleged a violation of federal law based on State's operation of state lottery and sought damages and other relief, was barred by Eleventh Amendment where the complaint "contain[ed] no allegations that the governor is charged with operating the state lottery" and "[n]owhere in the[] [state] statutes is there any indication that the governor has the responsibility of operating the state lottery or determining where its tickets will be sold").

Plaintiffs' requested relief also implicates the State's "special sovereignty interests."  *See Coeur d'Alene*, 521 U.S. at 281.  Not only do Plaintiffs seek to prohibit the Secretary from fulfilling her indirect role under the Ballot Order Statute, they demand the Court order the Secretary to affirmatively change ballot order procedures to give only

"similarly situated major-party candidates an equal opportunity to be listed first on the ballot. (*See* Doc. 13, ¶ 63(d).)  Arizona law nowhere defines "major parties."  Plaintiffs not only demand this Court (or possibly the Secretary) create a definition of "major parties" where Arizona has none, but that the Secretary then begin discriminating in favor of the "major parties."  This requested relief does not satisfy the "straightforward inquiry" of *Coeur d'Alene*.  *See* 521 U.S. at 281-82 (in evaluating whether "the *Ex parte Young* fiction is applicable[,]" courts should consider "the realities of the relief" requested, and reasoning the Tribe's "far-reaching and invasive relief" weighed in favor of finding that "Idaho's sovereign immunity controls").  Plaintiffs' request for a court order directing the precise way in which Arizona should conduct its ballot order process seeks to impermissibly interfere with Arizona's election process.

## III.   Plaintiffs' Claims Are Nonjusticiable Under *Rucho.*

Plaintiffs' challenges are premised on their assertion that the Ballot Order Statute is not fair to candidates affiliated with the Democratic Party.  Just six months ago, in *Rucho v. Common Cause*, 139 S.Ct. 2484 (2019), the Supreme Court addressed whether "partisan gerrymandering" claims are justiciable.  In concluding that they are not, the Court made clear that it is "vital" for litigants to identify clear legal standards to "meaningfully constrain the discretion of the courts" in this area, because without such limitations "intervening courts—even when proceeding with best intentions—would risk assuming political, not legal, responsibility" for a "process that is the very foundation of democratic decisionmaking."  *Id*. at 2498, 2499-500 (quoting *Vieth v. Jubelirer*, 541 U.S. 267, 291, 306-08 (2004) (opinions of Scalia, J and Kennedy, J)).  To that end, the Court held that claims seeking to invalidate a State's legislative map are justiciable only if they are based on "judicially discernible and manageable" standards.  *Rucho*, 139 S.Ct. at 2498 (citation omitted).  To satisfy that requirement, the standards "must be grounded in a 'limited and precise rationale' and be 'clear, manageable, and politically neutral.'"  *Id.*, quoting *Vieth*, 541 U.S. at 306-08 (opinion of Kennedy, J.).

Applying that requirement to the partisan gerrymandering claims before it, the

1    Supreme Court held that those claims were nonjusticiable because there are no judicially
2    discernible and manageable legal standards for resolving them.  The Court categorically
3    rejected the challengers' argument that such claims could be resolved using a standard
4    that asks whether people in the challenged district receive "fair" representation.  The
5    Court did so for three reasons, all of which are directly applicable here.

6         First, the Court held that there is "[no] basis for concluding" that federal courts are
7    even "authorized" to second guess the legislature's redistricting decisions out of a desire
8    to ensure "fair" representation.  *Rucho,* 139 S.Ct. at 2499.  Second, not only do federal
9    courts lack constitutional authority to interfere with such legislative choices out of a
10   concern for fairness, *Rucho* held that they also are not competent or "equipped" to do so.
11   *Id*.  This is because there is no "clear, manageable and politically neutral" test for
12   determining what "fair" representation even means, and such a standard therefore does
13   not "meaningfully constrain" the court's discretion in any way.  *Id*. at 2499-500 (quoting
14   *Vieth,* 541 U.S. at 291).  Indeed, the Court discussed at length how "fair" representation
15   could mean different things to different people, for any number of perfectly legitimate
16   reasons.  *Rucho,* 139 at 2500.  There are no judicially manageable standards for choosing
17   which of those "visions of fairness" should prevail, much less for clearly and precisely
18   describing what the prevailing vision is and how compliance with it should be measured.
19   *Id*.  Rather, such judgments "pose[] basic questions that are political, not legal," and any
20   judicial decision about them would be "an 'unmoored determination' of the sort
21   characteristic of a political question beyond the competence of the federal courts."
22   *Id.* (quoting *Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012)).

23        Third, even if courts could define "fair" representation and figure out how to
24   measure it, the Court held that such claims still would be nonjusticiable because the
25   "determinative question" is not what fair representation means, but rather, how much
26   deviation from perfect fairness is constitutionally permissible.  *Rucho,* 139 at 2501.  But
27   federal courts do not have any clear or precise standards for making that determination
28   either. Having conjured up their own criteria for defining and measuring "fair"

representation, courts would be left to arbitrarily weigh, in their own discretion, "how much deviation from each [of those criteria] to allow." *Id*. Such "questions are unguided and ill-suited to the development of judicial standards[.]" *Id*. (citation and quotation marks omitted).

Here, Plaintiffs' proposed standard is indistinguishable from the "fair" representation standard that the Supreme Court rejected in *Rucho*, and it is nonjusticiable for the same reasons. Plaintiffs do not argue that the statute was enacted as a result of partisan bias, nor can they, given the broad, bipartisan support it enjoyed when it passed. Instead, they allege that it has a partisan effect. To the extent the statute has the effect of benefiting partisan interests, that does not raise a justiciable claim. Courts cannot assess the partisan effect of a non-partisan statute without first defining a "fair" baseline. And it is not even clear what fairness looks like in this context, as in *Rucho*.

For example, does fairness require that no *votes* be affected by ballot order? That no *candidate* receives a net benefit from ballot order? That no *party* receives a net benefit from ballot order? Or, is *some* benefit to a candidate or party constitutionally permissible, so long as it does not exceed a certain statistical threshold? (See Doc. 13, ¶15 [contending the Ballot Order Statute confers "an unfair political advantage on candidates" and that "[t]he advantage of appearing first on a ballot is statistically significant"].) How is this benefit measured by judicial standards? To complicate matters, Plaintiffs intentionally exclude minor parties and independent candidates from their "fairness" calculation. (See Doc. 13, ¶ 5 n.3.) It is difficult to square Plaintiffs' constitutional claims with their suggestion that members of minor parties would not suffer the same constitutional harms from a system that always lists candidates from "major" parties first. Plaintiffs also emphasize that Maricopa County "is home to nearly two-thirds of Arizona's total population" and that "[w]ith the exceptions of 1982 and 2006, a Republican candidate has received a majority of the vote in the governor's race in Maricopa County for the last several decades." (*Id.*, ¶ 12.) Plaintiffs' "fairness" standard seems to be about their discontent with elections results in Maricopa County, and nothing

else.  Under *Rucho*, Plaintiffs' proposed standard "must be grounded in a 'limited and precise' rationale'" that covers all of the potential future applications, not just Plaintiffs' speculative allegations about how the "ballot order effect" could impact the November 2020 general election.  Their claims are political, not legal, and must be dismissed.

## IV.   Plaintiffs Fail to State a Claim Upon Which Relief Can Be Granted.

### A.   Count I Fails as a Matter of Law Because the Ballot Order Statute is Not an Undue Burden on the Right to Vote.

Even if Plaintiffs' claims were justiciable, they would be subject to the most minimal scrutiny under the First and Fourteenth Amendment because the Ballot Order Statute does not meaningfully impact the right to vote.  In Count I, Plaintiffs claim that the Ballot Order Statute "burdens the right to vote" of voters who "support candidates who affiliate with the non-favored party in each county, by diluting their vote relative to the votes for candidates who associate with the similarly situated, but statutorily-favored party."  (Doc. 13, ¶ 53.)  This "vote-dilution" claim "depends upon the existence of a pool of presumably uninformed voters."  *Clough v. Guzzi*, 416 F. Supp. 1057, 1067 (D. Mass. 1976).

Plaintiffs' theory of vote dilution is unsustainable because "[v]oters have no constitutional right to a wholly rational election, based solely on reasoned consideration of the issues and the candidates' positions, and free from other 'irrational' considerations[.]"  *Id.*; *see also Ulland v. Growe*, 262 N.W.2d 412, 416 (Minn. 1978) (rejecting argument that positional bias reduces the value of any individual vote, reasoning, "the 'biased' votes themselves are cast by fully qualified voters . . . [w]e know of no authority which would allow us to treat the votes of any voters, however ill-informed, as if they were somehow inferior, thereby 'diluting' the effect of the more thoughtfully cast ballots").  Nor is it clear that "federal courts possess the power to rule that some voters' choices are less constitutionally meaningful than the choices of other supposedly more informed or committed voters" as Plaintiffs' case depends on. *Libertarian Party of Va. v. Alcorn*, 826 F.3d 708, 718 (4th Cir. 2016).  The Ballot Order

14

Statute thus imposes "only a minimal burden on First and Fourteenth Amendment rights." *Id.* at 717 ("[M]ere ballot order neither denies the right to vote, nor the right to appear on the ballot, nor the right to form or associate in a political organization."). The names of candidates are listed on the ballot, and nothing stands in the way of a voter's choice.

Indeed, laws which have made it actually impossible to cast a ballot for a voter's preferred candidate in the preferred manner have been repeatedly held to have limited burdens. In *Burdick v. Takushi*, for example, the Supreme Court found a "very limited" burden in a complete prohibition on write-in voting, which denied voters the right to vote for their preferred candidate at all. 504 U.S. 428, 437 (1992); *see also Timmons*, 520 U.S. at 359 (no severe burden for law prohibiting candidates being listed for multiple political parties); *Storer v. Brown*, 415 U.S. 724, 726-28 (1974) (permissible for states to ban independent candidates from appearing on the ballot if registered with a political party in the previous year). Similarly, laws which make it difficult for new and small parties to obtain ballot access at all have been held to have a limited burden. *See, e.g. Munro v. Socialist Workers Party*, 479 U.S. 189, 190 (1986) (upholding law which required minor party candidates to receive at least 1% of all votes cast in primary elections to qualify for general election ballot). In light of the minimal constitutional burden of not being able to vote at all for a preferred candidate, Plaintiffs' concerns with their preferred candidates' "particular position on the ballot appear almost inconsequential." *Libertarian Party of Va.*, 826 F.3d at 718.

The *Anderson/Burdick* framework governs challenges to the voting process, and the level of scrutiny depends on the severity of the burden. *Burdick*, 504 U.S. at 433-34; *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). Assuming Plaintiffs' claim is justiciable after *Rucho*, the *Anderson/Burdick* framework requires only a showing that the law serves a legitimate state interest because the burden here is minimal. *See Burdick,* 504 U.S. at 434; *Rubin v. City of Santa Monica*, 308 F.3d 1008, 1014 (9th Cir. 2002) ("Courts will uphold as 'not severe' restrictions that are generally applicable, even-

15

1   handed, politically neutral, and which protect the reliability and integrity of the election
2   process.") (citing *Hussey v. City of Portland*, 64 F.3d 1260, 1265 (9th Cir. 1995)).

3        The Ballot Order Statute easily meets this showing.  It provides clear direction to
4   counties regarding ballot order to ensure that all ballots are "comprehensible and
5   manageable."  *New Alliance Party,* 861 F. Supp. at 296.  It avoids voter confusion by
6   having the parties listed in the same order throughout their ballot and is straightforward,
7   in contrast to random ordering, which forces voters to spend more time to "decipher
8   lengthy, multi-office, multi-candidate ballots to find their preferred candidates."
9   *Libertarian Party of Va.*, 826 F.3d at 719-720 (noting that election officials have a good
10  reason for designing ballots that minimize confusion).   Moreover, the Ballot Order
11  Statute uses a facially neutral, nonpartisan system based on demonstrated public support
12  at the county level, which is a legitimate basis for establishing ballot order.  *Id.* at 720
13  (recognizing legitimacy of ballot order law based on demonstrated public support).  Thus,
14  Count I does not state a cognizable constitutional violation and should be dismissed.  *See*
15  *Id.* at 719 ("[A]ccess to a preferred position on the ballot . . . is not a constitutional
16  concern."); *see also Smith v. Ark. State Highway Emps.*, 441 U.S. 463, 464–65 (1979)
17  ("The First Amendment right to associate and to advocate provides no guarantee that a
18  speech will persuade or that advocacy will be effective.") (citation and quotations
19  omitted).

20       **B.     Count II Fails to State a Valid Equal Protection Claim.**

21       In Count II, Plaintiffs argue the Ballot Order Statute "treats otherwise similarly
22  situated major-party candidates differently" by granting "a consistent, unfair, and
23  arbitrary electoral advantage to one party based solely on the county-level performance of
24  that party's candidate in the last gubernatorial election."  (Doc. 13, ¶ 61.)  Plaintiffs have
25  not plausibly alleged intentional or purposeful discrimination in which one class is
26  favored over another.  *See Bd. of Election Comm'rs v. Libertarian Party*, 591 F.2d 22,
27  24–25 (7th Cir. 1979) (ballot placement claim under the Equal Protection Clause requires
28  a showing of "an intentional or purposeful discrimination"). (citation omitted).

1    The Ballot Order Statute applies equally to everyone, regardless of political party.

2    Ballot order is determined by an objective rule, and as Plaintiffs admit, Democratic

3    candidates are often listed first on the ballot by operation of the statute.  (Doc. 13, ¶ 12.)

4    Statutes providing neutral rules, which might benefit any political party, are not rendered

5    discriminatory by the fact that they benefit one party when applied in particular

6    circumstances.  *See, e.g., Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 10 n.10

7    (1982) (holding that "a statute providing that all such vacancies [in the legislature] be

8    filled by appointment does not have a special impact on any discrete group of voters or

9    candidates" and thus is not discriminatory for equal-protection purposes); *Clough*, 416 F.

10   Supp. at 1068 (holding incumbent-first statute does not violate the equal protection clause

11   and "add[ing], as a further consideration supporting the rationality of Massachusetts'

12   choice, that none of the available alternatives are themselves without disadvantages").

13   Indeed, the neutral rules of the Ballot Order Statute subject all political parties to the

14   same rules, and allow all parties an even handed chance of obtaining a slot at the top of

15   the ballot in each county.[7]  Accordingly, Count II does not state a valid equal protection

16   claim and should be dismissed.

**CONCLUSION**

18   For the reasons set forth above, this Court should dismiss Plaintiffs' First

19   Amended Complaint.

20   Respectfully submitted this 2nd day of January, 2020.

---

[7]  In the seven, single winner statewide races in Arizona in 2018, the Republican candidate received the most votes in Maricopa County in four races, while the Democratic candidate received the most votes in three. *See https://azsos.gov/sites/default/files/2018%201203%20Signed%20Official%20Statewide%20Canvass.pdf* (last visited December 30, 2019). Plainly, the Ballot Order Statute does not lock in any particular party.

17

1

2                     OSBORN MALEDON, PA

3                      s/ Mary R. O'Grady

4                     Mary R. O'Grady (011434)
                    Kimberly I. Friday (035369)

5                     Emma J. Cone-Roddy (034285)

6                     OSBORN MALEDON, P.A.
                    2929 North Central Avenue, Suite 2100

7                     Phoenix, Arizona 85012–2793
                    (602) 640-9000

8

9                     MARK BRNOVICH

10                    ATTORNEY GENERAL

11                    Linley Wilson (027040)

12                    Deputy Solicitor General
                    Kara Karlson (029407)

13                    Assistant Attorney General
                    2005 North Central Avenue

14                    Phoenix, AZ  85004-1592

15                    Telephone (602) 542-4951
                    Facsimile (602) 542-4385

16

17                    *Attorneys for Defendant Arizona*
                   *Secretary of State Katie Hobbs*

18

19

20

21

22

23

24

25

26

27

28

1

**L.R.CIV. 12.1(c) CERTIFICATION**

2
      As required by Local Rule 12.1(c), undersigned counsel certifies that before filing

3
this motion, counsel for the Secretary of State discussed the issues asserted in this motion

4
with Plaintiffs' counsel, and the parties were unable to agree that Plaintiffs' Amended

5
Complaint was curable in any part by a permissible amendment.

6

7
       s/ Mary R. O'Grady

8
Mary R. O'Grady

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28