Mark Brnovich
Attorney General
Firm Bar No. 14000

Linley Wilson (027040)
Deputy Solicitor General
Kara Karlson (029407)
Assistant Attorney General
2005 North Central Avenue
Phoenix, AZ  85004-1592
(602) 542-4951
kara.karlson@azag.gov
linley.wilson@azag.gov
adminlaw@azag.gov

Mary R. O'Grady (011434)
Kimberly I. Friday (035369)
Emma J. Cone-Roddy (034285)
OSBORN MALEDON, P.A.
2929 North Central Avenue, Suite 2100
Phoenix, Arizona 85012–2793
(602) 640-9000
mogrady@omlaw.com
kfriday@omlaw.com
econe-roddy@omlaw.com

*Attorneys for Defendant Arizona Secretary of State Katie Hobbs*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Brian Mecinas, et al.,<br><br>                    Plaintiffs,<br><br>v.<br><br>Katie Hobbs, in her official capacity as Arizona Secretary of State,<br><br>                    Defendant. | Case No:  CV-19-05547-PHX-DJH<br><br>**ARIZONA SECRETARY OF STATE'S RESPONSE IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**<br><br>**(Oral Argument Requested)** |

## I. INTRODUCTION

For nearly forty years, Arizona has used a neutral, non-partisan method of listing candidates on ballots in partisan general elections that generally ensures no one political party will be listed first in every race statewide. The law mandating this system, A.R.S. § 16-502(E) (the "Ballot Order Statute"), rotates which party is listed first based on the party's vote share in the prior gubernatorial election within the county. In the 20 general elections since the Ballot Order Statute was enacted in 1979, the Democratic Party's candidates have been listed first in the majority of Arizona's counties twelve times, and the Republican Party's candidates have been listed first in eight. In all but one county, both parties' candidates have been listed first in at least two elections. In short, the Ballot Order Statute has accomplished the dual goal of ensuring variety in ballot order both within each election and over time, while providing a straightforward, organized ballot order that elected officials cannot manipulate for partisan advantage.

There is little evidence that there exists any measurable advantage to being listed first in the upcoming 2020 general election in Arizona. As the party label next to candidate's name on the ballot generally provides partisan voters with sufficient information to select a candidate, it is unsurprising that Plaintiffs can only rely on opportunistically-designed statistical models to detect a "ballot order effect" in Arizona elections.

Plaintiffs' complaint boils down to a single issue: Governor Ducey received the most votes in Maricopa County in 2018, so Republican Party candidates will be listed first in that county. Plaintiffs complain that 82% of Arizonans will receive ballots that list Republican candidates first, because Maricopa County contains a majority of the population. Someone has to be listed first on ballots in Maricopa County. The Ballot Order Statute provides an impartial method to determine which candidate is listed first. Plaintiffs' complaint is not with the Ballot Order Statute or the Secretary, but with the results of Arizona 2018 gubernatorial election.

1

## II. BACKGROUND

### A. Arizona's Ballot Order Statute

The Ballot Order Statute provides that, for each general election contest, names are organized within the candidates' party affiliation "in descending order according to the votes cast for governor for that county in the most recent general election for the office of governor[.]" A.R.S. § 16–502(E). Political parties that did not have candidates on the ballot in the last general election are "listed in alphabetical order below the parties that did have candidates on the ballot in the last general election." *Id*. Names of other candidates who were nominated but are not registered with a recognized political party appear below the names of the recognized parties. *Id*.[1] Next to each name is a three-letter abbreviation that identifies the candidate's party affiliation. *Id*.

The Arizona Legislature enacted the Ballot Order Statute in 1979 as part of a comprehensive new elections code, which "was a result of agreement between both major political parties and the County Recorders Association." *See* Ariz. H.R. Comm. Min., H.B. 2028 (Mar. 5, 1979); *see also* Ariz. House Journal, 591, 641, 644–45 (Apr. 20, 1979) (reflecting that H.B. 2028 passed 28-2 in the Senate and 40-11-9 in the House). The statute went into effect in 1980 and originally provided for left-hand and right-hand columns of candidate names. *See* Ariz. Sess. Laws 1979, Ch. 209, § 3; A.R.S. §16–502(H) (1980). In 1983, this provision was relocated to subsection (E) of the statute. *See* Ariz. Laws 1983, Ch. 33, § 1; A.R.S. § 16–502(E) (1983). In 2000, the Legislature amended the Ballot Order Statute to organize the candidates' names in one column instead of two. Ariz. Laws 2000, Ch. 249, § 25; A.R.S. § 16–502(E) (2000). The Senate Bill that prompted this change (among many revisions to Arizona's election laws) came "from all 15 County Recorders and all 15 Election Directors." Ariz. H.R. Comm. Min., S.B. 1372 (Mar. 1, 2000). The changes were aimed at "help[ing] the County Recorders and Election Directors do a better job and save public money." *Id*.; *see also* Ariz. Senate

---

[1] Recognized political parties in Arizona currently include the Democratic Party, Republican Party, and the Libertarian Party. *See* https://azsos.gov/elections/information-about-recognized-political-parties (last visited January 16, 2020).

1  Fact Sheet, S.B. 1372, 44th Leg., 2nd Reg. Sess. (May 12, 2000) ("State and county
2  election officials regularly identify areas of election law to be modified to promote
3  efficiency. . ."). Indeed, the Senate Bill passed with broad, bipartisan support in both
4  chambers. *See* Final Reading Votes, S.B. 1372, 44th Leg., 2nd Reg. Sess. (April 10,
5  2000) (showing the bill passed the Senate 27-2-1 and the House 43-15-2) (attached as
6  Exhibit C to Declaration of Emma Cone-Roddy ("Cone-Roddy Decl.").

7  During the forty years since the Ballot Order Statute was enacted—encompassing
8  20 general elections—ballot order has regularly rotated both by county within a given
9  election cycle, and within each county over time. A chart produced by Plaintiffs' expert
10 Jonathan Rodden (Doc. 15-1, at 10) ("Rodden Rprt.) provides a visual representation of
11 the variation of party representation in the first position on the ballot by county and year.

**Figure 1: Cross-County and Time-Series Variation in Ballot Order in Arizona General Elections, 1980-2018.**



As this chart reveals, Democratic candidates have been listed first in the majority of counties in twelve of Arizona's elections under the Ballot Order Statute, and the Republican candidates in the other eight. Only one county—Apache County—has never rotated which candidate is listed first. It has always listed the Democratic candidate first. And in all but four elections, different parties have been listed first throughout the state. In the four exceptions, it was Democrats who received the first listing on all ballots statewide.

Arizona's ballot order statute thus provides a fair and reasonable approach that protects Arizona's well-established "interest in protecting the integrity, fairness, and efficiency of their ballots and election processes" by having an orderly ballot, *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 364–65 (1997), and prevents any political party from permanently receiving the first position on the ballot. This is in sharp contrast to the recent litigation brought by some of the Committee Plaintiffs in Florida, where one political party had been listed first in *every* partisan election. *See Jacobson v. Lee*, 2019 WL 6044035, at *1 (N.D. Fl. Nov. 15, 2019).[2]

In short, even assuming there is an advantage to being listed first in a partisan, general election in Arizona, the bipartisan Ballot Order Statute *already* solves this problem by rotating which party goes first.

**B.     Insufficient Evidence of Position Bias in Arizona General Elections**

There are substantial questions as to whether a candidate listed first in a partisan general election even receives an electoral advantage in Arizona. Plaintiffs submit two reports by social scientists arguing that there must be an effect. The first report, by Dr. Rodden, purports to show a large advantage to being listed first rather than second by analyzing election outcomes in Arizona. (Rodden Rprt. at 3-4.). The second report, by Dr. Krosnick, is a general literature review of studies on ballot order effects in the past. (Doc. 15-2 ("Krosnick Rprt.").)

Though Dr. Rodden and Dr. Krosnick claim to marshal evidence of a significant ballot order effect in Arizona, a careful analysis of their findings reveals that the evidence is murky at best, as described in the expert report provided by Sean Trende, Cone-Roddy Decl. Ex. A ("Trende Rprt.") Mr. Trende identified two key problems with Dr. Rodden's statistical analysis. First, Dr. Rodden chose unusual variables when designing his model. For example, he used "renter share," which is unusual, and only included one racial or

---

[2] The District Court's analysis in *Jacobson* is erroneous for many of the reasons laid out in this Response. In any event, Florida provides a markedly different system where the Governor's political party is listed first in *every* election throughout the state, and where one party has controlled the governorship for over twenty years.

4

ethnic group, the Native American population. (Trende Rprt. ¶¶ 31-33.) He excluded powerful explanatory variables such as age and the size of Hispanic and African American populations. (*Id.* at ¶ 33.) To check these findings, Mr. Trende replicated Dr. Rodden's analysis, but included age and Hispanic and African-American population. (*Id.* at ¶ 34.) When he did this, Dr. Rodden's chosen variables ceased to be statistically significant, and more importantly, ballot order (for a Republican being listed first) ceased to be statistically significant. (*Id.* at ¶ 35.). To confirm this result, Mr. Trende ran the data again without the statistically insignificant variables and got substantially the same result. (*Id.* at ¶ 36.). In short, Dr. Rodden's conclusions are sensitive to model design. With different variables, there's no statistically supportable conclusion of a relationship between ballot order and vote share. (*Id.* at ¶ 37.)

Second, Mr. Trende noted that Dr. Rodden failed to account for the fact that how a county votes for one office is not independent of how it votes for other offices, or that how a county votes in one year is not independent of how it votes in another year. (*Id.* at ¶ 42.) The electoral voting habits of Apache County in 2016 are not independent of the electoral voting habits of Apache County in 2018. This has long been recognized as a problem generally in statistical analysis, and particularly in the voting context. (*Id.* at ¶¶ 42-46.). An analysis that treats these two observations as independent (as Dr. Rodden's does) is prone to error. (*Id.* at ¶ 74.)

Mr. Trende noted there are several techniques to correct for this, all of which have different strengths and weaknesses. (*Id.*) He reproduced Dr. Rodden's analyses using five different methods for dealing with non-independent variables: clustering standard errors, two variants of a generalized estimating equation ("GEE"), a Bayesian Hierarchical Model, and a spatial-temporal model. (*Id.* ¶¶ 49-67.)[3] While these techniques resulted in

---

[3] Some of Mr. Trende's techniques, like Dr. Rodden's, measure the statistical likelihood of an effect with what is known as a "p-value," which identify how likely data are starting from the assumption that no effect exists. At very low levels, p-values are evidence that there is an effect. (Trende Rprt. ¶¶ 37-40.) Others report results in 95% credible intervals, which are similar to error margins reported for public polls. Credible intervals tell us there is a 95% chance the effect is between two numbers. (*Id.* at ¶ 59.)

5

1  varied results (e.g., the spatial-temporal model found no evidence of an advantage for
2  going first, while the GEEs found evidence there might be an advantage in some
3  situations but not others), they each reported smaller and less certain effects (if any) of a
4  primacy advantage than Dr. Rodden's faulty design. (*Id.* at ¶ 72.)
5        While Plaintiffs and Dr. Rodden primarily rely on Dr. Rodden's standard
6  regressions, Dr. Rodden also claimed to find an effect using a matching analysis and a
7  regression discontinuity design. These results can safely be disregarded. First, they suffer
8  from the same flaws as Dr. Rodden's standard regressions. (*Id.* at ¶¶ 78-79, 83-84.)
9  Second, there is substantial doubt as to whether these methods can ever make reliable
10 findings in the election analysis context. (*Id.* at ¶¶ 80-82, 85.)
11       Mr. Trende also reviewed the report from Dr. Krosnick and noted several issues.
12 First, as Dr. Krosnick himself has observed, the literature prior to 1998 is
13 methodologically flawed and largely irrelevant—yet Dr. Krosnick includes this literature
14 in his report as support for finding an effect. (*Id.* at ¶ 88.). Second, the studies of similar,
15 United States elections are largely confined to three states, at least one of which (Ohio) is
16 different enough from Arizona to question the comparison. (*Id.* at ¶ 89.) Third, his studies
17 generally found effects only in county-level elections. (*Id.* at ¶ 90.) If the studies are
18 limited to United States general elections at the state legislative level or higher, there are
19 only a handful of studies, and they have mixed results. (*Id.* at ¶ 92.)[4] Dr. Krosnick's
20 report simply does not show a statistical consensus of a primacy effect in partisan,
21 general elections in the United States of America.
22                 **III.    ARGUMENT**
23       Plaintiffs are not entitled to preliminary relief because: (1) they are unlikely to
24 succeed on the merits; (2) they have not established irreparable harm; (3) the balance of
25 equities tips sharply in the Secretary's favor; and (4) an injunction is not in the public
26 interest. *Winter v. Nat. Res Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (setting out the
27
28 [4] And notably, Dr. Rodden reports implausibly high results against even the comparable studies. (Trende Rprt. ¶¶ 93-94).

factors for granting preliminary relief).[5] While courts evaluate the preliminary injunction factors on a "sliding scale," *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013), they must be "extremely cautious . . . and should deny such relief unless the facts and law clearly favor the moving party" when the moving party seeks a mandatory injunction. *Kostick v. Nago*, 878 F. Supp. 2d 1124, 1139 (D. Haw. 2012) (citations and quotations omitted). A mandatory injunction "orders a responsible party to take action," as opposed to a prohibitory injunction which merely "preserves the status quo pending a determination of the action on the merits." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878–79 (9th Cir. 2009) (citations and quotations omitted). Here, Plaintiffs seek a mandatory injunction. Rather than preserve the status quo, they ask the Court to order the Secretary to develop and implement a new method of listing candidates on Arizona's ballots. Accordingly, this Court must be "extremely cautious" and deny injunctive relief because the Plaintiffs cannot meet their high burden.

**A.     Plaintiffs are unlikely to succeed on the merits.**

    **1.     Plaintiffs cannot establish a constitutional violation under the First and Fourteenth Amendments.**

The *Anderson/Burdick* framework governs challenges to the voting process, and the level of scrutiny depends on the severity of the burden. *Burdick v. Takushi*, 504 U.S. 428, 433-34 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). In *Burdick*, the Supreme Court recognized that "[e]lection laws will invariably impose some burden upon individual voters," and that as a result, "there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Burdick*, 504 U.S. at 433 (internal quotation marks and citation omitted). Therefore, a court must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as

---

[5] When, as here, the government is a party, the balance of equities and public interest prongs merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

justifications for the burden imposed by its rule," and "the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.* at 434 (citations omitted). "When a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Pub. Integrity All., Inc. v. City of Tucson*, 836 F.3d 1019, 1024–25 (9th Cir. 2016) (quoting *Burdick*, 504 U.S. at 434). "Applying these precepts, we have repeatedly upheld as 'not severe' restrictions that are generally applicable, evenhanded, politically neutral, and protect the reliability and integrity of the election process." *Pub. Integrity,* 836 F.3d at 1024-25 (citation and alterations omitted).

The Ballot Order Statute fits all of these requirements. It is a politically-neutral statute that was enacted with broad, bipartisan support, and applies equally to all voters. Throughout its 40-year history, the statute has protected the reliability and integrity of the election process by establishing logical, efficient, and manageable rules to determine the order in which candidates' names appear on a general election ballot—at times resulting in Democratic candidates being listed first, and at other times Republican candidates. *See* Doc. 13, ¶ 12. Plaintiffs do not allege that the Ballot Order Statute is the result of intentional or purposeful discrimination in which one class is favored over another. *See Bd. of Election Comm'rs v. Libertarian Party*, 591 F.2d 22, 24–25 (7th Cir. 1979) (ballot placement claim under the Equal Protection Clause requires a showing of "an intentional or purposeful discrimination") (citations omitted). The Court should thus begin from the presumption that the Ballot Order Statue imposes a minimal burden on Plaintiffs.

        **a.**     **Plaintiffs cannot establish a meaningful, let alone severe, burden under the Equal Protection Clause.**

The Ballot Order Statute does not treat similarly-situated *voters* differently. Plaintiffs' disparate treatment claim is premised upon an allegation that the statute treats "similarly-situated major parties differently," Doc. 14 at 14, and thereby treats "similarly-situated candidates" differently, *id.* at 16. But Plaintiffs are not candidates. The harm

Plaintiffs claim to suffer is indirect, and derivative of the harm allegedly suffered by individuals who are not parties to this action. The cases Plaintiffs cite in support of their equal protection claim illustrate this distinction—nearly all of them are actions by *candidates*, not voters or voter groups. See *McLain v. Meier*, 637 F.2d 1159, 1160 (8th Cir. 1980) (plaintiff was a candidate); *Sangmeister v. Woodard*, 565 F.2d 460, 463, 463 (7th Cir. 1977) (same); *Graves v. McElderry*, 946 F. Supp. 1569, 1572 (W.D. Okla. 1996) (same); *Mann v. Powell*, 333 F. Supp. 677, 678 (N.D. Ill. 1969) (same); *Gould v. Grubb*, 14 Cal. 3d 661, 664-65 (1975) (same); *Akins v. Sec. of State*, 904 A.2d 702, 703 (N.H. 2006) (same); *Holtzman v. Power*, 313 N.Y.S.2d 904, 908–09 (N.Y. Sup. Ct. 1970) (same); *cf. Netsch v. Lewis*, 344 F. Supp. 1280 (N.D. Ill. 1972) (although not explicitly stating plaintiffs were candidates, holding plaintiffs' constitutional rights were violated under *Weisberg v. Powell*, 417 F.2d 388 (1969) (suit by candidates)).[6]

Plaintiff DNC alleges that its members "include Democratic Party candidates" and that the Ballot Order Statute "harms the DNC because it treats the DNC's candidate members in Arizona differently than similarly situated Republican Party candidates in partisan elections[.]" (Doc. 13, ¶ 24.) However, the DNC has not identified any candidate members who they claim are harmed by the Ballot Order Statute, even though this fact-intensive claim requires "the participation of individual members." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). The DNC is precluded from bringing a generic equal protection claim on candidates' behalf.

Moreover, Plaintiffs' evidence in support of a dramatic effect is far from conclusive. *See* Section II.B. Rather, they ask this Court to wade into an ongoing academic debate, on an expedited timeline with limited discovery, and enjoin a state law based on the particular—and questionable—modeling choices of Dr. Rodden. This supplies the Court with "no objective measure" for assessing whether Arizona's system of county-by-county rotation creates a constitutionally impermissible burden on voters.

---

[6] In *Mann v. Powell*, 314 F. Supp. 677 (N.D. Ill. 1969), plaintiffs were candidates and a registered voter, but the court did not discuss any distinct injury allegedly suffered by the plaintiff voter.

*See, e.g., Rucho v. Common Cause*, 139 S.Ct. 2484, 2501 (2019) (distinguishing the "relatively easy to administer as a matter of math" one-person, one-vote standard from partisan gerrymandering claims based on complex statistical modeling). "The 14th Amendment does not enact [Dr. Jonathan Rodden's]" preferred statistical modeling. *Lochner v. New York*, 198 U.S. 45, 75 (1905) (Holmes, J., dissenting).

Plaintiffs' evidence of a Ballot Order Effect in Arizona is based on a flawed statistical model that finds a larger and more certain effect than either the literature they cite, or any reasonable statistical model Plaintiffs' expert could have used. (Trende Rprt. ¶¶ 72, 92.) The Court should conclude that Plaintiffs' cherry-picked evidence fails to demonstrate that they are being treated disparately in intent or effect.

        **b.**    **Plaintiffs cannot establish a meaningful, let alone severe, burden on their right to vote.**

Plaintiffs argue that the Ballot Order Statute imposes a "substantial burden" on the right to vote by "diluting the votes" of several Plaintiffs. Notably, Plaintiffs do not allege that the Ballot Order Statute prevents them from voting for the candidate of their choice, makes it more difficult for them to cast a ballot, or prevents their vote from being counted. Rather, they argue their votes count less because the Ballot Order Statute "artificially inflates the Republican vote share" when they assume some voters will vote for whichever candidate is listed first, rather than second.

As an initial matter, as explained above, Plaintiffs simply have not provided competent evidence that suggests a large statistical effect harms their vote.

Plaintiffs speculate about how some voters *might* choose to cast their ballot, complain that those voters' choice is irrational, and theorize that they will suffer a constitutional injury unless the State ensures these irrational votes are balanced between the "major parties." This claim falls apart because the Constitution nowhere guarantees voters the "right to a wholly rational election, based solely on reasoned consideration of the issues and the candidates' positions, and free from other 'irrational' considerations[.]" *Clough v. Guzzi*, 416 F. Supp. 1057, 1067 (D. Mass. 1976). Nor does the Constitution

require—or allow—courts to dismiss "some voters' choices a[s] less constitutionally meaningful than the choices of other supposedly more informed or committed voters" as Plaintiffs seek. *Libertarian Party of Va. v. Alcorn*, 826 F.3d 708, 718 (4th Cir. 2016). Simply put, "mere ballot order neither denies the right to vote, nor the right to appear on the ballot, nor the right to form or associate in a political organization." *Id.* at 717.

Plaintiffs cite four cases they claim have found a meaningful constitutional injury. None are persuasive. The first case, *McLain v. Meier*, 637 F.2d 1159 (8th Cir. 1980), acknowledged that any effect ballot order may have on the right to vote is "somewhat attenuated." *Id.* at 1167. Despite finding a limited burden, the Eighth Circuit held that North Dakota's incumbent-first statute lacked any rational basis, and thus failed even minimal scrutiny. *See id.* This case has little relevance to Arizona's Ballot Order Statute, which does not place incumbents first, and indeed, varies which party is listed first throughout the state. Second, Plaintiffs cite *Graves v. McElderry*, 946 F.Supp. 1569 (W.D. Ok. 1996). In *Graves*, the district court (without citation) assumed that "careful and thoughtful voters' right of free speech and association" was burdened by "randomly or irrationally selected windfall votes." *Id.* at 1579. This position relies on courts determining whether certain votes are more constitutionally meaningful than others, a dubious—if not dangerous—proposition. Nothing in the Constitution allows any court to dismiss any voter's choice (whether rational or not) as not constitutionally meaningful. *Gould v. Grubb*, 14 Cal.3d 661, 670 (1975) relies on a similar—and equally dubious— distinction between "'conscious' supporters" and "unconcerned or uninformed voters." These courts were wrong to wade into the waters of valuing votes by testing how "informed" or "conscious" or "careful" the voters supposedly were when they cast a ballot, and this Court should not replicate their error.

Plaintiffs also argue that the court should weigh the burden on the right to vote under "heightened scrutiny" to "justify its favoritism of a single party and all of its candidates." But the Ballot Order Statute does no such thing—no party's candidates will be listed first throughout the state in 2020. Plaintiffs rely on *Jacobson* to argue that

heightened scrutiny should apply to Arizona's Ballot Order Statute, but *Jacobson* justified heightened scrutiny based on a finding that the different ballot order statute used in Florida was "often" "decisive" in Florida elections, which Plaintiffs have not argued here.[7] 2019 WL 6044035, at *22.

Moreover, both Plaintiffs and *Jacobson* ignored decades of pronouncements from the Supreme Court that far more burdensome regulations—some that deny voters the right to vote for their candidate at all—were *not* severe burdens that warrant heightened scrutiny. In *Burdick v. Takushi*, for example, the Supreme Court found a "very limited" burden in a complete prohibition on write-in voting, which denied some voters the right to vote for their preferred candidate. 504 U.S. 428, 437 (1992); *see also Storer v. Brown*, 415 U.S. 724, 726-28 (1974) (permissible for states to ban independent candidates from appearing on the ballot if registered with a political party in the previous year). In light of this precedent, Plaintiffs' concerns with their preferred candidates' "particular position on the ballot appear almost inconsequential." *Libertarian Party of Va.*, 826 F.3d at 718.

        **c.**    **Arizona's interest in enforcing the ballot order statute outweighs any burden on the Plaintiffs.**

The State has a significant regulatory interest in maintaining the Ballot Order Statute. The statute provides a method for ordering candidates on general election ballots that is facially-neutral, manageable, and cost-efficient. *See Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 191 (1999) ("States . . . have considerable leeway to protect the integrity and reliability of . . . election processes generally"); *New All. Party v. N.Y. State Bd. of Elections*, 861 F. Supp. 282, 296 (S.D.N.Y. 1994) (recognizing "the compelling nature of [a] State's interest in organizing a comprehensible and manageable ballot"). The Ballot Order Statute also avoids voter confusion by listing the parties in the

---

[7] The district court in *Jacobson* made several statistical errors, all of which highlight the danger of courts interfering in election administration based on social science they do not fully understand. Most egregiously, the district court confused how "p-value"[s] function in statistics, It treated p-values as reporting the likelihood of an effect, which is akin to assuming all dogs are pugs because all pugs are dogs. (Trende Rprt. ¶ 40.)

1 same order throughout their ballot, in contrast to random ordering, which forces voters to spend more time to "decipher lengthy, multi-office, multi-candidate ballots to find their preferred candidates." *Libertarian Party of Va.*, 826 F.3d at 719-720 (noting that election officials have a good reason for designing ballots that minimize confusion). Because the State's regulatory interests outweigh the minimal harm allegedly suffered by Plaintiffs, Plaintiffs have not shown a likelihood of success. *See Anderson*, 460 U.S. at 788 ("the state's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions"); *McDonald v. Bd. of Election Com'rs of Chicago*, 394 U.S. 802, 809 (1969) (rejecting equal protection challenge to Illinois's absentee ballot requirements while emphasizing that states may "take reform one step at a time" and need not "cover every evil that might conceivably [be] attacked") (internal quotation marks and citation omitted); *Clough v. Guzzi*, 416 F. Supp. at 1068 (incumbent-first ballot order statute does not violate the equal protection clause).

Plaintiffs argue that the Court should reject these interests because Arizona rotates candidates in primary elections, and within parties when two or more candidates from the same party run. This argument ignores a key distinction. Unlike in a general election, when voters are selecting between two or more candidates from the *same* party, primary voters cannot rely on the political party designations as a signaling mechanism to create a rough proxy for their preferences. The use of political parties provides voters the information they need to select candidates.

Plaintiffs also argue that the Ballot Order Statue cannot survive any standard of scrutiny and cite five cases where ballot order schemes were found not to serve any legitimate state interests. But these systems either always placed one party in the first position on the ballot throughout the entire state, *see Jacobson*, 2019 WL 6040435, at *22 (rejecting statute placing candidates from the governor's party in first position in every partisan race in Florida); *Graves*, 946 F. Supp. at 1571-72 (rejecting statute placing candidates from the Democratic party in first position in every partisan race in Oklahoma), always placed incumbent candidate first, *see Holtzman*, 313 N.Y.S. 2d at

13

1  908-09 (rejecting ordinance placing incumbent first in all New York City primary
2  elections); *McClain*, 647 F.2d at 1168 (placing incumbent first in all congressional
3  elections), or contained a partisan purpose , *see generally Sangmeister v. Woodard*, 565
4  F.2d 460 (7th Cir. 1977) (enjoining county boards from using their discretion to put a
5  preferred party first in all elections). The Ballot Order Statute does not suffer these flaws.

6  **2. As explained in the motion to dismiss, Plaintiffs cannot succeed due to jurisdictional flaws.**
7

8  As the Secretary previously explained in her Motion to Dismiss (Doc. 26),
9  Plaintiffs' complaint is subject to numerous jurisdictional bars that prohibit this Court
10 from granting them any relief. Because these issues will be fully briefed in the Motion to
11 Dismiss, the Secretary only summarizes them here.

12 *Standing*. As explained above in Section III.A.1.a, Plaintiffs are trying to vindicate
13 generalized partisan grievances about injuries suffered by unidentified, non-party
14 candidates; this is not a cognizable injury. *See Gill v. Whitford*, 138 S.Ct. 1916, 1933
15 (2018) ("[T]his Court is not responsible for vindicating generalized partisan
16 preferences."). And even if Plaintiffs could show a cognizable injury, it is the boards of
17 supervisors of Arizona's counties—not the Secretary—who enforce the Ballot Order
18 Statute, and any connection to the Secretary is "attenuated" at best. *Allen v. Wright*, 468
19 U.S. 737, 757 (1984), *overruled in part on other grounds by Lexmark Int'l, Inc. v. Static*
20 *Control Components, Inc.* 572 U.S. 118 (2014).

21 *Eleventh Amendment*. Although the Secretary is the chief state election officer, she
22 does not implement or enforce the Ballot Order Statute. *See Tohono O'odham Nation v.*
23 *Ducey*, 130 F. Supp. 3d 1301, 1308–11 (D. Ariz. 2015) (limiting lawsuits to when there is
24 a "fairly direct" connection between the government official and enforcement of the
25 challenged law). Rather, Arizona's counties are charged with preparing ballots. *See*
26 A.R.S. § 16–503.

27 *Nonjusticiability*. Plaintiffs' attempt to use social science and statistics to
28 determine that the Ballot Order Statute in the aggregate is not "fair" to Democratic

candidates raises a nonjusticiable political question under *Rucho v. Common Cause*, 139 S.Ct. 2484 (2019). There is no judicially-manageable standard to determine that a certain number of votes can be treated as random and must be allocated equally between certain (but not all, according to the Plaintiffs) political parties. *See* Sections II.B, III.A.1.a.

**B.     Plaintiffs Have Not Established Irreparable Harm.**

Plaintiffs are not entitled to a preliminary injunction because they have not established that they will suffer irreparable harm unless this Court grants that relief. A "possibility of irreparable harm" does not justify enjoining Arizona's law. *See Winter*, 555 U.S. at 22 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."). More is required.

As explained above, the Ballot Order Statute does not cause Plaintiffs harm that provides them standing to challenge the Ballot Order Statute. It certainly does not cause them the type of irreparable harm that merits a preliminary injunction. Plaintiffs rely primarily on the declaration from Justin Barasky, an employee of Plaintiff Democratic Senate Campaign Committee, whose work "in recent months" has included the 2020 U.S. Senate race in Arizona. Barasky Decl. ¶¶ 2-3. He alleges that because of ballot order the DSCC may need to spend additional resources on the Arizona Senate race. *Id*. ¶¶ 12, 13. Yet nothing in the declaration explains what the DSCC will do differently in counties where the Republican candidate appears first (rather than second). This fact alone belies the argument that there is any burden on the right to vote. Furthermore, making decisions about how to allocate resources in Senate races nationwide to have the best result for Democratic candidates is what the DSCC does. *Id.* ¶ 11. The fact that he considers ballot order a factor relevant to Arizona races does not amount to irreparable harm to justify a preliminary injunction. Any impact on the 2020 election is speculative. *S.W. Voter Registration Educ. Project. v. Shelley,* 344 F.3d 914, 919 (9th Cir. 2003) (en banc).

Moreover, Plaintiffs' argument that the Ballot Order Statute irreparably injures

them is undercut by the decades some of the Plaintiffs have suffered this supposed injury without complaint. Plaintiffs' own allegations state that political parties have "strongly suspected" that "the candidate whose name appears first on a ballot in a contested race receives an electoral benefit *solely* due to her first position." (Doc. 13, ¶ 1.) Indeed, Plaintiffs' own expert Dr. Krosnick claims "scientists have [been] test[ing]" the primacy effect since at least 1910. (Krosnick Rprt. at 6). This delay is inconsistent with their claim that, absent correction, they will suffer an irreparable injury to their right to vote.

In addition, although a deprivation of constitutional rights is irreparable harm, that principle does not help Plaintiffs here because, as explained in Section I.A above, they have not demonstrated that their candidates' appearance in the second position rises to the level of a constitutional injury.

**C.     The balance of equities and public interest do not support a preliminary injunction.**

Plaintiffs' arguments assume that the election systems in Arizona counties can easily be modified to change the ballot order for the 2020 election. That is not the case. The election equipment vendor in Maricopa County, Arizona's largest county, cannot rotate only Republican and Democratic candidates without developing new software, and obtaining a new certification from both the Election Assistance Commission and the Secretary of State, which cannot be completed before the 2020 election. Declaration of Dr. Eric Coomer, Cone-Roddy Decl. Ex. B, at ¶ 7. Thus, enjoining the current law and replacing it with a new ballot order system for the 2020 election that comports with Plaintiffs' demands is not feasible in Arizona's largest county.[8]

The Ballot Order Statute has been in place for 40 years. Despite apparently long-standing concerns about the impact of ballot order, there seems to have been no effort to change the law to address the issue of concern by the Plaintiffs. Instead, Plaintiffs are asking the Court to make election-year changes to an Arizona law enacted in 1979. An

---

[8] All counties can rotate all candidates, but that is not the system Plaintiffs seek in this lawsuit. (Doc. 13, ¶ 63(d).)

16

unreasonable delay in election cases often bars relief based on the laches doctrine. *See Ariz. Libertarian Party*, 189 F. Supp. 3d at 922–23 ("In the context of election matters, the laches doctrine seeks to prevent dilatory conduct and will bar a claim if a party's unreasonable delay prejudices the opposing party or the administration of justice.") (citation omitted). Indeed, close to an election, the need for established rules to permit the election to proceed bars relief under *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006). Here, the equities raised by the timing of this challenge weigh against a preliminary injunction.

As for the State's harm, "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers) (citation omitted); *Coal. for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997) ("[A] state suffers irreparable injury whenever an enactment of its people or their representatives is enjoined."). Allowing the Ballot Order Statute to stay in effect while this lawsuit is pending is thus in the public interest. *See, e.g.*, *Berman v. Parker*, 348 U.S. 26, 32 (1954) ("Subject to specific constitutional limitations, when the legislature has spoken, the public interest has been declared in terms well-nigh conclusive."); *Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 602 (1937) (holding that legislation "is in itself a declaration of the public interest."). Moreover, an injunction that impacts an impending election is "extraordinary." *S.W. Voter,* 344 F.3d at 919.

All parties to this case have an interest in fair 2020 elections. It is simply not appropriate to use a preliminary injunction to rewrite state statutes in an election year to fit litigants' notions of fairness--especially when the state statute at issue is facially neutral, does not abridge any individual's right to vote, and has been in place for decades. Plaintiffs have not established that the equities and public interest favor a preliminary injunction in this case.

## IV.   CONCLUSION

For the reasons stated above, the Court should deny Plaintiffs' motion for a preliminary injunction.

1. Respectfully submitted this 20th day of January, 2020.

OSBORN MALEDON, PA

 s/ Mary R. O'Grady
Mary R. O'Grady (011434)
Kimberly I. Friday (035369)
Emma J. Cone-Roddy (034285)
OSBORN MALEDON, P.A.
2929 North Central Avenue, Suite 2100
Phoenix, Arizona 85012–2793
(602) 640-9000


MARK BRNOVICH
ATTORNEY GENERAL

Linley Wilson (027040)
Deputy Solicitor General
Kara Karlson (029407)
Assistant Attorney General
2005 North Central Avenue
Phoenix, AZ  85004-1592
Telephone (602) 542-4951
Facsimile (602) 542-4385

*Attorneys for Defendant Arizona Secretary of State Katie Hobbs*