

649 North Fourth Avenue, First Floor
Phoenix, Arizona 85003
(602) 382-4078

Kory Langhofer, Ariz. Bar No. 024722
kory@statecraftlaw.com
Thomas Basile, Ariz. Bar. No. 031150
tom@statecraftlaw.com

*Attorneys for* Amici Curiae

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Brian Mecinas, *et al.*, | No. 2:19-cv-05547-DJH |
| Plaintiffs, | |
| v. | **BRIEF OF *AMICI CURIAE* ARIZONA HOUSE SPEAKER RUSSELL BOWERS AND ARIZONA SENATE PRESIDENT KAREN FANN** |
| Katie Hobbs, in her official capacity as the Arizona Secretary of State, | |
| Defendant. | |

Russell Bowers, Speaker of the Arizona House of Representatives, and Karen Fann, President of the Arizona Senate, respectfully submit this brief as *amici curiae* in opposition to the Plaintiffs' Motion for a Preliminary Injunction and in support of the Defendant's Motion to Dismiss.[1]

---

[1] Counsel for the parties have represented to the undersigned that they do not oppose the filing of this brief. *See Ctr. for Biological Diversity v. United States Forest Service*, No. CV-12-08176-PCT-SMM (D. Ariz.), Order dated Dec. 13, 2019 (McNamee, J.) (holding that, in the absence of a Local Rule governing *amicus* submissions, the Court will apply U.S. Supreme Court Rule 37.2, which permits filing of *amicus* briefs either upon motion or with the consent of the parties). The *amici* affirm that no counsel for a party authored the brief in whole or in part, that no counsel or party made a monetary contribution intended to

1

**INTRODUCTION**

The most striking feature of the Plaintiffs' challenge to Ariz. Rev. Stat. § 16-502(E)[2] is what it does *not* allege.  The Plaintiffs never contend that any voter has been denied the franchise, that any voter's right to access and cast a valid ballot for her elected representatives has been abrogated, or that any candidate who complied with the procedural prerequisites to obtain placement on the ballot was refused the opportunity to present himself to the electorate.

Rather, the Plaintiffs posit a "burden" that arises from, and inheres in, the act of voting itself—*i.e.*, reviewing the selection of candidates and making one's choice.  The alleged "ballot order effect" that is the crux of the Plaintiffs' case results from the voluntary decisions of individual electors, not any obstacle or encumbrance devised by the State.  What Plaintiffs characterize as infringements on voting rights are attributable not to neutral ballot ordering statutes such as Section 16-502(E), but rather to the superseding choices of individual voters exercising the franchise.

The Plaintiffs' attempt to enlist the judicial power for the acknowledged purpose of aiding the electoral fortunes of the Democratic Party misapprehends the doctrinal framework, conflates state action with the free choices of individual citizens, and derogates the constitutional policymaking prerogatives of Arizona's elected legislature.

**INTERESTS OF THE *AMICI***

Russell Bowers is the Speaker of the Arizona House of Representatives and Karen Fann is the President of the Arizona Senate.  The two houses together constitute the Arizona Legislature, which is the locus of lawmaking authority in the State of Arizona.  *See* ARIZ.

---

fund the preparation or submission of this brief, and that no person other than the *amici* or their counsel made such a monetary contribution.

[2]     The statute provides that "candidates of the several parties shall be arranged [on the general election ballot] with the names of the parties in descending order according to the votes cast for governor for that county in the most recent general election for the office of governor."

CONST. art. IV, pt. 1, § 1(1).  As the presiding officers of their respective houses, the *amici* submit this brief as representatives of the institution and as defenders of its sovereign powers, which it lawfully exercised in enacting Ariz. Rev. Stat. § 16-502(E).[3]

<strong>ARGUMENT</strong>

### I.   Because Section 16-502(E) Does Not "Dilute" or "Burden" the Right to Vote at All, It Is Not Subject to Judicial Scrutiny

The Plaintiffs contend that Section 16-502(E)'s ballot ordering provision sometimes disadvantages Democratic candidates for some offices, and inflicts a constitutional injury by "treat[ing] otherwise similarly-situated major-party candidates differently" and "diluting the votes of Plaintiffs and their supporters."  Pl. Motion for Preliminary Injunction at 10. But the Plaintiffs confound electoral misfortune with constitutional injury.  Assuming (but not conceding) that the "ballot position effect" exists it all, the resulting "burden" reflects the free choices of fellow voters acting within a facially neutral ballot regime; it is not a constitutional harm amenable to judicial remedy.   And "absent *any* burden [on the franchise], there is no reason to call on the State to justify its practice."  *Ariz. Libertarian Party v. Reagan*, 798 F.3d 723, 732 n.12 (9th Cir. 2015).

### A.   Overview of Standards of Review in the Voting Rights Context

Broadly speaking, the U.S. Supreme Court has recognized three kinds of constitutional injuries in the voting rights context.

First, if a state *denies* any citizen the franchise, the state must demonstrate that doing so was the least restrictive means of furthering a compelling governmental interest.  *See, e.g., Kramer v. Union Free Sch. Dist.*, 395 U.S. 621 (1969) (invalidating statute that limited right to vote in school board elections to property owners and parents of schoolchildren in the district); *Dunn v. Blumstein*, 405 U.S. 330 (1972) (invalidating requirement that individuals must reside in the state for a year and in the county for three months in order to

---

[3]   Recognizing the significance of their offices and the magnitude of the Legislature's interest in vindicating its official acts, Arizona law affords to the *amici* the right to intervene as a party and to otherwise "be heard" in any state judicial proceeding seeking a declaration that a state statute is unconstitutional.  *See* Ariz. Rev. Stat. § 12-1841.

1   be eligible to vote); *Evans v. Cornman*, 398 U.S. 419 (1970) (striking down Maryland

2   statute that prohibited residents of a federal enclave within the state from voting in state

3   elections); *Carrington v. Rash*, 380 U.S. 89 (1965) (statute denying the vote to military

4   personnel deemed unconstitutional); *see also Lemons v. Bradbury*, 538 F.3d 1098, 1104

5   (9th Cir. 2008) (noting that "strict scrutiny applies to 'regulations that unreasonably deprive

6   some residents in a geographically defined governmental unit from voting in a unit wide

7   election.'" (internal citation omitted)).

8       A second type of voting rights claim that likewise triggers strict scrutiny arises out

9   of "regulations that contravene the principle of 'one person, one vote,' by diluting the voting

10  power of some qualified voters within the electoral unit." *Green v. City of Tucson*, 340 F.3d

11  891, 900 (9th Cir. 2003); *see also Reynolds v. Sims*, 377 U.S. 533, 566 (1964) ("Diluting

12  the weight of votes because of place of residence impairs basic constitutional rights under

13  the Fourteenth Amendment just as much as invidious discriminations based upon factors

14  such as race.").

15      Occupying a third, and considerably more deferential, tier of constitutional review

16  are neutral, generally applicable laws that regulate the manner and method of voting.

17  Governed by the standard first articulated in *Anderson v. Celebrezze*, 460 U.S. 780 (1983),

18  and refined in *Burdick v. Takushi*, 504 U.S. 428 (1992), such "reasonable,

19  nondiscriminatory restrictions" are sustained by "the State's important regulatory interests,"

20  even if they modestly burden voting rights. *Burdick*, 504 U.S. at 434; *see also Pub. Integrity*

21  *Alliance v. City of Tucson*, 836 F.3d 1019, 1024 (9th Cir. 2016) ("We have repeatedly

22  upheld as 'not severe' restrictions that are generally applicable, evenhanded, politically

23  neutral, and protect the reliability and integrity of the election process" (quoting *Dudum v.*

24  *Arntz*, 640 F.3d 1098, 1106 (9th Cir. 2011)).[4]   This so-called *Anderson-Burdick* rubric

25

26  ――――――――――――――

    [4]      If the alleged burden on the franchise is "severe"—*i.e.*, it operates as a deprivation

27  or dilution of the right to vote—then the strict scrutiny standard controls. *See Burdick*, 504

    U.S. at 434; *Green*, 340 F.3d at 893 (noting that "the Supreme Court has applied strict

28

STATECRAFT
LAW · GOVERNMENT · CRISIS MANAGEMENT

applies irrespective of whether the voting procedure in dispute is cast as a violation of the government's equal protection obligations, or instead as an infringement of the voter's First Amendment right to associate with her preferred candidates. *See Obama for Am. v. Husted*, 697 F.3d 423, 430 (6th Cir. 2012) (explaining that *Anderson-Burdick* "creat[ed] a single standard for evaluating challenges to voting restrictions," whether predicated on the Fourteenth Amendment or the First Amendment).

### B.   Section 16-502(E) Does Not "Dilute" Any Person's Vote[5]

Contrary to the Plaintiffs' use of the term, "vote dilution" does not refer to any election procedure that, in practical operation, may hurt the electoral prospects of some candidates or political parties. Rather, it is a legal term of art imbued with a specific meaning, and courts have generally recognized just two types of constitutional vote dilution arguments. The first arises from malapportionment of the state's population in drawing congressional or legislative districts, or similar arrangements that afford a given elector's ballot proportionately greater voting power based solely on his or her geographic location within the election jurisdiction. *See, e.g.*, *Gray v. Sanders*, 372 U.S. 368 (1963) (invalidating "county unit" election system that weighted rural votes more heavily than urban ones); *Am. Civil Liberties Union of Nev. v. Lomax*, 471 F.3d 1010, 1020 (9th Cir. 2006) (holding that county distribution requirement for initiative petition signatures "dilutes the power of some votes by providing more sparsely populated counties with the same total power as densely populated counties"). In short, "vote dilution" is a violation of the principle that "each representative must be accountable to (approximately) the same number of constituents." *Rucho v. Common Cause*, 139 S. Ct. 2484, 2501 (2019).

Even the Plaintiffs do not contend that Section 16-502(E) accords votes cast in certain geographic areas of the state disproportionately greater weight in determining

---

scrutiny only to voting regulations that prohibit some residents in a given electoral unit from voting, or that dilute the voting powers of some residents in a given electoral unit").

[5]   Because the Plaintiffs do not allege that Section 16-502(E) deprives any person of his or her right to vote, this Brief need not address that variety of voting rights claims.

1    election outcomes.  A ballot cast for one gubernatorial candidate in Kingman and a ballot

2    cast for a different gubernatorial candidate in Phoenix each has an equal chance of deciding

3    the state's next governor.  *See Reynolds*, 377 U.S. at 563 (explaining that vote dilution arises

4    when "[t]wo, five, or 10 [voters in some geographic areas] must vote before the effect of

5    their voting is equivalent to that of their favored neighbor").  For this reason, at least one

6    federal court flatly rejected efforts to fashion a vote dilution claim from a ballot ordering

7    statute similar to Section 16-502(E), pointing out that "no . . . dilution of the value of one's

8    vote exists in the context of position bias because an irrational vote is just as much of a vote

9    as a rational one."  *New Alliance Party v. N.Y. State Bd. of Elections*, 861 F. Supp. 282, 297

10   (S.D.N.Y. 1994); *see also Clough v. Guzzi*, 416 F. Supp. 1057, 1067 (D. Mass. 1976)

11   (rejecting vote dilution claim in connection with ballot ordering statute, explaining that

12   "[t]he state practice here differs significantly from those in the apportionment and other

13   voting cases . . . in that it does not create the same kind of immutable or absolute advantage

14   or preclusion").

15        The second variant of vote dilution claim requires an "allegation[] that the State has

16   enacted a particular voting scheme as a purposeful device to 'minimize or cancel out the

17   voting potential of racial or ethnic minorities.'" *Miller v. Johnson*, 515 U.S. 900, 911 (1995)

18   (internal citation omitted); *see also Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 481 (1997)

19   ("[A] plaintiff bringing a constitutional vote dilution challenge, whether under the

20   Fourteenth or Fifteenth Amendment, [is] required to establish that the State or political

21   subdivision acted with a discriminatory purpose."); *Perez v. Abbott*, 253 F. Supp. 3d 864,

22   942 (W.D. Tex. 2017) ("To prove intentional vote dilution under the Fourteenth

23   Amendment, plaintiffs must show both discriminatory purpose and discriminatory

24   effect.").[6]  The Plaintiffs here have not alleged, let alone adduced any evidence, that Section

25   16-502(E) embodied a purposeful effort to diminish the voting power of any protected class.

26

27   [6]     While Section 2 of the Voting Rights Act of 1965 embraces a broader conception of

28   "vote dilution" in connection with election procedures that engender racially disparate

6

### C.   Section 16-502(E) Does Not "Burden" Any Person's Right to Vote

Not only does Section 16-502(E) not dilute the franchise, it imposes no cognizable "burden" on voting rights at all.  A voter is "burdened" for constitutional purposes when a law directly and proximately (1) requires the voter to expend some discernible additional time, effort, or expense to obtain or cast a duly tabulated ballot for her preferred candidate; or (2) requires a candidate to expend some discernible additional time, effort, or expense to present his or her candidacy to the electorate.

But the fact that a law produces some "burden" does not make it unconstitutional. Examples of even constitutionally sound enactments that can nevertheless produce articulable "burdens" include voter identification laws, *see Crawford v. Marion Cty. Election Bd.*, 553 US. 181, 198 (2008) (upholding voter ID law under the *Anderson-Burdick* framework, explaining that "[f]or most voters who need them, the inconvenience of making a trip to the BMV, gathering the required documents, and posing for a photograph" may be a "burden," albeit not a substantial one); restrictions on the collection of absentee ballots, *see Democratic Nat'l Comm. v. Reagan*, 329 F. Supp. 3d 824, 844-50 (D. Ariz. 2018) (finding that Arizona's prohibition on ballot harvesting presented "challenges for communities that lack easy access to outgoing mail services" but sustaining the statute under the *Anderson-Burdick* test); voter registration deadlines and limitations on polling hours, *see Ohio Democratic Party v. Husted,* 834 F.3d 620, 626-31 (6th Cir. 2016) (acknowledging that Ohio's elimination of same-day voter registration and truncation of early voting period potentially imposed a burden on some voters but finding that it was "minimal"); ballot access prerequisites for candidates, *see Nader v. Cronin*, 620 F.3d 1214, 1217-18 (9th Cir. 2010) (holding that petition signature requirement for independent presidential candidates seeking placement on the ballot constituted a minimal burden); and certain mandates for casting and tabulating ballots, *see Weber v. Shelley*, 347 F.3d 1101,

---

effects, *see* 52 U.S.C. § 10301(b), the Plaintiffs have not raised any Section 2 claims in this action.

1106-07 (9th Cir. 2003) (holding that any marginal risk of fraud arising out of touchscreen voting systems was, at most, a minimal burden on voting rights). Even in similar challenges to the layout or organization of ballots, the alleged "burden" has generally derived from some tangible hindrance of voters' actual ability to access and cast a ballot. *See, e.g.*, *Mich. State A. Philip Randolph Institute v. Johnson*, 749 Fed. App'x 342 (6th Cir. 2018) (evaluating—and ultimately rejecting—argument that elimination of straight-ticket voting option on ballots unduly burdened voting rights by increasing both the time required to complete a ballot and overall waiting times at the polling place).

The Plaintiffs' claims here are different. They do not allege that Section 16-502(E) impedes any person's ability to register to vote, obtain a ballot, or have a completed ballot properly tabulated. Nor do the Plaintiffs assert that Section 16-502(E) has foreclosed any candidate from qualifying for the ballot. Indeed, the statute does not afford any particular ballot slot to any specific political party, and any supposed "ballot position effect" has redounded to the benefit of both parties across various elections and locales. *See Libertarian Party of Va. v. Alcorn*, 826 F.3d 708, 718 (4th Cir. 2016) (finding that even if Virginia statute that afforded top ballot position to political parties that had achieved at least 10% of the vote in one of two preceding general elections produced a "windfall" effect, it "still does not 'restrict access to the ballot or deny any voters the right to vote for candidates of their choice'" and "'merely allocates the benefit of positional bias . . . in a neutral, nondiscriminatory manner.'").

Instead, the Plaintiffs mistake electoral effects for constitutional burdens. Even if it were true that ballot ordering produces some articulable *effect* on electoral outcomes, it would not follow that Section 16-502(E) itself creates a constitutional *burden* attributable to state action. Whatever effect ballot order supposedly exerts is mediated through, and ultimately subsumed by, the intervening actions of individual voters making free and independent choices. That this voting behavior may—in some elections or in some races— prove detrimental to Democrats does not transform it into a remediable harm. In short, the

8

alleged existence of some correlation between ballot order and electoral outcomes does not amount to a governmentally imposed burden.

The Plaintiffs' campaign to characterize voting behavior as a constitutional burden also encapsulates a deeper danger. The federal courts guard citizens' fundamental constitutional liberties, not political parties' electoral fortunes. Cases such as this one illuminate that critical fault line.

Reduced to its essence, the so-called "ballot ordering effect" is the proposition that some small subset of the electorate unthinkingly chooses the first name listed in each race— a phenomenon that some have mordantly dubbed the "donkey vote." *Sarvis v. Judd*, 80 F. Supp. 3d 692, 699 (E.D. Va. 2015), *aff'd*, 826 F.3d 708 (4th Cir. 2016). Even assuming that the "donkey vote" exists, and even if it were possible to quantify its precise impact on election outcomes, ballot order is merely one of many cognitive shortcuts that voters employ in their electoral decision-making. *See generally* Philip L. Dubois, *Voting Cues in Nonpartisan Trial Court Elections: A Multivariate Assessment*, 18 LAW & SOC'Y REVIEW 395, 397-98 (1984) (citing studies indicating that party label, incumbency, name familiarity, "religious-ethnic cues apparent from candidate surnames," and candidates' gender all are variables that, to varying degrees and in certain electoral contexts, may influence voter decision-making).

Irrespective of whether ballots cast in reliance on such heuristics represent irrational frivolity or a deliberate (albeit perhaps imperfect) effort to effectuate actual political preferences, they are products of voters' independent and unconstrained choices—not state action—and carry the same electoral and constitutional value as wholly "rational" (however that is defined) votes. *See Alcorn*, 826 F.3d at 718 (rejecting in ballot ordering case the notion that "some voters' choices are less meaningful than the choices of other supposedly more informed or committed voters"); *Clough*, 416 F. Supp. at 1067 (rejecting challenge to Massachusetts ballot ordering statute, noting that "there is no constitutional right to a wholly rational election"). They do not reflect a constitutional transgression that this Court should undertake to "fix."

**D.     Because Section 16-502(E) Does Not Burden Voting Rights, Plaintiffs' Claims Are Extinguished as a Matter of Law**

The Plaintiffs' failure to establish any cognizable "burden" on their voting rights necessitates the dismissal of their claims. As the Ninth Circuit has observed—and as other courts have agreed—"absent *any* burden [on the franchise], there is no reason to call on the State to justify its practice." *Ariz. Libertarian Party v. Reagan*, 798 F.3d 723, 732 n.12 (9th Cir. 2015); *see also New Alliance Party*, 861 F. Supp. at 295 n.15 (noting that "there are election law regulations [such as the ballot ordering statute in dispute] which do not burden constitutional rights and as such render the *Anderson* test superfluous"); *McLaughlin v. N. Carolina Bd. of Elections*, 65 F.3d 1215, 1227 (4th Cir. 1995) ("Although the particular language that North Carolina prescribes on ballot access petitions does not advance any important state interests, it fails the *Anderson* balancing test only if it also does in fact burden protected rights."); *Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 592 (6th Cir. 2012) (stating that "a rational basis standard applies to state regulations that do not burden the fundamental right to vote"); *Marcellus v. Va. State Bd. of Elections*, 168 F. Supp. 3d 865, 877 n.15 (E.D. Va. 2016), *aff'd*, 849 F.3d 169 (4th Cir. 2017) (applying rational basis to statute that permitted party designations on the ballot for candidates for some offices but not others, explaining that "[t]he *Anderson–Burdick* test does not apply simply because Plaintiffs have *alleged* a First Amendment claim in tandem with an equal protection claim."); *Obama for Am. v. Husted*, 697 F.3d 423, 429 (6th Cir. 2012) ("If a plaintiff alleges only that a state treated him or her differently than similarly situated voters, without a corresponding burden on the fundamental right to vote, a straightforward rational basis standard of review should be used." (citing *McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802 (1969)). And, as explained above, Section 16-502(E) does not burden any person's right to vote for his or her chosen candidate.

**II.     The State's Important Regulatory Interests Easily Sustain Section 16-502(E)**

Because Section 16-502(E) does not "burden" the franchise in any respect, it necessarily is constitutionally sound, or, at most, subject to only "very lenient," *RUI One*

*Corp. v. City of Berkeley*, 371 F.3d 1137, 1156 (9th Cir. 2004), rational basis review. *See generally F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) (explaining that a statute survives rational basis review as long as "there is any reasonably conceivable state of facts that could provide a rational basis for" the law, adding that "a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data").

Even if the Plaintiffs' claims were governed by the *Anderson-Burdick* framework, however, the State's important regulatory interests in ensuring an organized and symmetrical ballot more than counterbalance whatever tenuous "burden" the Plaintiffs assert. By according the lead ballot position to the political party whose gubernatorial candidate prevailed in that county in the immediately preceding election, Section 16-502(E) creates a uniform partisan ordering across each candidate race appearing on the ballot in that county. In the words of one court, "[a] statute that positions parties in all races based on performance in the prior gubernatorial election assists voters by constructing a symmetrical pattern on the ballot." *New Alliance Party*, 861 F. Supp. at 297. The imperatives of organization, consistency, and congruence in the administration of elections have always been recognized as "important" or even "compelling" state interests. *See id.* at 296 (acknowledging "the compelling nature of the State's interest in organizing a comprehensible and manageable ballot"); *Alcorn*, 826 F.3d at 720 (finding that Virginia's ballot ordering statute "maintain[s] party-order symmetry across many offices on the ballot," which "makes the ballot more easily decipherable, especially for voters looking for candidates affiliated with a given party," and thereby promotes the "state's interest in 'efficient procedures for the election of public officials'"); *see also Nader v. Brewer*, 531 F.3d 1028, 1040 (9th Cir. 2008) (deeming "orderly election administration" a "compelling" state interest).

The Plaintiffs contend that there are "fairer" ballot organizational methods, Motion at 14, but that is beside the point. *Anderson-Burdick* is a flexible rubric attuned to the discretion constitutionally committed to the States in the administration of elections; it does

11

not demand the most narrowly tailored or least restrictive means of advancing important regulatory objectives. *See Burdick*, 504 U.S. at 433; *Dudum*, 640 F.3d at 1114 ("[W]e emphasize that the City is *not* required to show that its system is narrowly tailored" under *Anderson-Burdick* test.).

The Plaintiffs also suggest that the State's use of a rotational ballot ordering system in other contexts somehow corrodes the constitutional legitimacy of Section 16-502(E). *See* Motion at 5. But just as the existence of supposedly more "narrowly tailored" alternatives is irrelevant to the constitutionality of an election regulation under *Anderson-Burdick*, a state's use of a given election procedure in one setting does not constitutionally constrain it from adopting a different (and perhaps more restrictive) method at another time or in another context. *See generally Ohio Democratic Party v. Husted*, 834 F.3d 620, 635 (6th Cir. 2016) (holding that Ohio's previously more permissive voter registration and early voting rules did not constitutionally undermine contrary policy choices later, commenting that "imposing such a one-way ratchet is incompatible with the 'flexible' *Anderson-Burdick* framework").

In sum, even indulging the Plaintiffs' contention that Section 16-502(E) somehow "burdens" their voting rights in some way, it remains a valid and politically neutral means of attaining Arizona's important objective of an organized, symmetrical, and consistently ordered ballot.

## III.   There is No Constitutional Right to Randomly Ordered Ballots Across Different Election Jurisdictions

In effect, the Plaintiffs ask the Court to discover a new constitutional requirement that candidates be randomly ordered on every ballot. Although the Plaintiffs do not explicitly specify the alternative ballot ordering method they desire the Court to impose, the answer is apparent. The Plaintiffs undoubtedly would object to an "incumbents first" rule for the same reasons they bemoan Section 16-502(E). Alphabetical ordering is also anathema to the Plaintiffs (*see* Motion at 4), and a single, uniform randomized sequence of candidates across all ballots statewide would engender the same alleged "burden" that the

1  Plaintiffs argue afflicts Section 16-502(E) by supposedly "diluting" the votes of those who

2  support candidates occupying the lower ballot positions.  Not coincidentally, the method

3  prescribed by Ariz. Rev. Stat. § 16-464 (*i.e.*, different random ordering sequences across

4  precincts) is the sole surviving alternative.

5        Not only is the notion that the Constitution compels one specific variant of ballot

6  ordering dissonant with the adaptable and deferential character of the *Anderson-Burdick*

7  framework (as discussed above), it also embodies a more fundamental fallacy.  The

8  Constitution expressly entrusts to the States control over the "times, places and manner of

9  holding elections for Senators and Representatives" (subject, of course, to contrary

10  congressional directives).  U.S. CONST. art. I, § 4; *see also Wash. State Grange v. Wash.*

11  *State Republican Party*, 552 U.S. 442, 451 (2008) ("The States possess a 'broad power to

12  prescribe the 'Times, Places and Manner of holding Elections for Senators and

13  Representatives,' which power is matched by state control over the election process

14  for state offices.'" (internal citations omitted)).  This delegation reflects the federalist

15  precept that "states retain broad authority to structure and regulate elections," *Short v.*

16  *Brown*, 893 F.3d 671, 676 (9th Cir. 2018), even when such limitations incidentally impact

17  voter behavior or even election outcomes.  *See Ariz. Libertarian Party*, 798 F.3d at 729

18  (noting that "*every* law regulating elections, 'whether it governs the registration and

19  qualifications of voters, the selection and eligibility of candidates, or the voting process

20  itself, inevitably affects—at least to some degree—the individual's right to vote and his

21  right to associate with others for political ends.'").

22        The Plaintiffs' push to turn one specific election procedure (*i.e.*, randomly ordered

23  ballots across different precincts) into an immutable constitutional command is

24  irreconcilable with "our democratic federalism, a system that permits states to serve 'as

25  laboratories for experimentation to devise various solutions where the best solution is far

26  from clear.'" *Pub. Integrity Alliance*, 836 F.3d at 1028.  The Court should reject this effort

27  to refashion the Constitution's broad conceptual parameters into a detailed election

28

1   procedures code, and decline the Plaintiffs' invitation to become drawn inexorably deeper

2   into the political quicksand such a project inevitably promises.

3                                          **CONCLUSION**

4          For the foregoing reasons, the Court should deny the Plaintiffs' Motion for a

5   Preliminary Injunction and grant the Defendant's Motion to Dismiss.

6

7          RESPECTFULLY SUBMITTED this 20th day of January, 2020.

8

9                                          STATECRAFT PLLC

10                                 By:   */s/ Thomas Basile*
                                         Kory Langhofer
11                                         Thomas Basile
12                                         649 North Fourth Avenue, First Floor
                                         Phoenix, Arizona 85003
13
                                         *Counsel for* Amici Curiae
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28