Mark Brnovich
Attorney General
Firm Bar No. 14000

Linley Wilson (027040)
Deputy Solicitor General
Kara Karlson (029407)
Assistant Attorney General
2005 North Central Avenue
Phoenix, AZ  85004-1592
(602) 542-4951
kara.karlson@azag.gov
linley.wilson@azag.gov
adminlaw@azag.gov

Mary R. O'Grady (011434)
Kimberly I. Friday (035369)
Emma J. Cone-Roddy (034285)
OSBORN MALEDON, P.A.
2929 North Central Avenue, Suite 2100
Phoenix, Arizona 85012–2793
(602) 640-9000
mogrady@omlaw.com
kfriday@omlaw.com
econe-roddy@omlaw.com

*Attorneys for Defendant Arizona Secretary of State Katie Hobbs*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Brian Mecinas, et al., <br><br>　　　　　　Plaintiffs, <br>v. <br><br>Katie Hobbs, in her official capacity as Arizona Secretary of State, <br><br>　　　　　　Defendant. | Case No:  CV-19-05547-PHX-DJH <br><br>**ARIZONA SECRETARY OF STATE'S REPLY IN SUPPORT OF MOTION TO DISMISS** |

For nearly forty years, A.R.S. § 16-502(E) (the "Ballot Order Statute") has allowed Arizona's counties to produce orderly, symmetrical ballots that allow voters to easily find candidates running in the voters' party of choice, while usually preventing any one political party from securing the first position on the ballot statewide. Indeed, in all but four general elections, the Republican and Democratic Parties have each had first position in some, but not all of Arizona's counties. And in the exceptions, it has been the Democratic Party—not the Republican Party—that has secured first position throughout the state. By providing clear and unambiguous instructions directly to the counties, the Ballot Order Statute ensures that no election official can manipulate ballot order to favor candidates or political parties of their choice. There are no allegations that the Ballot Order Statute prevents any voter from voting, prevents any vote from being counted, or makes the voting process more difficult.

Yet Plaintiffs cry foul. They claim that social statistics demonstrate that the Ballot Order Statute has worked to perniciously cause a marginal number of voters to select Republican Party candidates over Democratic Party ones, which supposedly dilutes Plaintiffs' votes. They demand that this Court enjoin the Arizona Secretary of State (the "Secretary"), who neither implements or enforces the Ballot Order Statute, from enforcing the Ballot Order Statute and instead implement some new ballot ordering scheme that would supposedly be more fair.

Plaintiffs' claims necessarily fail. Plaintiffs have not been injured by the Ballot Order Statute. The Secretary has no power to redress their grievances. Her connection with the Ballot Order Statute is attenuated at best. And Plaintiffs' claim that ballot ordering must be sufficiently fair under their cherry-picked advanced statistical analysis is based on a standard that is not judicially manageable. But even if none of this were true, Plaintiffs fail to allege a constitutional violation in need of redress. The Secretary's Motion to Dismiss must be granted.

# ARGUMENT

## A. Plaintiffs lack a legally cognizable injury.

Despite their best efforts, Plaintiffs fail to identify any legally cognizable injury suffered by any of the six Plaintiffs.

### 1. Voter Plaintiffs lack a legally cognizable injury.

Plaintiffs Mecinas, Serrano, and Vasko ("Voter Plaintiffs") claim they have been injured because the Ballot Order Statute "burden[s] [their] ability to engage in effective efforts to elect Democratic Party candidates" and causes their votes to be "diluted relative to that of voters who cast their ballots for Republican Party candidates." (Doc. 13, ¶¶ 21–23.)

Plaintiffs do not defend the first claimed injury. As the Secretary pointed out in her motion, a vague allegation that a law might make it harder to achieve partisan electoral victories is a generalized grievance about Voter Plaintiffs' partisan preferences. As the Supreme Court admonished in 2018, courts are "not responsible for vindicating generalized partisan preferences." *Gill v. Whitford,* 138 S.Ct. 1916, 1933 (2018); *see also Becker v. FEC,* 230 F.3d 381, 390 (1st Cir. 2000) (when a "preferred candidate . . . has less chance of being elected," the "harm" is not "a restriction on voters' rights and by itself is not a legally cognizable injury sufficient for standing"). Plaintiffs cannot claim as an injury that some candidates they might support in a future election may get less votes.

Plaintiffs' vote dilution injury fairs no better. While vote dilution can be a cognizable injury, Plaintiffs' claim is not similar to any recognized vote dilution injuries. *See, e.g., Baker v. Carr*, 369 U.S. 186, 206 (1962) (voters have standing to challenge a grossly disproportionate distribution of voters across districts); *United States v. Hays*, 515 U.S. 737, 744-45 (1995) (plaintiffs who live in a racially gerrymandered district can sue because the legislature treated them differently on the basis of race); *Gill*, 138 S.Ct. at 1930-31 (voters deliberately placed in a district designed to waste their vote have suffered cognizable injury).

Rather than claim that Voter Plaintiffs' vote has been diluted because of deliberate

action by the state to reduce its power, Plaintiffs' complaint is that some voters simply pick whatever candidate is first, and the state has failed to ensure perfect distribution of these votes between "major parties." No matter how Plaintiffs formulate it, their alleged "injury" depends on this Court finding that some voters' votes are so irrational as to not be entitled to the same constitutional respect and deference as Voter Plaintiffs' own votes. This is insufficient for Article III standing. *See Mann v. Powell*, 333 F. Supp. 1261, 1264–65 (N.D. Ill. 1969) (dismissing registered voter for lack of standing, reasoning that plaintiff's allegation that the "state action may cause other voters to act irrationally" is "an insufficient personal interest to state a cause of action").

Plaintiffs have identified three cases they claim were correctly decided, substantially similar, and support finding standing. None are persuasive. First, neither *Graves v. McElderry*, 946 F. Supp. 1569, 1576-77 (W.D. Okla. 1996) nor *Gould v. Grubb*, 536 P.2d 1337 (Cal. 1975) featured voters as plaintiffs, so neither court addressed whether voters had standing. This leaves Plaintiffs only with one case, *Jacobson v. Lee*, —F.Supp.3d—, 2019 WL 6044035, at *5 (N.D. Fla. Nov. 15, 2019). Though *Jacobson* found that voters had standing to challenge a dissimilar ballot order scheme, the court failed to identify *what* cognizable injury any voter supposedly suffered. It did not appear to be based on a theory of vote dilution. *Id.* At most, *Jacobson* impermissibly found an injury based on a "generalized partisan" grievance. *Gill*, 138 S.Ct. at 1933.

Voter Plaintiffs also allege they have standing on a theory of competitive standing, but they ignore the Ninth Circuit's holding in *Townley v. Miller*, 722 F.3d 1128 (9th Cir. 2013), which the Secretary cited in her motion to dismiss. In *Townley*, the Ninth Circuit specifically *rejected* standing based on "siphoning effect" theories in ballot design—the same injury Plaintiffs allege here. *Id.* at 1135-36. In that case, Plaintiffs alleged that the inclusion of a "none of those candidates" line on Nevada ballots would siphon votes away from their preferred candidate. *Id.* Despite Plaintiffs' attempt to dress up their claim in the language of vote dilution, their claimed injury is the same. And as *Townley* noted, competitive standing has only been recognized in the Ninth Circuit when the allegations

deal with a candidate being unlawfully placed on the ballot. *Id.* at 1136. Moreover, competitive standing has only ever been recognized for candidates and political parties, not for voters. *See Drake v. Obama*, 664 F.3d 774, 782-83 (9th Cir. 2011) (collecting cases brought by candidates and political parties).

### 2. Committee Plaintiffs lack standing.

Plaintiffs Democratic National Committee, Democratic Senatorial Campaign Committee, and Priorities USA ("Committee Plaintiffs") lack standing under any theory. They lack associational standing because they have identified nothing more than that some of their members[1] may have a statistical probability of an injury. The Supreme Court has rejected this theory. *Summers v. Earth Island Institute*, 555 U.S. 488, 499 (2009). They lack organizational standing because they have failed to allege that the Ballot Order Statute causes them to expend additional resources, and that "but for" the Statute, they would have used those resources to accomplish other aspects of their mission. *See Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1040-41 (9th Cir. 2015). And they lack competitive standing for the same reason Plaintiffs do—they do not challenge the illegal inclusion of a candidate on the ballot.

Plaintiffs spend most of their response arguing they have shown associational standing. Yet they fail to respond to *Summers*'s admonishment that associational standing requires more than a "statistical probability" of an injury. Instead, they argue incorrectly (at 5) that the Secretary conceded that candidates have standing. Candidate standing is not the issue before the Court. Rather, the issue before the Court is whether an organization has associational standing when it only alleges a statistical probability some of its members might be injured; the Supreme Court says no.

Plaintiffs point to three cases they claim support a finding of associational standing. None do. In *Owen v. Mulligan*, a candidate and his affiliated party sued the postal service after the postal service illegally allowed his opponent access to a discounted postal rate. 640 F.2d 1130, 1131-33 (9th Cir. 1981). The Ninth Circuit did not

---

[1] Neither the DSCC nor Priorities USA alleges that they have members.

4

consider whether the affiliated party alone would have had standing; additionally, the alleged injury was real, and not merely a statistical probability that some unknown candidate might be harmed by their position on the ballot.[2] The associational standing discussion in *Democratic National Committee v. Reagan*, 329 F.Supp.3d 824, 841 (D. Ariz. 2018) is likewise inapposite because the party presented testimony from affiliated voters in the context of plaintiffs' standing to challenge ballot collection and Election Day voting procedures. But the Voter Plaintiffs here have not alleged an injury in connection with the ballot order statute. And *Texas Democratic Party v. Benkiser* is inapposite because it is a competitive standing case. 459 F. 3d 582, 587-88 (5th Cir. 2006) (finding party had standing to sue to keep opposing candidate from appearing on the ballot unlawfully).

Plaintiffs' attempt to claim organizational standing fairs no better. As the Ninth Circuit has observed, to obtain organizational standing, a plaintiff must show "(1) frustration of its organizational mission; and (2) diversion of its resources." *Smith v. Pac. Props. and Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004). Plaintiffs first suggest—wrongly—that they need only satisfy one of the two prongs. The Ninth Circuit has been plain that both prongs must be satisfied. Even assuming Committee Plaintiffs can meet the first prong, their generic allegations that they will have to spend additional money on "Get Out the Vote ("GOTV") assistance," "voter persuasion efforts," and making "contributions and expenditures in the tens of millions of dollars to persuade and mobilize voters to support Democratic Senate candidates" (Doc. 13, ¶¶ 24–26) are insufficient. This is what political committees do—Plaintiffs cannot turn their normal activities into a "harm" to manufacture standing. *See, e.g., Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1054 (9th Cir. 2009) (discounting alleged "harm" consisting of doing the "normal operations" of an organization).

Like Voter Plaintiffs, Committee Plaintiffs cannot exploit the narrow doctrine of

---

[2] Despite Plaintiffs' argument, they cannot plausibly claim all their candidates are injured. Candidates running in or mostly in counties where Democrats are listed first cannot be "harmed" by the alleged primacy effect.

5

competitive standing to manufacture standing here. *See Townley*, 722 F.3d at 1135-36.

**B.    The Secretary is not a proper defendant.**

The Ballot Order Statute does not mention the Secretary. Nor does A.R.S. § 16-503, which directs the board of supervisors in Arizona's counties to prepare and print ballots. Nor does the Ballot Order Statute offer any discretion in how the counties list candidates—first, parties that fielded gubernatorial candidates in the prior election by votes within the county, then parties that did not field candidates listed alphabetically, then unaffiliated candidates, then a blank spot for write-in candidates. The Secretary did not create this law and has no power to enforce it. The "line of causation" between her actions is at best "attenuated," which defeats standing. *Allen v. Wright*, 468 U.S. 737, 757 (1984), *overruled in part on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.* 572 U.S. 118 (2014).

In response, Plaintiffs cite several other cases where the Secretary's connection with the claimed injury was more direct. For example, in *Arizona Democratic Party v. Reagan*, the plaintiff party challenged the legality of a voter registration deadline after the "Secretary made the determination concerning the . . . deadline." No. CV-16-03618-PHX-SPL, 2016 WL 6523427, at *7 (D. Ariz. Nov. 3, 2016). Similarly, in *Democratic National Committee v. Reagan*, Plaintiffs challenged the combined effect of several Arizona laws and the Arizona Election Procedures manual regarding the non-counting of out-of-precinct votes. No. CV-16-01065-DLR, at 1 (D. Ariz. Mar. 3, 2017). Judge Rayes held he could grant meaningful relief because he could order the Secretary to proscribe a rule, and the Secretary's co-defendant, the Attorney General, would be "authorized to prosecute county officials who violate it." *Id.* at 7.

Here, the facts are markedly different. *First*, Plaintiffs contention that the Secretary can be sued because she is the "Chief Elections Officer" is misleading at best. The Secretary serves in this role under A.R.S. § 16-142 for limited purposes where *federal* law requires the state to have a point person. Her authority is constrained to what is expressly granted to her by state law. Ariz. Const. art. V, § 9. *Second,* Plaintiffs do not

challenge the Election Procedures Manual, or any other decision made by the Secretary. *Third*, the Secretary has absolutely no discretion in how candidates from parties that participated in the previous election are to be listed. As a convenience, she identified the Ballot Order Statute's directives in the Election Procedures Manual, but the order is established by statute. Indeed, Plaintiffs claim the county officials who actually prepare and print ballots are not the proper defendants because they "have no discretion" in how they go about the task. The same is true for the Secretary—she has no discretion to set ballot order.

The Secretary has no more than an attenuated connection with the Ballot Order Statute. Thus, the Plaintiffs lack standing to pursue their claims against her.

**C.     The Secretary is immune from lawsuit.**

Similarly, the Secretary is immune from lawsuit because a "general supervisory power over the persons responsible for enforcing the challenged provision" is insufficient to invoke the *Ex parte Young* exception and subject a state official to suit. *Coal. to Defend Affirmative Action v. Brown*, 674 F.3d 1128, 1134 (9th Cir. 2012) (citation omitted).

Plaintiffs argue (at 13) that the Secretary has a "duty to enforce the election laws," which makes her subject to suit. It is unclear where they have found this duty. They seem to point to A.R.S. § 16-452, which authorizes the Secretary to promulgate rules related to "producing, distributing, collecting, counting, tabulating and storing ballots," but those rules must ultimately comport with state law, including the Ballot Order Statute. A.R.S. § 16-452(A). And the Secretary is not vested with the authority to initiate criminal prosecutions for violations of those rules.

**D.     Plaintiffs' claims lack a judicially manageable standard.**

Arizona's Ballot Order Statute does not lock any one party into the first position on the ballot. Rather, it causes the order of political parties on the ballot to be rotated based on the outcome of the prior gubernatorial race in each county. Plaintiffs complain that the rotation is not perfect enough, and has allegedly provided a "consistent, unfair,

1   and arbitrary electoral advantage" to a party they do not support. (*Id*. ¶ 61.) Since no
2   party will be listed first throughout the state, Plaintiffs will apparently seek to prove that
3   the advantage of being first given to their party's candidates in some counties will be
4   outweighed by the advantage of going first by another party's candidates in different
5   counties.
6       Plaintiffs' attempt to cast this as a simple, straightforward, and justiciable
7   constitutional issue plainly fails in light of *Rucho v. Common Cause*, 139 S.Ct. 2484
8   (2019). In *Rucho*, though not an identical context, the Supreme Court admonished that
9   courts require "judicially discernible and manageable" standards. *Id.* at 2498 (citation
10  omitted). These standards "must be grounded in a 'limited and precise rationale' and be
11  'clear, manageable, and politically neutral.'" *Id.* quoting *Vieth v. Jubelirer*, 541 U.S. 267,
12  306-08 (2004) (opinion of Kennedy, J.). And the Supreme Court specifically
13  distinguished constitutional claims that rely on complex statistical modeling, rather than
14  those that were "relatively easy to administer as a matter of math." *Rucho*, 139 S.Ct. at
15  2501. Just as courts cannot enjoin a legislative map on the basis of a complex statistical
16  model showing it is supposedly unfair, they cannot enjoin a ballot ordering scheme on the
17  basis of a complex statistical model supposedly showing it is unfair in the aggregate.
18      Plaintiffs first argue that *Rucho* has no application beyond partisan
19  gerrymandering cases. The Ninth Circuit disagrees. *See Juliana v. United States*, —
20  F.3d—, 2020 WL 254149, at *9, (Jan. 17, 2020) (extending *Rucho* to claim unrelated to
21  partisan gerrymandering and vacating district court injunction). Plaintiffs cannot ask this
22  Court to ignore *Rucho*. A constitutional standard that requires a complex, mathematical
23  comparison to a baseline "fair" primacy effect is no different. *See Id.* at *9 (observing
24  that *Rucho*'s holding is that "a proposed standard involving a mathematical comparison
25  to a baseline election map is too difficult for the judiciary to manage").
26      Plaintiffs next argue (at 16) that this Court can adjudicate this claim because all
27  they ask is that this Court find that certain votes are not intentional but "windfall" votes,
28  and Arizona has a constitutional obligation to "distribut[e]" these windfall votes

...

1  "equally." It is unclear why Plaintiffs believe an invitation for courts to declare that some
2  votes are less constitutionally meaningful than others is a point in their favor; as the
3  Fourth Circuit has observed, nothing in the Constitution would appear to grant courts this
4  power. *See Libertarian Party of Va. v. Alcorn*, 826 F.3d 708, 718 (4th Cir. 2016)
5  (expressing doubt that courts can treat "some voters' choices a[s] less constitutionally
6  meaningful than the choices of other supposedly more informed or committed voters").

7  Plaintiffs also argue that the claim is justiciable because "Arizona is patently
8  aware of what a 'fair' ballot order looks like and how to implement it." This entirely
9  misses the point of non-justiciability analysis. That Arizona might be able to develop
10 some more "fair" system from the Plaintiffs' perspective is not an invitation for the
11 judiciary to solve a problem. *See Juliana*, 2020 WL 254149, at *10 ("Not every problem
12 posing a threat—even a clear and present danger—to the American Experiment can be
13 solved by federal judges."). Federal courts "have no commission to allocate political
14 power and influence in the absence of a constitutional directive or legal standards to
15 guide [courts] in the exercise of such authority." *Rucho*, 139 S.Ct. at 2508. That
16 Arizona—whether through the Secretary, Arizona's legislature, or Arizona's courts—
17 might be able to develop a more "fair" system does not mean it is the province of federal
18 courts to mandate it.

19 Nor is extending *Rucho* to similar claims, such as Plaintiffs', that seek to declare
20 elections regulations unconstitutional based on advanced statistical analysis of their
21 partisan effect an invitation to "hold that essentially any elections-related challenge with
22 political ramifications is non-justiciable" as Plaintiffs claim (at 15). Plaintiffs cite
23 *Democratic National Committee v. Hobbs*, No. 18-15845 (9th Cir. Jan. 27, 2020) (en
24 banc), to argue their claims are justiciable, but *Hobbs* applied a statutory standard (*see,
25 e.g.,* slip op. 34 and 35) set out by Congress and did not ask any court to reallocate votes
26 based on some statistical model of fairness. *Rucho* forbids only the narrow class of
27 claims, such as Plaintiffs', which seek to impose "fairness" and reallocate partisan power
28 based on advanced statistical modeling.

E.     **Plaintiffs fail to state a claim under the First or Fourteenth Amendments.**

While the Court need not reach the merits of Plaintiffs' claims given the numerous fatal jurisdictional flaws, Plaintiffs fail to state a claim. No matter how Plaintiffs describe their claim, it boils down to an allegation that it violates their constitutional rights under the First and Fourteenth Amendments if candidates from the political party they support are listed first on only some of the ballots in Arizona, and second on others. Plaintiffs fail to articulate any plausible burden on any protected right. And for good reason: all the statute does is sometimes require Plaintiffs to select a candidate closer to the bottom of the list.

Rather, Plaintiffs rely on a strained theory of "vote dilution" that does not allege Arizona has sought to reduce their political power, but rather that Arizona has failed to account for the possibility that some voters might be casting irrational votes based on ballot order, and that Arizona should be trying to ensure these irrational votes are evenly distributed. This claim is a non-starter because "[v]oters have no constitutional right to a wholly rational election, based solely on reasoned consideration of the issues and the candidates' positions, and free from other 'irrational' considerations[.]" *Clough v. Guzzi*, 416 F. Supp. 1057, 1067 (D. Mass. 1976). As the Fourth Circuit has observed, "mere ballot order neither denies the right to vote, nor the right to appear on the ballot, nor the right to form or associate in a political organization." *Libertarian Party of Va.*, 826 F.3d at 717. Certainly, the minimal burden suffered by Plaintiffs is wholly justified by the State's legitimate interests in an orderly, symmetrical ballot. *See id.* at 719-20 (noting that election officials have a good reason for designing ballots that minimize confusion).

Plaintiffs spend nearly a page of their response insisting that the *Anderson/Burdrick* balancing test applies to their claims, such as they are, a point the Secretary did not dispute. Next, Plaintiffs note that some courts have found ballot ordering systems that uniformly place a single party in the first position throughout the state are unconstitutional, an irrelevant point because Arizona does not.

Plaintiffs suggest that the Ninth Circuit held in *Soltysik v. Padilla*, 910 F.3d 438

(9th Cir. 2018) that it is *never* appropriate to dismiss a challenge to an election law under Rule 12(b)(6). *Soltysik* made no such holding. Rather, when a plaintiff "adequately plead[s] . . . more than a minimal burden," further factual development is necessary. *Id*. at 449. When the burden is minimal, dismissal may be appropriate. *See, e.g., Storer v. Brown*, 415 U.S. 724, 728 (1974) (affirming dismissal of challenges to election law); *Rubin v. City of Santa Monica*, 308 F.3d 1008, 1012-13, 1019-20 (9th Cir. 2002) (same). Here, Plaintiffs have not adequately pleaded more than the minimal burden of having to look slightly lower down the page. *Libertarian Party of Va.*, 826 F.3d at 717 (finding that ballot order laws impose "only a minimal burden on First and Fourteenth Amendment rights"). Their claims are thus appropriate for resolution now. *See id*. at 712–21 (affirming district court's dismissal under Rule 12(b)(6) regarding a ballot order law).

**F.     Conclusion.**

The Court should dismiss the complaint in its entirety.

Respectfully submitted this 31st day of January, 2020.

          OSBORN MALEDON, PA

          s/ Mary R. O'Grady
          Mary R. O'Grady (011434)
          Kimberly I. Friday (035369)
          Emma J. Cone-Roddy (034285)
          OSBORN MALEDON, P.A.
          2929 North Central Avenue, Suite 2100
          Phoenix, Arizona 85012–2793
          (602) 640-9000

          MARK BRNOVICH
          ATTORNEY GENERAL

          Linley Wilson (027040)
          Deputy Solicitor General
          Kara Karlson (029407)
          Assistant Attorney General
          2005 North Central Avenue
          Phoenix, AZ  85004-1592
          Telephone (602) 542-4951
          Facsimile (602) 542-4385

          *Attorneys for Defendant Arizona Secretary of State Katie Hobbs*