1   Sarah R. Gonski (# 032567)
    PERKINS COIE LLP
2   2901 North Central Avenue, Suite 2000
    Phoenix, Arizona 85012-2788
3   Telephone: (602) 351-8000
    Facsimile: (602) 648-7000
4   SGonski@perkinscoie.com

5   Marc E. Elias (WDC# 442007)*
    Elisabeth C. Frost (WDC# 1007632)*
6   John M. Geise (WDC# 1032700)*
    PERKINS COIE LLP
7   700 Thirteenth Street NW, Suite 600
    Washington, D.C. 20005-3960
8   Telephone: (202) 654-6200
    Facsimile: (202) 654-6211
9   MElias@perkinscoie.com
    EFrost@perkinscoie.com
10  JGeise@perkinscoie.com

11  Abha Khanna (WA# 42612)*
    PERKINS COIE LLP
12  1201 Third Avenue, Suite 4900
    Seattle, WA 98101-3099
13  Telephone: (206) 359-8000
    Facsimile: (206) 359-9000
14  AKhanna@perkinscoie.com

15  *Admitted Pro Hac Vice

16  *Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Brian Mecinas, *et al.*, | No. 19-cv-05547-DJH |
| Plaintiffs, | |
| v. | **REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| Katie Hobbs, in her official capacity as the Arizona Secretary of State, | |
| Defendant. | |

**TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................ 1

II. ARGUMENT...................................................................................................... 2

    A. Plaintiffs are highly likely to succeed on the merits of their claims. ................... 2

        1. The Secretary mischaracterizes the Statute and its impact. ........................... 2

        2. Courts have found statutes similar to Arizona's unconstitutional. ................. 3

        3. Plaintiffs have shown position bias impacts Arizona's elections.................... 5

        4. The Statute substantially burdens Plaintiffs' rights. ....................................... 7

        5. None of the Secretary's proffered interests justify the Statute. ...................... 9

    B. Without an injunction, Plaintiffs will suffer textbook irreparable harm. ........... 10

    C. The balance of equities and public interest support an injunction. .................... 10

CONCLUSION ............................................................................................................ 11

# TABLE OF AUTHORITIES

**CASES**

*Burdick v. Takushi*,
    504 U.S. 428 (1992) ............................................................................................. 9

*Common Cause v. Rucho*,
    279 F. Supp. 3d 587 (M.D.N.C. 2018), vacated and remanded, 138 S. Ct.
    1916 (2018) ........................................................................................................ 6

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993) ............................................................................................. 6

*Democratic Nat'l Comm. V. Reagan*,
    329 F. Supp. 3d 824 (D. Ariz. 2018) ................................................................... 6

*Gould v. Grubb*,
    536 P.2d 1337 (Cal. 1975) ......................................................................... 3, 8, 11

*Graves v. McElderry*,
    946 F. Supp. 1569 (W.D. Okla. 1996) ................................................................. 8

*Harper v. Va. State Bd. of Elections*,
    383 U.S. 663 (1966) ............................................................................................. 2

*Jacobson v. Lee*,
    411 F. Supp. 3d 1249 (N.D. Fla. 2019) ........................................................ 2, 5, 8

*Kautenburger v. Jackson*,
    333 P.2d 293 (Ariz. 1958) ................................................................................ 1, 3

*Lawrence v. Texas*,
    539 U.S. 558 (2003) ............................................................................................. 2

*Mann v. Powell*,
    314 F. Supp. 677 (N.D. Ill. 1969), *aff'd*, 398 U.S. 955 (1970) ...................... 3, 4, 9

*McLain v. Meier*,
    637 F.2d 1159 (8th Cir. 1980) .......................................................................... 4, 5

*N.C. State Conference of the NAACP v. McCrory*,
    182 F.Supp.3d 320 (2016) ................................................................................... 6

*NAACP v. Husted*,
 768 F.3d 524 (6th Cir. 2014), *vacated sub nom. Ohio State Conference
 of NAACP v. Husted*, 768 F.3d 524 (6th Cir. 2014) ....................................................... 6

*Netsch v. Lewis*,
 344 F. Supp. 1280 (N.D. Ill. 1972) ................................................................................. 3

*Ohio Org. Collaborative v. Husted*,
 189 F. Supp. 3d 708 (S.D. Ohio), *rev'd on other grounds sub nom. Ohio
 Democratic Party v. Husted*, 834 F.3d 620 (6th Cir. 2016) .......................................... 6

*Purcell v. Gonzalez*,
 549 U.S. 1 (2006) ......................................................................................................... 11

*Rucho v. Common Cause*,
 139 S. Ct. 2484 (2019) ................................................................................................... 9

*Sangmeister v. Woodard*,
 565 F.2d 460 (7th Cir. 1977) ............................................................................... 2, 3, 11

*Schulz v. Williams*,
 44 F.3d 48 (2d Cir. 1994) ............................................................................................... 8

*Smith v. Boyle*,
 144 F.3d 1060 (7th Cir. 1998) ....................................................................................... 7

*Soltysik v. Padilla*,
 910 F.3d 438 (9th Cir. 2018) ................................................................................... 5, 10

*Sw. Voter Registration Educ. Project v. Shelley*,
 344 F.3d 914 (9th Cir. 2003) ....................................................................................... 10

*Tex. Democratic Party v. Benkiser*,
 459 F.3d 582 (5th Cir. 2006) ......................................................................................... 7

*Thomas J. Kline, Inc. v. Lorillard, Inc.*,
 878 F.2d 791 (4th Cir. 1989) ......................................................................................... 6

*Weinberger v. Wiesenfeld*,
 420 U.S. 636 (1975) ....................................................................................................... 2

*Whitford v. Gill*,
 218 F. Supp. 3d 837 (W.D. Wis. 2016), *vacated and remanded*, 138 S.
 Ct. 1916 (2018) .............................................................................................................. 6

**STATUTES**

A.R.S. §§ 16-464 ............................................................................................................. 1

A.R.S. § 16-502(C) ........................................................................................................ 10

A.R.S. § 16-502(E) ..................................................................................................... 1, 3

**OTHER AUTHORITIES**

Fed. R. Civ. P. 10(c) ....................................................................................................... 2

Fed. R. Evid. 702 ............................................................................................................ 5

## I. INTRODUCTION

The Secretary does not dispute that in primaries—and even general elections, when candidates from the same party run for the same office—Arizona rotates candidate position equally across ballots. *See* A.R.S. §§ 16-464; 16-502(H). The Secretary also does not dispute that this system only makes sense if the State recognizes (as the Arizona Supreme Court did in *Kautenburger v. Jackson*, 333 P.2d 293, 295 (Ariz. 1958)) that a meaningful advantage confers to the first-listed candidate. Indeed, the Secretary appears to implicitly recognize as much, insisting (albeit incorrectly) that the Ballot Order Statute, A.R.S. § 16-502(E), is a facially-neutral means of candidate "rotation." The Secretary's contention, therefore, that Plaintiffs fail to demonstrate that ballot order impacts Arizona's elections is all the more perplexing since *Arizona* has plainly concluded it *does.*

As detailed in Dr. Jon Krosnick's expert report, this is consistent with the now universal conclusion of serious academics, who have been studying the topic for years and have overwhelmingly found that ballot order impacts elections. Dr. Jonathan Rodden submits a detailed report confirming this is true in Arizona as well. In response, the Secretary offers the opinions of Sean Trende, a political blogger who has recently returned to school to study statistics and whose only relevant experience is the unrelated reports that other states attempting to avoid voting rights judgments have paid Mr. Trende to write. Given the paucity of his qualifications, it is not surprising that Mr. Trende's "analyses" here, too, are easily rebutted.

Despite the Secretary's insistence to the contrary, the Ballot Order Statute is not neutral: on its face, it favors candidates of a particular political party, and in practice it has not resulted in any meaningful "rotation" of candidates. Unless Plaintiffs motion is granted the same will be true in 2020, when the Statute will put a state-mandated thumb on the scale in favor of Republican Party candidates on ballots presented to 82% of Arizona's population. The Secretary fails to identify any legitimate justification for *this* ballot ordering scheme, making it clear she cannot prevail under *Anderson-Burdick*, and

1  she fares no better on the other preliminary injunction factors. In the end, the Secretary
2  reembraces the arguments from her motion to dismiss, attempting to convince the Court
3  not to tangle with the merits at all. As set forth in Plaintiffs' response to that motion, Doc.
4  27, those arguments fail.[1] The legal precedent and factual evidence compel the conclusion
5  that Plaintiffs' motion should be granted and the Ballot Order Statute enjoined.

## II.   ARGUMENT

### A.   Plaintiffs are highly likely to succeed on the merits of their claims.

#### 1.   The Secretary mischaracterizes the Statute and its impact.

The Secretary first describes the Statute's history, emphasizing that it was enacted in 1979 on a bipartisan basis, Doc. 29 ("Resp.") 2-4, but Plaintiffs' claims do not involve legislative intent. Nor does a statute's age shield it from invalidation. *See, e.g.*, *Lawrence v. Texas*, 539 U.S. 558, 578-79 (2003); *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638-39 (1975); *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 664-66 (1966); *Jacobson v. Lee*, 411 F. Supp. 3d 1249, 1263, 1286 (N.D. Fla. 2019); *see also Sangmeister v. Woodard*, 565 F.2d 460, 467 (7th Cir. 1977) (striking down ballot ordering practice that "ha[d] been carried out for at least 100 years").

The Secretary also misrepresents both the Statute's history and the nature and scope of Plaintiffs' harm. Most notably, the Secretary focuses not on the *number of voters* who have historically received ballots that list a party's candidates first, but on the *number of counties* where each party has been listed first. *See* Resp. 3. But Arizona's population is not evenly distributed; Maricopa County is home to over 60% of the State's registered voters. *See* Doc. 14 ("Pls.' Mot.") 6. Thus, the contention that the Ballot Order Statute is even a "*reasonable*" means of ensuring that no single party or category of candidate is regularly and systemically favored, Resp. 4, is transparently wrong.

The Secretary's assertion that the Statute is "non-partisan" or "politically neutral" is also incorrect. *See* Resp. 1, 8. It allocates the advantage conferred by the primacy effect

---

[1] Plaintiffs do not repeat those arguments here where avoidable, and instead incorporate that response by reference under Fed. R. Civ. P. 10(c).

1  to candidates in each county based *solely* on their partisan affiliation with the candidate
2  who received the most votes in the prior gubernatorial election. *See* A.R.S. § 16-502(E).
3  From the voter's perspective, the favored party's candidates will be listed first for a
4  minimum of four years. *See* Ariz Const. art. 5 §1.A. But in practice, changes in ballot
5  order have occurred far less frequently. For Maricopa County voters, for example, ballot
6  order has changed only four times in the Statute's entire 41-year existence. *See* Resp. 3.
7  Even then, the change was fleeting: Republican candidates have been listed first for 16 of
8  the 20 election cycles under the Statute in the State's most populous county. *See id*.

        **2.**     **Courts have found statutes similar to Arizona's unconstitutional.**

10      Even if the Secretary were right about the Statute's "*political* neutrality," that
11  would not save it from invalidation. Courts, including the U.S. Supreme Court, have
12  repeatedly found ballot ordering schemes that are explicitly linked to favoritism of a
13  particular party to be neither "neutral" nor constitutional. *See Mann v. Powell*, 314 F.
14  Supp. 677 (N.D. Ill. 1969), *aff'd*, 398 U.S. 955 (1970); *Sangmeister*, 565 F.2d 468 (noting
15  procedures that "invariably award[] the first position on the ballot to the County Clerk's
16  party, the incumbent's party, or the 'majority' party" are not "neutral"); *Netsch v. Lewis*,
17  344 F. Supp. 1280, 1281 (N.D. Ill. 1972) (granting TRO of statute that favored candidates
18  based on incumbency and seniority); *Kautenburger*, 333 P.2d at 295 (ballot order based
19  on fixed alphabetical order violated Arizona Constitution); *Gould v. Grubb*, 536 P.2d
20  1337, 1346 (Cal. 1975) (incumbent-first statute violated federal and state constitution).
21  And although the Secretary claims that the "mandatory" nature of the relief sought here is
22  reason to deny the motion, Resp. 7, she fails to mention that the preliminary injunction the
23  Supreme Court affirmed in *Mann* granted exactly the relief Plaintiffs request. *Compare*
24  *Mann*, 314 F. Supp. at 679 (requiring implementation of a "nondiscriminatory means by
25  which each of such candidates shall have an equal opportunity to be placed first on the
26  ballot") *with* Pls.' Mot. 2 (requesting "a nondiscriminatory system that gives similarly
27  situated major-party candidates an equal opportunity to be listed first on the ballot").

28

1    The Secretary's attempts to distinguish the extensive precedent finding similar
2 statutes unconstitutional only illustrate why Plaintiffs are highly likely to succeed. For
3 example, the Secretary argues *McLain v. Meier*, 637 F.2d 1159 (8th Cir. 1980), in which
4 the Eighth Circuit reversed a decision denying an injunction of a ballot order statute, is
5 different because: (1) Arizona's Statute "varies which party is listed first throughout the
6 state," (2) it "does not place incumbents first," and (3) *McLain* was decided under rational
7 basis review. Resp. 11. As already discussed, Arizona's Ballot Order Statute does not
8 meaningfully rotate candidates. Moreover, the Secretary provides no basis for concluding
9 that the fact that the Ballot Order Statute mandates the first position based on a party's
10 vote share on a county basis, rather than imposing a fixed state-wide ballot order, saves it
11 from unconstitutionality. In fact, such a conclusion would be contrary to the Supreme
12 Court's affirmance of *Mann*. There, the practice at issue did *not* assure that the favored
13 class of candidates *always* had the first place on the ballot; it *only* elevated incumbents
14 when its first-line neutral ballot ordering system resulted in a tie. 314 F. Supp. at 678.

15    As for the Secretary's attempt to distinguish *McLain* as an "incumbent-first"
16 statute, it is both wrong as a matter of fact and inconsequential as a matter of law.
17 Although *McLain* referred to the statute at issue as an "incumbent-first" statute in a
18 section heading, the opinion shows that it, like Arizona's Statute, reserved the first
19 position for candidates of one party (there, the party with the highest vote in the last
20 congressional election). *See* 637 F.2d at 1166. And, as Plaintiffs have noted, it is not just
21 incumbent-only statutes that courts have invalidated. Courts have consistently found that
22 ballot order statutes (like Arizona's) that impose a predetermined systemic favoritism of
23 one category of candidates over others similarly situated are unconstitutional, be it based
24 on incumbency, seniority, party affiliation, prior party vote share, or the like. Pls.' Mot. at
25 11.

26    As for *McLain*'s application of rational basis review, the case predated the
27 Supreme Court's development of the *Anderson-Burdick* standard. The Secretary concedes
28 that *Anderson-Burdick* now "governs challenges to the voting process," including this

one. Resp. 7. And in the decades that have passed since the standard was announced, the Ninth Circuit has squarely rejected the notion that pure rational basis review is *ever* appropriate under *Anderson-Burdick*: instead, courts always must conduct a means-fit analysis. *See, e.g.*, *Soltysik v. Padilla*, 910 F.3d 438, 444, 450 (9th Cir. 2018). That said, the fact that the Eighth Circuit found the statute in *McLain* could not survive even rational basis underscores why Plaintiffs are highly likely to succeed here. *See also Jacobson*, 411 F. Supp. 3d at 1282-83 (finding Florida's statute fails even rational basis review).

### 3. Plaintiffs have shown position bias impacts Arizona's elections.

Plaintiffs have introduced expert opinions from two well-regarded tenured professors of political science at Stanford University: Dr. Krosnick, who analyzed over 70 years-worth of ballot order studies, many of which he authored, and Dr. Rodden, who conducted statistical analyses of Arizona election results from the past 40 years. Defendants' proffered expert in response is Sean Trende, a political blogger currently pursuing a degree in political science who is unqualified to act as an expert in this case, *see* Fed. R. Evid. 702, and whose report reflects this in its repeated misuse and misunderstanding of statistical analyses. *See, e.g.*, Second Rodden Rpt. at 6-7, 11-12, 15-16; Second Krosnick Rpt. ¶¶ 10-14, 17.

Mr. Trende does not purport to be an expert in ballot order or the statistical analysis of elections data, Doc. 30-1 ¶ 2, the subjects of Plaintiffs' expert reports. He obtained his master's degree in applied statistics just last year and is still finishing his doctorate coursework. *Id*. ¶¶ 9, 10. For the past decade, Mr. Trende has worked at RealClearPolitics, a website that aggregates political news and commentary, *id*. ¶ 11, and before that was a law firm associate, *id.*, Ex. 1. He has never published any statistical analysis in a peer-reviewed journal.[2] Mr. Trende's strongest claim to expertise is having previously been hired as an expert by litigants, but even there his record is deficient. Of the ten cases Mr. Trende's report mentions, *id*. ¶¶ 22-27, he never testified in four, and courts in the other

---

[2] Although Mr. Trende states RealClearPolitics "produces original content, including [ ] data analysis," he does not assert *he* has ever produced original data analysis. *See id.* ¶ 12.

-5-

1    six criticized, disclaimed, and/or discounted his analysis.[3] *See also Thomas J. Kline, Inc.*
2    *v. Lorillard, Inc.*, 878 F.2d 791, 800 (4th Cir. 1989) ("[I]t would be absurd to conclude
3    that one can become an expert simply by accumulating experience in testifying.").

4    For all of these reasons, this Court should strike Trende's report and/or exclude his
5    testimony from these proceedings. *See* LRCiv 7.2(m)(2); *Daubert v. Merrell Dow Pharm.,*
6    *Inc.*, 509 U.S. 579, 597 (1993). But even if the Court were to consider his report, his
7    critiques are baseless, speculative, and unreliable. As detailed in Dr. Rodden's rebuttal
8    report, Mr. Trende's report suffers from multiple basic errors in statistical analyses,
9    including mindlessly adding variables highly correlated with each other, attempting to
10   import from other areas of study models ill-suited for the questions at issue, and then
11   applying them mechanistically, without thought or care for their design or what the results
12   might mean. Second Rodden Rpt. at 6-7, 11-12, 15-16. The only careful thought that
13   appears to have gone into Mr. Trende's report is his choice of specific variables to reverse
14   engineer his model to reach the result that he prefers—as Dr. Rodden shows, virtually any
15   other application of the data or the models supports *Dr. Rodden's* conclusions. *Id.* at 6-8,
16   12. Mr. Trende's criticisms of Dr. Krosnick's report similarly reveal Mr. Trende's lack of
17   understanding of statistical methods, and repeatedly mischaracterize the findings of the

---

[3] *NAACP v. Husted*, 768 F.3d 524, 536-37 (6th Cir. 2014), *vacated sub nom. Ohio State Conference of NAACP v. Husted*, 768 F.3d 524, 536 (6th Cir. 2014) (approving of district court's decision to credit the findings of an "academic in the area of electoral processes and election issues" over those of Trende, "an elections analyst for [a] political website [ ], who apparently has not conducted a peer-reviewed analysis similar to the one at issue here"); *Ohio Org. Collaborative v. Husted*, 189 F. Supp. 3d 708, 723 (S.D. Ohio), *rev'd on other grounds sub nom. Ohio Democratic Party v. Husted*, 834 F.3d 620 (6th Cir. 2016) (finding "much of Trende's report [ ] irrelevant to the Court's analysis"); *Democratic Nat'l Comm. V. Reagan*, 329 F. Supp. 3d 824, 837 (D. Ariz. 2018) (Trende's opinion deserved little weight because his critique of another expert's analysis was "insignificant" and "offered no new information or analysis," he lacks a Ph.D., and he had never written a peer reviewed article); *Whitford v. Gill*, 218 F. Supp. 3d 837, 914-15 (W.D. Wis. 2016), *vacated and remanded*, 138 S. Ct. 1916 (2018) (significance of Trende's analysis was "not clear" and the analysis had "problem[s]" and lacked "analytical detail"); *Common Cause v. Rucho*, 279 F. Supp. 3d 587, 647 n.24 (M.D.N.C. 2018)), *vacated and remanded*, 138 S. Ct. 2679 (2018) (citing Trende only for a concession supporting the other side's experts); *N.C. State Conference of the NAACP v. McCrory*, 182 F.Supp.3d 320, 382 n.71 (2016) (Trende was qualified only "to present and organize the laws of the fifty States").

studies discussed, including in several of Dr. Krosnick's own published papers. Second Krosnick Rpt. ¶ 14. Mr. Trende's response is also highly selective, ignoring studies from numerous states finding primacy effects. *Id.* ¶ 12. Despite all of this, in the end, even Mr. Trende acknowledges that Dr. Krosnick's review of the literature studying ballot order effects—an area of study in which Dr. Krosnick has dedicated himself to for over 20 years and in which he is widely recognized as the leading academic—"is largely accurate." Doc. 30-1 ¶ 102. For all of these reasons, the Court should strike Mr. Trende's report and prohibit him from testifying in these proceedings, but in any event, Plaintiffs have strongly demonstrated that ballot order impacts Arizona's elections.

### 4. The Statute substantially burdens Plaintiffs' rights.

For the reasons already discussed, Mr. Trende's sloppy critique of Dr. Krosnick's and Dr. Rodden's work fails to rebut the strongly supported conclusion that the ballot order effect significantly impacts Arizona's elections. *See supra* § II.A.3. Further, the Secretary does not actually dispute that the effect of the Statute has been to heavily favor Republican candidates in Arizona elections, and that in 2020 it would dictate that 82% of Arizona's voters receive ballots that list Republicans first. *See* Doc. 15-3.

Given this evidence, the fact that each of the Plaintiffs who have brought this action have been and will continue to be substantially burdened as a result of the Statute is beyond serious debate. Of course Democratic Party entities and voters are injured by a law that systemically puts a thumb on the scale in favor of the Republican Party. The Secretary's argument to the contrary—particularly as it relates to the political party Plaintiffs—conflates the question of burden with standing, *see* Resp. 8-10, but on that front it is also wrong, ignoring the vast body of case law (including in this district and the Ninth Circuit) finding political party entities have standing because their fundamental rights are directly injured when they or their candidates are systemically disadvantaged by an elections law. *See* Doc. 27 at 5-8 (discussing case law); *see also, e.g.*, *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 589 (5th Cir. 2006); *Smith v. Boyle*, 144 F.3d 1060, 1061–63 (7th Cir. 1998) (Republican Party had standing to challenge rules that

1 disadvantaged candidate); *Schulz v. Williams*, 44 F.3d 48, 53 (2d Cir. 1994) (Party official
2 had standing to challenge opposing candidate's position on the ballot where opponent
3 "could siphon votes from" candidate).

4 That some challenges to other ballot order statutes were brought by candidates, *see*
5 Resp. 9, does not mean that political parties cannot lay claim to the same burdens. And in
6 attempting to make the case that the parties are not burdened by the Statute (even while
7 conceding that candidates may be, *see* Resp. 8-9), the Secretary ignores that the *Jacobson*
8 court recently unequivocally found to the contrary. 411 F. Supp. 3d at 1259-61. That
9 decision was consistent with the extensive precedent discussed above, in which courts
10 have recognized that a law that harms a party's electoral prospects, whether conceived of
11 as a harm to individual candidates, voters, or the party itself, is a legally cognizable harm
12 to the party. This is exceedingly logical: a political party at its most basic is individuals
13 who associate to advance shared political interests through the election of preferred
14 candidates. In the standing context, moreover, courts have routinely rejected the argument
15 that parties may not bring voting rights claims on behalf of candidates.

16 The burden that the Statute imposes on the political party Plaintiffs is alone
17 sufficient to demonstrate a substantial burden under *Anderson-Burdick*, but the evidence
18 also proves the Statute substantially burdens the individual Plaintiffs' rights. *See* Pls.'
19 Mot. 13-14. In opposition, the Secretary repeatedly incorrectly states that Plaintiffs ask the
20 Court to discount unconcerned or uninformed voters. *See* Resp. 11. Not so. As Plaintiffs
21 have previously explained, the injury they suffer "is not that voters are susceptible to the
22 common psychological phenomenon of primacy effect; it is that the state implements a
23 ballot order scheme that ensures the predictable advantage will accrue to candidates of a
24 certain political party." Doc. 27 at 9-10. The Secretary similarly mischaracterizes the
25 findings in *Graves*, *Gould*, and *Jacobson*, all of which found that the statutes at issue
26 burdened plaintiffs because of the manner in which they distributed the advantages that
27 accrue from position bias. *See Graves v. McElderry*, 946 F. Supp. 1569, 1579-80 (W.D.
28 Okla. 1996); *Gould*, 536 P.2d at 1342-44; *Jacobson*, 411 F. Supp. 3d at 1276-77.

1  Plaintiffs do not seek to have any election undone or any ballot invalidated; they merely
2  seek to remove the state-mandated bias that the Statute imposes on Arizona's elections.

3  Finally, for the reasons discussed in Plaintiffs' response to the motion to dismiss, any reliance on *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019), is fundamentally misplaced and, if accepted, would set a dangerous precedent that could broadly be used to deny voting rights plaintiffs their day in court, even in cases (such as this one) that federal courts have been ably adjudicating for decades. *See* Doc. 27 at 2, 15-17. *Rucho* marked the point where the Supreme Court gave up trying to find a judicially manageable standard for partisan gerrymandering claims after decades of futility. *See* 139 S. Ct. at 2491, 2507 (explaining Court "struggled without success" to identify a standard and, as a result, it "ha[d] never struck down a partisan gerrymander as unconstitutional—despite various requests over the past 45 years"). In contrast, courts have been evaluating challenges to ballot order statutes for decades and the Supreme Court affirmed a preliminary injunction of one in *Mann*.

**5.    None of the Secretary's proffered interests justify the Statute.**

None of the interests offered by the Secretary to justify the Statute explain its favoritism of candidates of the same party as the gubernatorial candidate who received the most county-level votes. *See* Resp. 12-14. Instead, the Secretary relies on generalized interests in a ballot ordering system that is "facially-neutral, manageable, and cost-efficient." Resp. 12. But the question is why the burdens on *these* Plaintiffs' rights is justified by *this* specific Statute's particular method of ballot order. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992). The Secretary never answers this question.

For example, the purported interest in having all candidates of a party listed uniformly down each ballot could just as easily be met by rotating parties by jurisdiction to accomplish true (not merely aspirational) rotation. And, if, as the Secretary insists, all ballots in a county must be ordered the same (a somewhat dubious proposition given that Arizona already rotates candidates within counties in primaries and on certain general election ballots), that, too, could be done without systemically favoring the candidates of

one party (e.g., by flipping a coin in the county each election). The Secretary's assertion that general elections are different because voters are looking for party designations might make sense if Arizona voters had to figure out which candidate belonged to which party based on ballot placement, but they do not. Arizona expressly designates each candidate's party on the ballot with terms such as "Rep." and "Dem.," *see* A.R.S. § 16-502(C), and Plaintiffs do not seek the removal of those designations.

In other words, the Secretary completely sidesteps the "means-fit" test *Anderson-Burdick* requires. *Soltysik*, 910 F.3d at 449. She does so because the Ballot Order Statute's favoritism is indefensible, and Plaintiffs are highly likely to succeed on their claims.

### B. Without an injunction, Plaintiffs will suffer textbook irreparable harm.

The Secretary's argument that Plaintiffs have failed to establish irreparable harm is undercut by her acknowledgement that "a deprivation of constitutional rights is irreparable harm." Resp. 16. Plaintiffs have amply established that the Ballot Order Statute burdens both their right to equal protection and their ability to advance their political interests, constitutional injuries that constitute irreparable harm. *Supra* § II.A.4; *see also* Pls.' Mot. 8-14. The Secretary's arguments to the contrary are unsupported by legal citation, and for good reason. There is no basis for conditioning a finding of irreparable harm (here, a systemic disadvantage in an election that cannot, after the election is over, be remedied) on any of the facts that the Secretary focuses on.[4]

### C. The balance of equities and public interest support an injunction.

The balance of the equities and the public interest also strongly favor an injunction. In response, the Secretary asserts for the first time that Maricopa County's voting machines require a software update to permit rotation among top-tier candidates. Resp. 16-17. This is surprising given that when the Secretary first sought to delay these proceedings, Plaintiffs expressed their concern that the Secretary would later use any delay to argue that Plaintiffs' injury could not be remedied in advance of the November

---

[4] *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914 (9th Cir. 2003), involved a "extraordinary" preliminary injunction of an entire election, *id.* at 919, and is thus inapt.

-10-

1  2020 election. Doc. 19 at 2-4. In response, the Court directed the Secretary to identify the
2  date by which a decision was needed to allow sufficient time to implement a remedy, Doc.
3  20 at 3, and the March hearing date was set based on the Secretary's response. That
4  response stated that a remedy could be implemented as late as *June or July*. Doc. 22 at 11.
5  At no point did the Secretary state there would be an issue with doing so. Nevertheless, if
6  the Court issues a decision shortly after the March hearing the Secretary's own evidence
7  shows that should allow sufficient time even for top-tier rotation. *See* Doc. 30-2 at ¶ 7
8  (stating software change would take three to four months to certify).

But even if that were not the case, top-tier rotation is only one of a host of constitutional remedies this Court could order. Plaintiffs' preliminary injunction motion is not predicated on a specific remedy. They have suggested top-tier rotation because it respects Arizona's choice to order its candidates in tiers, but the Court is free to enter any remedy that cures the constitutional deficiency in the Statute's favoritism of a certain type of candidate over others similarly situated. By the Secretary's own admission, "[a]ll counties can rotate all candidates," Resp. 16 n.8, so that remedy it appears would be easily (and instantly) implementable, without administrative burden or delay. The Court could also order that first position within each county be determined by lot (either among top-tier or all candidates) for the 2020 election. Indeed, courts have repeatedly ordered more expedient remedies for upcoming elections where time did not allow for rotational ballot ordering schemes. *See, e.g.*, *Sangmeister*, 565 F.2d at 463; *Gould*, 536 P.2d at 1340. Plaintiffs also predicted the Secretary's citation to *Purcell v. Gonzalez*, 549 U.S. 1 (2006), *see* Doc. 19 at 3, but the Secretary has unholstered this weapon prematurely. There remain more than nine months before the next election, and the Secretary previously assured the Court it had plenty of time to decide this matter. Doc. 22 at 10-11. Her attempt to backtrack now is not supported by credible facts.

## CONCLUSION

Plaintiffs request that the Court grant their motion for a preliminary injunction.

Dated: February 3, 2020

*/s/ Sarah R. Gonski*
Sarah R. Gonski (Bar No. 032567)
**PERKINS COIE LLP**
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788
Telephone: (602) 351-8000
Facsimile: (602) 648-7000
SGonski@perkinscoie.com

Marc E. Elias (WDC Bar No. 442007)*
Elisabeth C. Frost (WDC Bar No. 1007632)*
John M. Geise (WDC Bar No. 1032700)*
**PERKINS COIE LLP**
700 Thirteenth Street NW, Suite 600
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-6211
MElias@perkinscoie.com
EFrost@perkinscoie.com
JGeise@perkinscoie.com

Abha Khanna (WA Bar No. 42612)*
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Telephone: (206) 359-8000
Facsimile: (206) 359-9000
AKhanna@perkinscoie.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 3, 2020, I electronically transmitted the attached document to the Clerk's Office using the ECF System for filing and transmittal of a Notice of Electronic Filing to the ECF registrants.

/s/ Michelle DePass