**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Brian Mecinas, et al., | No. CV-19-05547-PHX-DJH |
| Plaintiffs, | **ORDER** |
| v. | |
| Katie Hobbs, | |
| Defendant. | |

This matter is before the Court on Plaintiffs' Motion for Preliminary Injunction (Doc. 14) and Defendant's Motion to Dismiss the First Amended Complaint (Doc. 26). Plaintiffs seek declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202. (Doc. 13).  The Court held oral argument on the Motion to Dismiss and an evidentiary hearing on the Motion for Preliminary Injunction on March 4, 5, and 10, 2020 ("Hearing"), and took both Motions under advisement.  (Docs. 49, 52, and 55).

**I.    Background**

This case involves the constitutionality of Arizona's general election ballot ordering statute, A.R.S. § 16-502(E) (the "Ballot Order Statute").  The Ballot Order Statute, enacted in 1979, will be utilized for the twentieth time in the November 2020 general election.  The Ballot Order Statute establishes the order in which candidates appear on the ballot in each of Arizona's fifteen counties.[1]  Names of candidates are listed according to their political

---

[1] The Statue was enacted in 1979 as a part of a comprehensive elections code agreed to by the Arizona Democratic and Republican parties and the County Recorders Association. The Statute, which has periodically been modified over time with participation of the 15 County Recorders, aims to "help the County Recorders and Election Directors do a better

party, "in descending order according to the votes cast for governor for that county in the most recent general election for the office of governor." A.R.S. § 16-502(E). Therefore, candidates of the political party that received the most votes in the most recent gubernatorial election in that county appear first in all races and on all ballots in that county. *Id*. This has generally led to Republican candidates being listed first in some counties, and Democratic candidates being listed first in other counties in any given general election.[2] A three-letter political party identification—DEM for Democrat and REP for Republican— is listed next to each candidate's name regardless of the candidate's position on the ballot. A.R.S. § 16-502(C). This identification provides voters with visual cues when searching for their preferred party on the ballot.

### A.    The Parties

Plaintiffs in this matter include three Arizona voters, Brian Mecinas, Carolyn Vasko, and Patti Serrano (collectively the "Voter Plaintiffs"), and three organizations, the Democratic National Committee ("DNC"), the Democratic Senatorial Campaign Committee ("DSCC"), and PRIORITIES USA ("Priorities"), a political action committee (collectively the "Organizational Plaintiffs"). (Doc. 13). Plaintiffs contend that a "well-documented phenomena" known as "position bias" or "primacy effect" exists in elections of all kinds throughout the country. Plaintiffs define position bias as the "significant electoral advantage" gained by the first-listed candidate "merely from being listed first." (Doc. 14 at 5). They allege that candidates in Arizona who are listed first on the ballot obtain "several percentage points" more than those candidates not listed first. *Id.* While Plaintiffs acknowledge that the Ballot Order Statute could theoretically equally distribute the number of times a candidate from each party appears first, they argue that this could never happen in Arizona because the population is not equally divided between counties.

The Voter Plaintiffs allege that the Ballot Order Statute injures them, other Arizona

job and save public money." Ariz. H.R. Comm. Min., S.B. 1372 (Mar. 1, 2000).

[2] In four general elections since the Statute's enactment, 1984, 1986, 2008 and 2010, Democratic candidates appeared first on the ballots in every race in all 15 counties statewide. These four elections are the only instances where a single party's candidates were listed first on all ballots statewide since the Statute was enacted. (Doc. 15-1 at 11).

voters, and the candidates they support, by diluting their votes and creating an "artificial" advantage to Republicans.  (Doc. 13 at 9).  They explain that this "dilution" results from their votes needing to "compete with the overwhelming majority of Arizonans who vote in counties where the favored party is the Republican Party." (Doc. 13 at 6).  Moreover, they allege that the "weight and impact" of their votes are "consistently decreased by the votes accruing to the first-listed candidates." (Doc. 13 at 18).  The Voter Plaintiffs further allege that because they live in Maricopa County, where Republicans will be listed first on the ballot, they will personally suffer irreparable injury due to the burden on their ability to "engage in effective efforts to elect" Democrats.  (Doc. 13 at 8).  Plaintiff Mecinas specifically alleges that the Ballot Order Statues impedes his work of supporting and interning for a congressional campaign.  (*Id.*)  Plaintiff Vasko, who was 17 years old when this case was filed, alleges that the impact of her efforts to elect Democratic candidates, including during her mother's 2014 candidacy for the state legislature, have been negatively impacted.  (*Id.* at 9).  Plaintiff Serrano alleges that she participates in "advocacy efforts for progressive causes" that are negatively impacted by the Ballot Order Statute.  (*Id.* at 10).

Plaintiff DNC is the national committee of the Democratic Party.  It alleges that the Ballot Order Statute frustrates its mission to elect Democratic candidates and to actively support the development of programs that benefit its candidates.  (Doc. 13 at 10-11).  The DNC alleges that it has "seven members in Arizona and millions of constituents who affiliate with and consider themselves to be members of the Democratic Party." (Doc. 14-6 at 4).  The DNC alleges that it has expended extra resources and diverted funding to Arizona in order to combat the effects of the Ballot Order Statute.  (Doc. 13 at 10).  It further alleges that its members are harmed when Republican candidates are listed first "in the vast majority of Arizona's counties" because its members' votes are diluted.  (Doc. 13 at 10).

Plaintiff DSCC is the national senatorial committee of the Democratic Party with a mission of electing Democrats to the United States Senate.  (Doc. 13 at 11).  The DSCC

alleges that it spent millions of dollars in Arizona in 2018 to "persuade and mobilize voters to support Democratic Senate candidates" and that it "again intends to make substantial contributions and expenditures to support the Democratic candidate for U.S. Senate in Arizona in 2020." (*Id.*)  The DSCC alleges that the Ballot Order Statute frustrates its mission by giving an arbitrary and artificial electoral advantage to Republicans, including in Arizona Senate races.[3]  The DSCC states that, "[o]f particular concern to the DSCC is that the Ballot Order Statute will give the Republican candidate a meaningful advantage in what is expected to be a highly competitive race for U.S. Senate, as Republican Senator Martha McSally will be defending the seat to which she was appointed earlier this year." (Doc. 14-5 at 4).  It further alleges that the Ballot Order Statute will significantly impact DSCC's resources, "in a severe and irreparable way," by diverting money away from other unspecified states to combat the "arbitrary advantage" Republicans enjoy in Arizona.  (*Id.*)

Plaintiff Priorities is an advocacy organization with a mission to "engage Americans in the progressive movement by running a permanent digital campaign" to mobilize citizens around issues.  (Doc. 13 at 11).  Priorities spent money in Arizona in the 2018 election to advance this mission.  (*Id.* at 12).  Priorities alleges that the Ballot Order Statute frustrates its mission by giving an arbitrary and artificial electoral advantage to Republicans, which causes it to spend more money in Arizona and divert money away from other unspecified states.  (*Id.*)

### B.  Relief Requested

Plaintiffs request that the Court issue an order (1) declaring that the Ballot Order Statute is unconstitutional pursuant to the First and Fourteenth Amendments, (2) preliminarily and permanently enjoining the Secretary from utilizing the Ballot Order Statute, (3) directing the Secretary to comply with a new scheme they wish the Court to develop, and (4) awarding costs, disbursements and attorneys' fees incurred in bringing this action.  (Doc. 13).  Specifically, Plaintiffs request a system by which major party

---

[3] Democratic candidate, Kyrsten Sinema, won the U.S. Senate race in 2018, becoming the first Democrat elected to the Senate from Arizona in nearly three decades.  Simon Romero, *Kyrsten Simema Declared Winner in Arizona Senate Race,* THE NEW YORK TIMES, Nov. 12, 2018, https://www.nytimes.com/2018/11/12/us/kyrsten-sinema-arizona-senator.html.

candidates have an equal opportunity to be listed first on the ballot by either requiring the rotation of major party candidates by precinct or county, or by a lottery to determine which candidate will be listed first in each precinct or county.[4]  (Doc. 64 at 24-26).  At the hearing, Plaintiffs stressed that they are not requesting that Independent Party candidates or write-in candidates be included in the new rotation scheme.  (*Id.*)

### C.   Defendant's Position

Defendant argues that the Court must not reach the merits of Plaintiffs' arguments, as they have not alleged a concrete injury sufficient to satisfy the requirements of Article III standing, that the relief sought is barred by the Eleventh Amendment, and that the claims are non-justiciable political questions.  (Doc. 26).  Alternatively, Defendant argues that Plaintiffs failed to establish that the primacy effect exists in Arizona, and thus, that their claims fail as a matter of law.  The Court must first address Defendant's Motion to Dismiss and the jurisdictional arguments Defendant makes therein.  (Doc. 26).

## II.   Legal Standards

"To ensure that the Federal Judiciary respects the proper—and properly limited—role of the courts in a democratic society, a plaintiff may not invoke federal-court jurisdiction unless he can show a personal stake in the outcome of the controversy."  *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) (internal citations omitted).  Article III provides that federal courts may only exercise judicial power in the context of "cases" and "controversies."  U.S. CONST. art. III, § 2, cl. 1; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559 (1992).  For there to be a case or controversy, the plaintiff must have standing to sue. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) ("*Spokeo II*").  Whether a plaintiff has standing presents a "threshold question in every federal case [because it determines] the power of the court to entertain the suit."  *Warth v. Seldin*, 422 U.S. 490, 498 (1975). "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases

---

[4] Arizona recognizes three political parties: the Democratic Party, the Republican Party and the Libertarian Party.  *See* https://azsos.gov/elections/information-about-recognized-political -parties. (last visited June 25, 2020).

1   or controversies." *DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 341 (2006).   A suit

2   brought by a plaintiff without Article III standing is not a "case or controversy," and an

3   Article III federal court therefore lacks subject matter jurisdiction.  *Steel Co. v. Citizens for*

4   *a Better Environment,* 523 U.S. 83, 101 (1998).

5   "[A] plaintiff seeking relief in federal court must first demonstrate . . . a personal

6   stake in the outcome," *Baker v. Carr*, 369 U.S. 186, 204 (1962), distinct from a "generally

7   available grievance about government," *Lance v. Coffman*, 549 U.S. 437, 439 (2007) (per

8   curiam).  That threshold requirement "ensures that we act as judges, and do not engage in

9   policymaking properly left to elected representatives."  *Gill*, 138 S. Ct. at 1923.   To

10   establish standing, a plaintiff has the burden of clearly demonstrating that she has: "(1)

11   suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the

12   defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo*

13   *II,* 136 S. Ct. at 1547 (quoting *Warth*, 422 U.S., at 518); accord *Kokkonen v. Guardian Life*

14   *Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (noting the party asserting jurisdiction bears the

15   burden of establishing subject matter jurisdiction on a Rule 12(b)(1) motion to dismiss).

16   To establish an injury in fact, "a plaintiff must show that he or she suffered 'an

17   invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or

18   imminent, not conjectural or hypothetical.'"  *Spokeo,* 136 S. Ct. at 1548 (quoting *Lujan,*

19   504 U.S., at 560).  "When we have used the adjective 'concrete,' we have meant to convey

20   the usual meaning of the term—'real,' and not 'abstract.'"  *Id.*  The plaintiff must establish

21   a "particularized" injury, which means that "the injury must affect the plaintiff in a personal

22   and individual way."  *Raines v. Byrd*, 521 U.S. 811, 819 (1997).  Moreover, "[a]lthough

23   imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its

24   purpose, which is to ensure that the alleged injury is not too speculative for Article III

25   purposes—that the injury is certainly impending."  *Clapper v. Amnesty Int'l USA,* 568 U.S.

26   398, 409 (2013).  Where a plaintiff has not established the elements of standing, the case

27   must be dismissed pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(1).

28   Rule 12(b)(1) authorizes a court to dismiss claims over which it lacks subject-matter

jurisdiction.   A Rule 12(b)(1) challenge may be either facial or factual.   *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).   In a facial attack, the court may dismiss a complaint when the allegations of and documents attached to the complaint are insufficient to confer subject-matter jurisdiction.   *See Savage v. Glendale Union High Sch. Dist. No. 205*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003).   In this context, all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party.   *Fed'n of African Am. Contractors v. City of Oakland*, 96 F.3d 1204, 1207 (9th Cir. 1996).   In contrast, when a court evaluates a factual challenge to jurisdiction, a court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. *Safe Air for Everyone*, 373 F.3d at 1039 ("In resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment.").

Under Rule 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted.   To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, (2007).   A claim is facially plausible when the plaintiff pleads facts that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).   There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id*.   In other words, while courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *See Twombly*, 550 U.S. at 570.

Establishing the plausibility of a complaint's allegations is "context-specific" and "requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.   In that regard, and important here, this Court acknowledges that federal courts cannot lightly interfere with a state election. *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc).   Although election cases are not exempt from traditional stay standards, courts must nonetheless take careful account of

considerations specific to state election cases.  *Feldman v. Arizona Secretary of State's Office*, 843 F.3d 366, 368 (9th Cir. 2016) (citing *Veasey v. Perry*, 135 S.Ct. 9, 10 (2014)) (Ginsburg, J., dissenting); *see also Purcell v. Gonzales*, 549 U.S. 1 (2006).

The Court will first address Defendant's Motion to Dismiss and examine whether Plaintiffs have alleged sufficient facts to establish standing.

## III.    Analysis

Defendant argues that neither the Voter Plaintiffs nor the Organizational Plaintiffs have alleged an injury sufficient to establish Article III Standing.  Defendant also argues that Plaintiffs' alleged injuries are not redressable by this Court.  They argue that the lack of either of these elements requires dismissal.  (Doc. 26).

### A.    Injury in fact

Plaintiffs allege that, absent an Order from this Court, they will be "severely injured" because of the Ballot Order Statute and its history of "overwhelmingly favor[ing] the Republican Party."  (Doc. 13 at 6).  To determine whether Plaintiffs have adequately alleged an injury in fact to establish standing, the Court must look to the Amended Complaint.  (Doc. 13).

As an initial matter, Plaintiffs heavily rely on a recent decision arising in Florida, where a district court enjoined Florida's state ballot order statute, which is similar to Arizona's Ballot Order Statute.  *See Jacobson v. Lee*, 411 F. Supp. 3d 1249 (N.D. Fla. 2019), vacated and remanded sub nom. *Jacobson v. Fla. Sec'y of State*, 957 F.3d 1193 (11th Cir. 2020).  There, the secretary of state argued that the plaintiffs lacked standing, however, the district court found that those "hodgepodge" arguments were designed to prevent the court from reaching the merits of the case.  *Id.* at *2.  Plaintiffs argue that Defendant here is also attempting to mislead the Court into dismissing the case on standing grounds.  *See* (Doc. 14 at 9; *see also* Doc. 27 at 7) ("Instead of grappling head-on with the serious constitutional claims . . . Defendant . . . moves to dismiss the Complaint in its entirety." "The remainder of [Defendant's] motion is spent conjuring doubt as to whether this case is justiciable at all.").  What Plaintiffs fail to fully appreciate, however, is that this

Court *must* analyze the elements of standing thoroughly.  This is a fundamental principal of Article III.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101–02 (1998) ("For a court to pronounce . . . the constitutionality of a state or federal law when it has no jurisdiction to do so is, by very definition, for a court to act *ultra vires*.").

The district court decision in *Jacobson* has no bearing on this Court, especially in light of the Eleventh Circuit's decision reversing that order in its entirety and finding that the plaintiffs did not have standing.  *See Jacobson v. Fla. Sec'y of State*, 957 F.3d 1193, 1201 (11th Cir. 2020) ("Unfortunately, the district court took its obligation to ensure its jurisdiction far too lightly. It dismissed weighty challenges to the voters' and organizations' standing under Article III as a 'hodgepodge' of '[p]reliminary [m]iscellanea' and proceeded to declare Florida's ballot statute unconstitutional and enter an injunction against both the Secretary and the nonparty Supervisors.  In doing so, the district court acted *ultra vires* by ordering relief that the voters and organizations had no standing to seek.").

This Court is obligated to address standing and determine whether Plaintiffs have adequately alleged an injury in fact.  In doing so, the Court will first address standing as to the Voter Plaintiffs, followed by the Organizational Plaintiffs.

### 1. Voter Plaintiffs

The Voter Plaintiffs allege that the Ballot Order Statute impermissibly infringes on their right to vote when Republican candidates appear first on the majority of ballots in the state. (Doc. 13).  The Amended Complaint alleges that "ballot order matters, and when it is unfairly or arbitrarily assigned, it can raise concerns of constitutional magnitude." (Doc. 13 at 2).  Plaintiffs allege that in the upcoming 2020 general election, the Ballot Order Statute will cause "severe and irreparable harm to the Plaintiffs, the candidates they support, and the voters who support them." (Doc. 13 at 16).  They allege that the candidates they support "may well be unable to overcome the advantage the Ballot Order Statute gives to their Republican opponents." (Doc. 14-2 at 3).  They allege that these are all examples of a state-sanctioned burden on their right to vote.  The Voter Plaintiffs also allege that the

1    Ballot Order Statute "dilutes" their votes in relation to votes cast for Republicans who are

2    listed first on the ballot.  (Doc. 13).

3                   **a.    Right to Vote**

4            Individuals have an interest in being able to vote under the First and Fourteenth

5    Amendments to the Constitution.  Indeed, "voting is of the most fundamental significance

6    under our constitutional structure."  *Illinois Bd. of Elections v. Socialist Workers Party*,

7    440 U.S. 173, 184 (1979).  All voters have a legal interest in their ability to vote, in not

8    being prevented from voting because of state-imposed obstacles, and in their vote being

9    weighed the same as all others.  *See, e.g., Wesberry v. Sanders*, 376 U.S. 1, 17 (1964) ("No

10   right is more precious in a free country than that of having a voice in the election of those

11   who make the laws under which, as good citizens, we must live"); *Reynolds v. Sims*, 377

12   U.S. 533, 544 (1964) ("It has been repeatedly recognized that all qualified voters have a

13   constitutionally protected right to vote . . . " and that right cannot not be "diluted by ballot-

14   box stuffing"); *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663 (1966) (declaring

15   poll taxes as unconstitutional infringement on the right to vote); *United States v. Mosley,*

16   238 U.S. 383, 386 (1915) ("the right to have one's vote counted is as open to protection by

17   Congress as the right to put a ballot in a box.").  "These associational rights, however, are

18   not absolute and are necessarily subject to qualification if elections are to be run fairly and

19   effectively."  *Munro v. Socialist Workers Party*, 479 U.S. 189, 193 (1986).  As to the

20   "right" to vote, the Supreme Court has noted that the Constitution "does not confer the

21   right of suffrage upon any one," *Minor v. Happersett*, 88 U.S. 162, 178 (1874), and that

22   "the right to vote, *per se*, is not a constitutionally protected right."  *San Antonio*

23   *Independent School Dist. v. Rodriguez*, 411 U.S. 1, 35, n.78 (1973).  And "absent any

24   burden [on the franchise], there is no reason to call on the State to justify its practice."  *Ariz.*

25   *Libertarian Party v. Reagan*, 798 F.3d 723, 732 n.12 (9th Cir. 2015).

26           The Voter Plaintiffs allege that they intend to cast ballots in the November 2020

27   election.[5]  However, the harm that Plaintiffs allege is not a harm to themselves, but rather

28   _____

[5] Plaintiff Vasko states that she "plans to" register to vote in time to vote in the November
2020 election.  (Doc. 13 at 8).

an alleged harm to the Democratic candidates whom they intend, at this juncture, to support.  As explained recently by the Eleventh Circuit Court of Appeals, "[a] candidate's electoral loss does not, by itself, injure those who voted for the candidate.  Voters have no judicially enforceable interest in the outcome of an election." *Jacobson*, 957 F.3d at 1202 (citing *Raines v. Byrd*, 521 U.S. 811, 819 (1997)).  Additionally, as the Supreme Court determined in *Raines*, a group of legislators had not suffered a concrete injury when a piece of legislation they voted for was not enacted.  *Raines*, 521 U.S. 811 at 814.  The Supreme Court determined that the legislators' votes were counted and given full effect, and the legislators "simply lost that vote."  *Id.* at 824.  To be sure, the voting rights of elected legislators and of a citizen are not the same*.  See Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 126 (2011).  However, multiple circuit courts have held that an individual voter is not harmed by a candidate losing an election, or where the harm alleged to the voter is abstract or widely shared.  *See Jacobson*, 957 F.3d at 1202–03; *see also Berg v. Obama*, 586 F.3d 234, 240 (3d Cir. 2009) (dismissing for lack of standing where voter's "wish that the Democratic primary voters had chosen a different presidential candidate . . . do[es] not state a legal harm"); *Crist v. Comm'n on Presidential Debates*, 262 F.3d 193, 195 (2d Cir. 2001) ("a voter fails to present an injury-in-fact when the alleged harm is abstract and widely shared or is only derivative of a harm experienced by a candidate"); *Becker v. Fed. Election Comm'n*, 230 F.3d 381, 390 (1st Cir. 2000) (dismissing for lack of standing where a candidate's alleged decreased "chance of being elected" was "hardly a restriction on voters' rights and by itself [was] not a legally cognizable injury sufficient for standing").

Moreover, although the Voter Plaintiffs attempt to frame their injury as personal to them, the Plaintiffs do not argue that they, personally, are at greater risk of losing an election due to the alleged effects of Arizona's Ballot Order Statute.  Nor could they, as none of the Voter Plaintiffs allege that they are, or intend to be, candidates on the ballot.  Although they allege that "the Ballot Order Statute offends the First and Fourteenth Amendments to the U.S. Constitution because it confers an unfair political advantage on ***candidates*** solely because of their partisan affiliation and the fact that a different ***candidate***,

also affiliated with their party, won the majority of votes in a specific county in an unrelated, previous election," no candidates, either former or present, are named plaintiffs in this suit.  (Doc. 13 at 7) (emphasis added).  Moreover, while Plaintiffs argue that they are not aware of "a single challenge brought by similarly-situated parties against a ballot order statute that was dismissed," they fail to recognize that the majority of the cases they cite to support their theories of injury involve ***candidates*** as plaintiffs who were alleging the personal harm of not getting elected.  (Doc. 14 at 7-9).  *See McLain v. Meier*, 637 F.2d 1159 (8th Cir. 1980) (plaintiff, a candidate in upcoming election, challenged an incumbent first ballot statute); *Sangmeister v. Wodard*, 565 F.2d 460, 463, 463 (7th Cir. 1977) (consolidated appeal brought by multiple plaintiffs who were all candidates for office); *Kautenburger v. Jackson*, 333 P.2d 293, 294-95 (Ariz. 1958) (constitutional challenge by a primary candidate who sought to enjoin the board of supervisors from using voting machines unless fellow candidates' names were rotated); *Akins v. Sec. of State*, 904 A.2d 702, 703 (N.H. 2006) (Democratic, Republican, and Libertarian Party candidates challenging organization of the general election ballot); *Gould v. Grubb*, 14 Cal. 3d 661, 664-65 (Cal. 1975) (nonincumbent candidates had standing to bring action challenging constitutionality of incumbent first ballot procedure); *Mann v. Powell*, 333 F. Supp. 1261, 1264–65 (N.D. Ill. 1969) (finding that candidate had alleged an injury in fact to maintain the suit challenging ballot order, while dismissing individual voter for lack of standing, reasoning that a voter cannot "maintain this action on behalf of candidates in the primary election").  These cases do not persuade this Court that the Voter Plaintiffs have standing.

Voter Plaintiffs have not established a meaningful infringement on their right to vote caused by the Ballot Order Statute.  They do not argue that the Ballot Order Statute prevents them from casting a ballot for their intended candidate, nor do they argue that their lawfully cast votes will not be counted.  Rather, the Voter Plaintiffs allege that the Statute places a burden on them, because a number of other voters' choices in the ballot box are irrational because they select the first name listed regardless of who it is.  In short, they do not allege that the Ballot Order Statute imposes a burden on them personally that

1    is not common to all voters.[6]  *See Gill*, 138 S. Ct. at 1933 (Article III courts are unable to

2    redress a "generalized partisan preference").

3                            **b.    Dilution of Votes**

4            Voter Plaintiffs have also not established a concrete injury based on an alleged

5    dilution of their votes.  The Voter Plaintiffs allege that the Ballot Order Statute causes a

6    "reduction in the value of their votes," by providing an "artificial" advantage for first-listed

7    Republican candidates.  (Doc. 27 at 15).

8            In *Gill*, a political gerrymandering case, the Supreme Court addressed the voter

9    plaintiffs' claim that they had standing based on the dilution of their votes.  The plaintiffs

10   there presented a similar theory of the case as here, that the weight of their votes were

11   decreased based on the makeup of the voting districts.  *Gill*, 138 S. Ct. at 1929-31.  The

12   Supreme Court concluded that the injury alleged did not impact the individual voter, but

13   rather the "fortunes of political parties," throughout the entire state.  *Gill*, 138 S. Ct. at

14   1922.  In finding that the voter plaintiffs had not proven "concrete and particularized

15   injuries," the Supreme Court concluded that the issue was one of "political interests, not

16   individual legal rights," and that it did not infringe on the plaintiffs' right to vote.  *Id.*

17          Similarly, while Plaintiffs rely heavily on the Supreme Court's summary affirmance

18   in *Mann*, they fail to explain that the three-judge panel of the district court dismissed the

19   voter plaintiff for lack of standing.  333 F. Supp. at 1264–65.[7]  The district court reasoned

20

21   _____

     [6] Likewise, Plaintiffs argue that the Ballot Order Statute "treats similarly-situated major
22   parties differently," in violation of the Equal Protection Clause.  (Doc. 14 at 14).  Plaintiffs
     cannot sustain this Equal Protection claim on behalf of unnamed candidates.  Moreover,
23   the Voter Plaintiffs do not allege that the Ballot Order Statute treats similarly situated
     ***voters*** differently, as all voters in a given county receive the same ballot.

24   [7] Moreover, *Mann* was a summary affirmance by the Supreme Court of a district court
     decision, which contains all of four words, "[t]he judgment is affirmed."  *Mann*, 398 U.S.
25   at 955.  That holding carries little weight in this case.  *See Mandel v. Bradley*, 432 U.S.
     173, 176 (1977) ("When we summarily affirm, without opinion, . . . we affirm the judgment
26   but not necessarily the reasoning by which it was reached.  An unexplicated summary
     affirmance settles the issues for the parties, and is not to be read as a renunciation by this
27   Court of doctrines previously announced in our opinions after full argument.") (internal
     citations omitted); *See also Tedards v. Ducey*, 951 F.3d 1041, 1048 (9th Cir. 2009) (noting
28   that "[n]ormally, a summary affirmance binds us to the precise result affirmed, yet it
     remains incumbent upon us to give full consideration to the issues and articulate our own
     independent analysis") (citations omitted).

that plaintiff's allegation that "his right to vote will be burdened or the strength of his vote diluted because unconstitutional action by the defendants will benefit candidates whom he opposes" is "an insufficient personal interest to state a cause of action." *Id.*

Here, the Voter Plaintiffs will not be injured simply because other voters may act "irrationally" in the ballot box by exercising their right to choose the first-listed candidate. *See Alcorn*, 826 F.3d at 718 (rejecting the notion that "some voters' choices are less constitutionally meaningful than the choices of other supposedly more informed or committed voters"). The Court finds that the Voter Plaintiffs have not alleged a concrete injury in fact, but rather a generalized political grievance with the Ballot Order Statute and its alleged effects.[8] Therefore, the Court must dismiss this action, unless it finds that the Organizational Plaintiffs have standing. *See Leonard v. Clark*, 12 F.3d 885, 888 (9th Cir. 1993), as amended (Mar. 8, 1994) ("The general rule applicable to federal court suits with multiple plaintiffs is that once the court determines that one of the plaintiffs has standing, it need not decide the standing of the others.").

### 2.    Organizational Plaintiffs

The Organizational Plaintiffs allege that the Secretary has no constitutionally justifiable reason to enforce the Ballot Order Statute, and argue that it violates the Equal Protection Clause as it treats similarly situated political parties differently. The Organizational Plaintiffs argue that they have alleged sufficient facts to establish associational, organizational, or competitive standing regardless of whether the Voter Plaintiffs have standing. The Court will address each standing theory in turn.

#### a.    Associational Standing

"Even in the absence of injury to itself, an association may have standing solely as the representative of its members." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 342–43 (1977). "The association must allege that its members, or any one of

---

[8] And while Plaintiffs are correct that the presence of a "widely shared grievance" does not necessarily mean that it is a "generalized grievance," the case they cite for that proposition does not support their argument. (Doc. 27 at 15); *See Fed. Election Comm'n v. Akins*, 524 U.S. 11, 12 (1998) (finding voter plaintiffs had pleaded an injury in fact where a federal statute explicitly allowed them to file a complaint, and if their complaint was dismissed, to seek district court review of the dismissal).

them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." *Id.* An association has standing to bring suit on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* at 343. Organizations seeking to establish standing on behalf of members must "identify members who have suffered the requisite harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009).

As an initial matter, Plaintiffs DSCC and Priorities do not allege that they are membership organizations or that they have any members. (Doc. 13, ¶¶ 25–26). This glaring omission is fatal to associational standing for these two Plaintiffs. *See Hunt*, 432 U.S. at 343 ("The association must allege that its **members**, or any one of them, are suffering immediate or threatened injury. . ..") (emphasis added). Notably, when presented with this argument in the Motion to Dismiss, Plaintiffs' respond that the Voter Plaintiffs are "members" of the Democratic Party. (Doc. 27 at 12). While the "Democratic Party" may have "members," it does not follow that the DSCC or Priorities do. Moreover, the Democratic Party is not a Plaintiff in this case. (Doc. 13). As having members is crucial to asserting jurisdiction under associational standing, the DSCC and Priorities have not established standing under this theory.

Even had the DSCC established that it were a membership organization, the mission of the DSCC to elect Democrats to the U.S. Senate was not apparently frustrated. For example, in the 2018 election, a Democratic candidate was indeed elected to the Senate under the state's current ballot system. Moreover, whether Priorities' mission is frustrated is highly speculative. Priorities alleges that its mission is to build a permanent digital campaign and engage Americans in the democratic process, something it has already spent considerable time and money on in Arizona, specifically in 2018. (Doc. 13 at 11).

1    Priorities has not established how the current ballot order system frustrates its mission to

2    build a permanent digital campaign or engage Arizonans in the democratic process.

3            Plaintiff DNC does allege that it has members, stating that is has "seven members

4    in Arizona and millions of constituents who affiliate with and consider themselves to be

5    members of the Democratic Party." (Doc. 14-6 at 4).  The DNC does not name any of

6    these individuals, does not allege how any of them were specifically harmed, and does not

7    allege that any of those seven members are candidates who will appear on the general

8    election ballot.  The allegations generally are that Plaintiff DNC provides support to its

9    candidate "members." (Doc. 13 at 10-11).  These allegations are not specific to what it is

10   doing in Arizona, however.  Moreover, the Court will not assume, based on a single

11   affidavit, that "millions" of Arizonans who vote for Democratic candidates "consider

12   themselves" to be "members" of the Democratic Party. (Doc. 14-6).  This assumption is

13   not relevant to the Court's determination of whether the ***DNC*** has established standing as

14   a result of having "seven members" in Arizona.  For purposes of associational standing,

15   the Court will look to the allegations with respect to the "seven members" of the DNC

16   alleged to be located in Arizona.

17           Plaintiff DNC alleges that the Ballot Order Statute "gives Republican voters more

18   voting power and dilutes the relative strength of Democratic voters, because of the built-in

19   advantage to the first-listed party." (Doc. 14-6 at 6).  This is the same type of harm alleged

20   by the Voter Plaintiffs discussed above.  Plaintiff DNC has failed to identify its members

21   and their specific alleged injuries; thus, the Court is unable to determine whether "its

22   members would otherwise have standing to sue in their own right," which is required for

23   associational standing.  *See Hunt*, 432 U.S. at 343.  Even accepting as true that the DNC's

24   seven Arizona members are Arizona voters who will be voting in the 2020 Election, the

25   DNC does not allege any specific harm as to those alleged seven unnamed members, nor

26   does it allege that any of the seven are candidates.  Based on the information pleaded in the

27   Amended Complaint, the Court cannot discern the alleged injuries of Plaintiff DNC's

28   members.  *See Summers*, 555 U.S. at 497 (holding that an organization could not meet the

injury in fact requirement simply by alleging that "there is a statistical probability that some of those members are threatened with concrete injury"). Therefore, the DNC has not established standing under associational standing.

### b.    Organizational Standing

The Organizational Plaintiffs alternatively allege they have suffered their own injuries sufficient to establish organizational standing. (Doc. 27 at 13-14). To establish organizational standing, a plaintiff must allege an injury-in-fact to include: "(1) frustration of its organizational mission; and (2) diversion of its resources" to mitigate the effects of the challenged action. *Smith v. Pac. Props. and Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004). An organizational plaintiff must allege "more than simply a setback to the organization's abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). Allegations of "*concrete* and *demonstrable* injury to the organization's activities—with the consequent drain on the organization's resources— constitutes far more than simply a setback to the organization's abstract social interests." *Id.* (emphasis added). However, an organization "cannot manufacture the injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all." *La Asociacion de Trabajadores de Lake Forest v. Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010). "It must instead show that it would have suffered some other injury if it had not diverted resources to counteracting the problem." *Id.*

As to the first element, the Organizational Plaintiffs allege that the Ballot Order Statute frustrates the missions of electing Democrats in Arizona by giving an "unfair, arbitrary, and artificial" advantage to Republicans. (Doc. 13 at 25). As discussed above, this is not a concrete injury to establish standing, but rather a generalized grievance with the political process that this court "is not responsible for vindicating." *Gill*, 138 S. Ct. at 1933; *see also id.* at 1932 (dismissing voters' "hope of achieving a Democratic majority in the legislature" as "a collective political interest" that cannot establish standing). Their dissatisfaction with the Ballot Order Statute is nothing more than "a setback to the

organization's abstract social interests."  *See Havens Realty Corp*, 455 U.S. at  379. Plaintiff's described injury can fairly be described as abstract.  *See Spokeo*, 136 S.Ct. at 1548 (citation omitted).  Therefore, the argument that the Ballot Order Statute frustrates their mission of electing Democrats is not a cognizable injury.

As to the second element, the Organizational Plaintiffs allege that the Ballot Order Statute has required them to expend resources on "Get Out the Vote ("GOTV") assistance," "voter persuasion efforts," and making contributions and expenditures to persuade voters to support Democratic Senate candidates.  (Doc. 13, ¶¶ 24–26).  The DSCC alleges that it "will have to expend and divert additional funds and resources . . . in Arizona." (Doc. 13 at 13).    Additionally, the DSCC states that it "again intends to make substantial contributions and expenditures to support the Democratic candidate for U.S. Senate," in Arizona.  (Doc. 13 at 11).  Therefore, the Organizational Plaintiffs acknowledge that despite the Ballot Order Statute, they plan to expend significant time and resources in Arizona this election cycle on a Senate race they describe as one of the seats "most likely to flip" the U.S. Senate this year.  (Doc. 13 at 15).  Moreover, and despite the operation of the Statute, the Organizational Plaintiffs' efforts were rewarded in the much-publicized U.S. Senate race in 2018, which was won by their Democratic candidate.

Perhaps most importantly, the Organizational Plaintiffs do not put forth any evidence of resources being diverted from other states to Arizona.  Nor did they offer witness testimony on this element at the hearing on the Motion to Dismiss.  Their allegations, without more, do not establish the very specific requirements for organizational standing.  *See ACORN v. Fowler*, 178 F.3d 350, 359 (5th Cir. 1999) (expenditures must be "caused by an[] action by" the defendant that the organization "claims is illegal, as opposed to part of the normal, day-to-day operations of the group" to confer standing); *see also Jacobson*, 957 F.3d at 1206 (finding the testimony of the representatives of the organizations did not explain "what activities the Committee or Priorities USA would divert resources away from in order to spend additional resources on combatting the primacy effect, as precedent requires").

The Organizational Plaintiffs have not established that they would spend additional funds because of the Ballot Order Statute, nor have they established that they are diverting those funds from other places.  In short, they have not established that they "would have suffered some other injury if [they] had not diverted resources to counteracting the problem."  *La Asociacion de Trabajadores*, 624 F.3d at 1088.  Therefore, this theory of standing also fails.

### c.    Competitive Standing

The Organizational Plaintiffs also argue that they have alleged facts sufficient to establish competitive standing.  Competitive standing is recognized in the Ninth Circuit.  Generally, the doctrine provides that "a candidate or his political party has standing to challenge the inclusion of an allegedly ineligible rival on the ballot, on the theory that doing so hurts the candidate's or party's own chances of prevailing in the election." *Townley v. Miller*, 722 F.3d 1128, 1135 (9th Cir. 2013) (quoting *Drake v. Obama*, 664 F.3d 774, 782 (9th Cir. 2011)).

The theory put forward by the Organizational Plaintiffs is that the Ballot Order Statute "frustrat[es] its mission and efforts to elect Democratic Party candidates" by allegedly diverting more votes to Republicans than Democrats. (Doc. 13, ¶ 24).  Therefore, they allege that the ability of their candidates to be competitive in the election is compromised.  However, the injuries alleged by the Organizational Plaintiffs are dissimilar to the injuries required by the line of competitive standing cases.  The Organizational Plaintiffs rely on the holding of *Drake*, that a political organization suffers an injury where its "interest in having a fair competition" is compromised.  *Drake v. Obama*, 664 F.3d 774, 782-83 (9th Cir. 2011).  The court in *Drake*, however, did not find that the plaintiffs had a redressable injury; instead, the court held that the plaintiffs did not have a live claim or controversy because the election was over.[9]  Therefore, *Drake* does not support the

---

[9] Moreover, Plaintiffs cited quote comes from the "Synopsis" and "Holdings" section of the case, a section which generally is not part of the opinion.  *See United States v. Detroit Timber & Lumber Co.*, 200 U.S. 321, 337 (noting that the syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader).

1    Organizational Plaintiffs' contention.

2          Plaintiffs also cite to the nearly 40-year-old decision in *Owen v. Mulligan* to support

3    their theory of competitive standing.  640 F.2d 1130, 1132–33 (9th Cir.1981).  In *Owen*,

4    the Ninth Circuit held that the "potential loss of an election" was an injury-in-fact sufficient

5    to give a ***candidate*** and Republican party officials standing.  *Id.*  In that case, the candidate

6    plaintiff sued the Postal Service for giving his opponent a cheaper mailing rate, in violation

7    of its own regulations and of its representations to the court regarding procedures

8    implemented in response to a previous injunction.  *Id*. at 1132.  The candidate and party

9    officials sought "to prevent their opponent from gaining an unfair advantage in the election

10   process through abuses of mail preferences which arguably promote his electoral

11   prospects."  *Id.*  While the court in *Owen* recognized that candidate's right to competitive

12   standing on those facts, the injuries were found to be concrete as the Postal Service's

13   violations were not limited to its own policies, but also related to a previous injunction.  *Id.*

14   Therefore, *Owen* is also distinguishable.

15         Moreover, Plaintiffs gloss over the holding of a recent Ninth Circuit decision that

16   narrowed the scope of competitive standing.  *See Townley v. Miller*, 722 F.3d 1128, 1131

17   (9th Cir. 2013).  In *Townley*, the Republican Party plaintiff alleged that the appearance of

18   a "none of these candidates" ("NOTC") option on the ballot would cause their candidates

19   to receive fewer votes and potentially lose the election.  *Id.* at 1131.  The plaintiffs in

20   *Townley* argued that they had established competitive standing based on the inclusion of

21   the NOTC option on all ballots.  *Id.*  The Ninth Circuit, however, declined to find

22   competitive standing, reasoning that the inclusion of an "NOTC" was not the *inclusion of*

23   *a candidate* on the ballot necessary to advance a competitive standing theory.  Moreover,

24   garnering support from other circuit court opinions that recognize competitive standing,

25   the Ninth Circuit in *Townley* held that for competitive standing to apply, a plaintiff must

26   allege that another candidate has been impermissibly placed on the ballot.  *See Townley*,

27   722 F.3d at 1136; *see also Texas Democratic Party v. Benkiser*, 459 F.3d 582, 586 (5th

28   Cir. 2006) (allowing competitive standing where Democratic Party challenged decision to

- 20 -

1 declare one candidate ineligible and replace him with a different candidate on the ballot);

2 *Schulz v. Williams*, 44 F.3d 48, 52–53 (2d Cir. 1994) (finding competitive standing based

3 on the inclusion of Libertarian candidates on the ballot after State had concluded the

4 petition to include those candidates was statutorily invalid); *Fulani v. Hogsett*, 917 F.2d

5 1028, 1029 (7th Cir. 1990) (challenging decision to allow candidates on the ballot who

6 were not certified by the Indiana Secretary of State by the statutory deadline).

7       There are no allegations of candidates being impermissibly placed on the ballot in

8 this case. The Court finds, in line with Ninth Circuit precedent, that the Organizational

9 Plaintiffs have not alleged facts sufficient to confer standing under this very limited

10 theory.[10] Therefore, the Court finds that none of the Organizational Plaintiffs have

11 established standing under any of these theories.

12       As neither the Voter Plaintiffs nor the Organizational Plaintiffs have established

13 standing, the Court must dismiss them all from the case and grant the Secretary's Motion

14 to Dismiss.

15 **III.     Justiciability**

16       Generally, a court must give plaintiffs at least one chance to amend a deficient

17 complaint, absent a clear showing that amendment would be futile. *Eminence Capital,*

18 *LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). However, the Secretary argues

19 that even if a single Plaintiff had established standing, the Court should decline to reach

20 the merits of the case because no judicially discernable standard exists to determine what

21 constitutes a fair ballot ordering scheme. (Doc. 26 at 18-21). In other words, the Secretary

22 argues that this case, in the way that Plaintiffs frame it, involves a nonjusticiable political

23 question and, therefore, any amendment to the Complaint would be futile.

24       The standard of review for laws regulating a person's First and Fourteenth

25 Amendment rights to vote was analyzed by the Supreme Court in *Burdick v. Takushi*, 504

26 U.S. 428 (1992). There, the Supreme Court held that states "must play an active role in

---

27 [10] To the extent that the Voter Plaintiffs also argue they have competitive standing based
28 on the "competitive interest of [their] preferred candidate," there are no candidates named in this case and the Court cannot find competitive standing for the Voter Plaintiffs on these allegations. *See Drake*, 664 F.3d at 784.

structuring elections," and that "[e]lection laws will invariably impose some burden upon individual voters." *Id.* at 433. "Consequently, not every voting regulation is subject to strict scrutiny." *Pub. Integrity All., Inc. v. City of Tucson*, 836 F.3d 1019, 1024 (9th Cir. 2016). Importantly, courts "have to identify a burden before [they] can weigh it." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 205 (2008) (Scalia, J., concurring in the judgment).

The Supreme Court's recent decision in *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019), is relevant to this inquiry. While *Rucho* involved political gerrymandering, it is nonetheless instructive. The Supreme Court explained that some cases, by their very nature, are not redressable by the judicial branch because "the question is entrusted to one of the political branches or involves no judicially enforceable rights." *Id.* (quoting *Vieth v. Jubelirer,* 541 U.S. 267, 277 (2004) (plurality opinion)). "In such a case the claim is said to present a 'political question' and to be nonjusticiable—outside the courts' competence and therefore beyond the courts' jurisdiction." *Baker*, 369 U.S. at 217. "Among the political question cases the Court has identified are those that lack judicially discoverable and manageable standards for resolving [them]." *Rucho*, 139 S. Ct. at 2494. The Supreme Court in *Rucho* concluded that partisan gerrymandering claims are nonjusticiable political questions because they rest on an initial determination of what is "fair," and a secondary determination of how much deviation from what is "fair" is permissible. *Id.* at 2500. These questions of fairness are best left to the legislatures and not the courts. *Id.*

Plaintiffs argue that *Rucho* has no bearing on this case at all as it is "unambiguously limited to partisan gerrymandering cases." (Doc. 27 at 21). However, the Ninth Circuit recently extended the reasoning of *Rucho* to find that claims related to climate change are nonjusticiable. *Juliana v. United States*, 947 F.3d 1159, 1173 (9th Cir. 2020) (holding that, absent a judicially manageable standard, "federal judicial power could be unlimited in scope and duration, and would inject the unelected and politically unaccountable branch of the Federal Government [into] assuming such an extraordinary and unprecedented role"). To be sure, *Juliana* was a case brought by climate change activists attempting to limit the

Government's emission of carbon dioxide into the atmosphere, which has nothing to do with Arizona's Ballot Order Statute.  Yet climate change also has little in common with political gerrymandering.  Thus, Plaintiffs' contention that the holding in *Rucho* cannot be extended past political gerrymandering cases is unpersuasive.  *See Juliana*, 947 F.3d at 1173 ("The Court found in *Rucho* that a proposed standard involving a mathematical comparison to a baseline election map is too difficult for the judiciary to manage. It is impossible to reach a different conclusion here.").

The crux of Plaintiffs' case is for the Court to determine what is "fair" with respect to ballot rotation.  (Doc. 13).  Indeed, the specific relief requested involves this Court developing a new ballot system for Arizona's state elections.  This idea of "fairness" is the precise issue that *Rucho* declined to meddle in.  *Rucho*, 139 S. Ct. at 2494; *see also Jacobson*, 957 F.3d at 1213 ("No judicially discernable and manageable standards exist to determine what constitutes a 'fair' allocation of the top ballot position, and picking among the competing visions of fairness poses basic questions that are political, not legal.") (internal citations omitted).  Determining what is "fair" for purposes of ballot order rotation has a number of complications.  Fairness, as Plaintiffs define it, requires rotation of all "similarly-situated major-party" candidates on the general election ballot.  (Doc. 14 at 21).  While Plaintiffs argue that their case is "not predicated on a specific remedy," their definition of "fairness" does not require rotation of Independent Party candidates, write-in-candidates from the primary election, or other third-party candidates in their ballot scheme, meaning that those candidates would never be listed first on the ballot.  (Doc. 14 at 10; Doc. 35 at 16).  In fact, Plaintiffs' counsel explicitly stated at the hearing that their proposal need not disrupt the status of those candidates in terms of ballot order.  (Doc. 64 at 24).

Most importantly, for the Court to examine the alleged burden on Plaintiffs, it necessarily would have to accept their version of what is "fair," in this case, by making it more "fair" for Democratic candidates in the upcoming election only, by rotating Democratic and Republican candidates, or having a lottery to determine which party's

1  candidates would be listed first.  The Court cannot do so.  The allegations in the Amended

2  Complaint are simply not based upon Plaintiffs being prevented from exercising their right

3  to vote or being burdened in any meaningful way.  Plaintiffs theories are that their votes

4  for Democratic candidates are diluted whenever Republican candidates are listed first on

5  the ballot.  (Doc. 13).  As discussed above, these alleged injuries are not actual and

6  concrete.  Therefore, as there is no burden, the court is unable to weigh it.  *See Crawford*,

7  553 U.S. at 205 (2008) (Courts must "identify a burden before [they] can weigh it") (Scalia,

8  J., concurring in the judgment).

9       While Plaintiffs argue that there is a judicially manageable test for examining

10  challenges to election-related issues, Plaintiffs fail to establish that the Ballot Order Statute

11  meaningfully burdens them in the ways in which the Supreme Court has recognized as

12  being appropriate for examination under the *Anderson-Burdick* framework.  *See Crawford*,

13  553 U.S. at 181 (analyzing constitutionality of photo-identification law); *Clingman v.*

14  *Beaver*, 544 U.S. 581, 584 (2005) (challenging Oklahoma's semi-closed primary system);

15  *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 353–54 (1997) (analyzing law that

16  forbade candidates from appearing on the ballot for more than one party); *Burdick*, 504

17  U.S. 428 (examining complete prohibition on write-in voting); *Norman v. Reed*, 502 U.S.

18  279, 288–89 (1992) (overturning law limiting the access of new political parties on the

19  ballot); *Munro v. Socialist Workers Party*, 479 U.S. 189, 190 (1986) (challenging statute

20  that restricted minor-party candidates from appearing on the ballot unless they met specific

21  criteria).

22       The Ballot Order Statute here does not prevent candidates from appearing on the

23  ballot or prevent anyone from voting.  The Ballot Order Statute merely establishes the order

24  by which candidates appear on the ballot in each of Arizona's fifteen counties.  Because

25  Plaintiffs have not established a "burden" on their rights to vote, the court cannot "weigh

26  it."[11]  *See Crawford*, 553 U.S. at 205 (2008).  The Court finds that the relief sought amounts

27
28

---

[11] For instance, Dr. Krosnick acknowledged on cross-examination that none of the studies he reviewed analyzed the existence of any ballot order effect in Arizona. (Doc. 58 at 51). He also testified that "listing the party affiliation of the candidates on the ballot, all other things equal, reduces the size of the primacy effects." (Doc. 58 at 62). The Court

1    to a nonjusticiable political question that the Court is unable to redress.  This serves as an

2    independent ground to grant the Secretary's Motion to Dismiss.  Thus, it would be futile to

3    grant Plaintiffs leave to amend their Amended Complaint.

4    **IV.    Conclusion**

5         It is fundamental that plaintiffs establish the elements of standing before a court

6    exercises jurisdiction.  The Supreme Court has insisted on strict compliance with this

7    jurisdictional standing requirement.  *See Chicago & Grand Trunk R. Co. v. Wellman,* 143

8    U.S. 339, 345 (1892) (federal courts may exercise power "only in the last resort, and as a

9    necessity"); *Muskrat v. United States,* 219 U.S. 346, 356 (1911) ("[F]rom its earliest

10   history this [C]ourt has consistently declined to exercise any powers other than those which

11   are strictly judicial in their nature").  This requirement assures that "there is a real need to

12   exercise the power of judicial review in order to protect the interests of the complaining

13   party."  *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 221 (1974).  For

14   a court to step in where plaintiffs have not established that a need to do so exists, "would

15   significantly alter the allocation of power . . . away from a democratic form of

16   government."  *Summers*, 555 U.S. at 493 (quoting *Richardson*, 418 U.S. at 188).

17        Although Plaintiffs frame this case as a "straightforward" matter, the Court finds

18   that they cannot satisfy the requirements of Article III Standing.  Thus, any order issued by

19   this Court would be an unlawful advisory opinion.  Therefore, the Court cannot reach the

20   merits of this matter and Defendant's Motion to Dismiss will be granted.  Moreover, even

21   if Plaintiffs had standing, the Court is prevented from rendering an opinion on the merits

22   because Plaintiffs have not established that the Statute burdens them, and the relief sought

23   amounts to a nonjusticiable political question.  Thus, the Court will not grant Plaintiffs

24   leave to amend their Amended Complaint.

25   …

26   …

27   …

28

---

acknowledges the difficulty Plaintiffs face in presenting evidence in this fashion to establish an injury.  But they simply did not meet their burden in so showing.

Accordingly,

**IT IS HEREBY ORDERED** that the Motion to Dismiss (Doc. 26) is **granted with prejudice**.  The Clerk of Court shall kindly enter judgment and terminate this matter.

Dated this 25th day of June, 2020.

Honorable Diane J. Humetewa
United States District Judge