1  Sarah R. Gonski (Bar No. 032567)
   Austin Yost (Bar No. 034602)
2  **PERKINS COIE LLP**
   2901 North Central Avenue, Suite 2000
3  Phoenix, Arizona 85012-2788
   Telephone: (602) 351-8000
4  Facsimile: (602) 648-7000
   SGonski@perkinscoie.com
5  AYost@perkinscoie.com

6  Marc E. Elias (WDC Bar No. 442007)*
   Elisabeth C. Frost (WDC Bar No. 1007632)*
7  Jacki L. Anderson (WDC Bar No. 1531821)*
   John M. Geise (WDC Bar No. 1032700)*
8  **PERKINS COIE LLP**
   700 Thirteenth Street NW, Suite 600
9  Washington, D.C. 20005-3960
   Telephone: (202) 654-6200
10 Facsimile: (202) 654-6211
   MElias@perkinscoie.com
11 EFrost@perkinscoie.com
   JackiAnderson@perkinscoie.com
12 JGeise@perkinscoie.com

13 Abha Khanna (WA Bar No. 42612)*
   **PERKINS COIE LLP**
14 1201 Third Avenue, Suite 4900
   Seattle, WA 98101-3099
15 Telephone: (206) 359-8000
   Facsimile: (206) 359-9000
16 AKhanna@perkinscoie.com

17 *Admitted Pro Hac Vice*

18 *Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| Brian Mecinas, *et al.*, | No. 19-cv-05547-PHX-DJH |
| Plaintiffs, | **PLAINTIFFS' EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL** |
| v. | |
| Katie Hobbs, in her official capacity as the Arizona Secretary of State, | **(EXPEDITED CONSIDERATION WITHOUT ORAL ARGUMENT REQUESTED)** |
| Defendant. | |

Pursuant to Federal Rule of Civil Procedure 62(c) and Federal Rule of Appellate Procedure 8(a)(1), Plaintiffs respectfully request that the Court enjoin the enforcement of A.R.S. § 16-502(E) (2018) (the "Ballot Order Statute"), pending resolution of Plaintiffs' appeal of the Court's June 25, 2020 Order (the "Order" or "Op.") (Doc. 73).

Given the rapidly approaching election and the need for emergency relief to avoid severe irreparable harm that Plaintiffs, their memberships, and constituencies will suffer to their fundamental rights if the Ballot Order Statute is not promptly enjoined, Plaintiffs request emergency relief from this Court. If, upon reviewing this motion, the Court does not believe that Plaintiffs have met the requirements for such relief, Plaintiffs request that the Court summarily deny the motion without awaiting a response from Defendant Arizona Secretary of State Katie Hobbs (the "Secretary") or other further briefing or argument, so that Plaintiffs may seek the same relief from the Court of Appeals with the benefit of the Court's ruling. Plaintiffs have notified counsel for the Secretary of this motion, and the Secretary opposes.[1]

## I.  Introduction

An emergency injunction pending appeal is necessary to avoid irreparable and severe harm to Plaintiffs' (and, in the case of the organizational Plaintiffs, their memberships' and constituencies') First and Fourteenth Amendment rights. At issue is Arizona's Ballot Order Statute, which mandates that all of the ballots in any given county must list first, in every partisan election, those candidates who belong to the same political party as the gubernatorial candidate who won the most votes in that county during the last general election. A.R.S § 16-502(E).

---

[1] Given the Secretary's prior representations about the deadline by which she would require a ruling to change the manner in which Arizona ballot are ordered in advance of the November election, *see infra* Section IV.B, Plaintiffs intend to seek relief from the Ninth Circuit pursuant to Federal Rule of Appellate Procedure 8(a)(2) by 4 p.m. on Friday, July 10, to enable that Court sufficient time to consider the issue and still issue an order within the timeline set forth by the Secretary. Counsel for the Secretary requests seven days to file a response to Plaintiffs' motion, but in light of her stated opposition, the timeline she presented to the Court, and the fact that the questions at issue are effectively the same as what the parties have briefed and argued before in the preliminary injunction proceedings, Plaintiffs do not believe the Secretary's preferred briefing schedule is warranted.

As countless courts (including the Arizona Supreme Court) have recognized, it is a "well-known fact" that "where there are a number of candidates for the same office, the names appearing at the head of the list have a distinct advantage." *Kautenburger v. Jackson*, 85 Ariz. 128, 131 (1958). In recent years, political scientists have been able to empirically demonstrate this phenomenon, confirming that a ballot ordering scheme that awards first position to one candidate across all or a majority of general election ballots places a thumb on the scale in favor of that candidate's election, for no other reason than that they were listed first.

Because the Ballot Order Statute systematically mandates that one political party receive the first position in each county for every race based on the results of one election held every four years, it arbitrarily discriminates against the other, similarly situated political party and burdens the right to vote in a manner unconstitutional under the First and Fourteenth Amendments and U.S. Supreme Court precedent. Plaintiffs are highly likely to succeed on the merits of their claims. In fact, every single court to have considered the merits of an analogous ballot order challenge on behalf of similarly situated parties has found that such statutes violate the Constitution. The Court's conclusions that Plaintiffs lack standing to bring their claims or that this case presents a nonjusticiable political question were legal error and are likely to be reversed. However, if an injunction pending appeal does not enter immediately, relief from the Court of Appeals is likely to come too late to avoid serious, irreparable harm to Plaintiffs in the upcoming November election.

For all of these reasons, and those set forth in the briefing and evidence previously submitted to the Court, Plaintiffs respectfully request that the Court grant this motion.

**II.     Factual and Procedural Background**

The relevant factual background is set forth in Plaintiffs' motion for a preliminary injunction and reply in support, Docs. 14, 35, which are incorporated by reference. Plaintiffs filed their Complaint initiating this action on November 1, 2019. Doc. 1. They filed their Amended Complaint on November 15. Doc. 13. Three days later, they filed their motion seeking a preliminary injunction. Doc. 14. The Secretary sought an extension to respond

and subsequently filed her opposition on January 20, 2020. Doc. 29. The matter was fully briefed when Plaintiffs filed their reply on February 3. Doc. 35. The Secretary also filed a motion to dismiss on January 2, 2020, Doc. 26. Plaintiffs responded on January 16, Doc. 27, and the Secretary filed her reply on January 31, Doc. 34.  The Court held an evidentiary hearing on March 4 and 5, with oral argument on both motions on March 10. The Court issued an Order granting the Secretary's motion to dismiss with prejudice on June 25, 2020. Doc. 73. Plaintiffs have filed a Notice of Appeal, Doc. 75, and now seek an emergency injunction pending appeal in the first instance from this Court in accordance with Fed. R. App. P. 8(a).

### III.    Legal Standard

The Court has the power to grant a stay or injunction "[w]hile an appeal is pending from an interlocutory order or final judgment that . . . refuses an injunction[.]" Fed. R. Civ. P. 62(d). The Court's decision whether to grant such a motion is guided by four factors: (1) whether the applicant makes a strong showing of likely success on the merits; (2) whether the applicant will be irreparably harmed absent relief; (3) whether issuing relief will substantially injure other parties; and (4) where the public interest lies. *Lair v. Bullock*, 697 F.3d 1200, 1203 (9th Cir. 2012); *see also Se. Alaska Conservation Council v. U.S. Army Corps of Eng'rs.*, 472 F.3d 1097, 1100 (9th Cir. 2006). Although "'[t]here is substantial overlap between these and the factors governing preliminary injunctions,'" *id.* at 1203 n.2 (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)), several courts have recognized that "[c]ommon sense dictates …. that the standard cannot … require that a district court confess to having erred in its ruling" to grant the motion. *Evans v. Buchanan*, 435 F. Supp. 832, 843 (D. Del. 1977); *Canterbury Liquors & Pantry v. Sullivan*, 999 F. Supp. 144, 149 (D. Mass. 1998). An injunction pending appeal should be granted if the movant demonstrates serious questions going to the merits on appeal and the balance of the hardships tips sharply in their favor. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134 (9th Cir. 2011) (holding "serious questions" test for preliminary injunctions and stays pending appeal survives *Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008)).

## IV. Argument

The Court should grant Plaintiffs' motion for an injunction pending appeal or, in the alternative, swiftly deny it, so that any delay will not result in a *de facto* barrier to Plaintiffs' ability to obtain meaningful relief on appeal for a remedy to be in place by the November election. For the reasons set forth by Plaintiffs in the preliminary injunction proceedings, which are hereby incorporated by reference, as well as those that follow, the relevant factors weigh strongly in favor of issuing an injunction pending appeal.

### A. Plaintiffs are highly likely to succeed on the merits of their appeal.

First, Plaintiffs are highly likely to succeed on the merits of their appeal. This Court's holdings regarding the lack of standing of the Democratic National Committee ("DNC"), DSCC, and Priorities USA ("Priorities") (collectively, the "Organizational Plaintiffs") and the individual voters here, as well as its determination that this case presents a nonjusticiable political question were in error, and Plaintiffs are highly likely to succeed on their claim that the Ballot Order Statute violates their First and Fourteenth Amendment rights.

#### 1. Plaintiffs have standing.

The Court erred in holding that the Organizational Plaintiffs lack organizational and associational standing.

First, the Organizational Plaintiffs have direct standing based on harm to their electoral prospects. The Ninth Circuit has long recognized this type of direct, organizational injury to political parties where they challenge a law that harms their political prospects. *See Owen v. Mulligan*, 640 F.2d 1130 (9th Cir. 1981). The Court's determination that *Townley v. Miller*, 722 F.3d 1128 (9th Cir. 2013), limited the injury for competitive standing to the sole factual instance in which "another candidate has been impermissibly placed on the ballot," Doc. 73 at 20, was in error.

In *Townley*, the Republican Party plaintiff alleged that the appearance of a "[n]one of these candidates" ("NOTC") option on the ballot would cause its candidates to receive fewer votes and potentially lose the election. *Id.* at 1131. Most importantly here, the court assumed that the potential loss of an election would constitute an injury-in-fact. *Id.* at 1135.

-4-

But it held that the plaintiffs had not established the traceability and redressability necessary for standing. *Id.*; *see also id*. at 1136 ("Here, plaintiffs' failure to meet the causation and traceability requirement is their ultimate undoing."). This holding was based on the fact that the *Townley* plaintiffs had "conceded the legality of the NOTC option being on the ballot—the voter option that would have a siphoning effect," and instead challenged "only the subsection prohibiting ballots cast for NOTC from being given legal effect." *Id*. at 1136. Because "the state's failure to give legal effect to the ballots cast for NOTC [was] immaterial to plaintiffs' alleged *competitive* injury," the *Townley* plaintiffs failed to allege that their competitive injury was fairly traceable to the "conduct being challenged." *Id.*

With this understanding, *Townley* in fact supports, rather than diminishes, the Organizational Plaintiffs' standing argument here. The science is abundantly clear that a candidate listed first on the ballot receives votes solely due to that position. Unlike the *Townley* plaintiffs, Organizational Plaintiffs here assert a competitive injury—that the Ballot Order Statute has a "siphoning effect" on votes for the candidates they support—that is directly traceable to the Ballot Order Statute and redressable by enjoining the Ballot Order Statute. Thus, Plaintiffs' claims resemble those of the individuals the *Townley* court found *would* have standing far more than those of the *Townley* plaintiffs themselves.

The Court's ruling rejecting Organizational Plaintiffs' competitive standing argument is contrary to the law in not just the Ninth Circuit, but six other Circuits as well. *See Green Party of Tenn. v. Hargett*, 767 F.3d 533, 544 (6th Cir. 2014) (concluding political parties "subject to" state's ballot-ordering provision had standing to challenge it); *LaRoque v. Holder*, 650 F.3d 777, 786-87 (D.C. Cir. 2011) (holding candidate had standing to challenge election law that "provid[es] a competitive advantage to his . . . opponents" "even if 'the multiplicity of factors bearing on elections' prevents [him] from establishing 'with any certainty that the challenged rules will disadvantage [his] . . . campaign[]'") (quoting *Shays v. Fed. Election Comm'n*, 414 F.3d 76, 90-91 (D.C. Cir. 2005)); *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 586-87 (5th Cir. 2006) (holding party had "direct standing" based on "harm to its election prospects"); *Smith v. Boyle*, 144 F.3d 1060, 1062 (7th Cir.

1998) (holding Republican Party had standing to challenge at-large method of electing judges that disadvantaged Republicans); *Schulz v. Williams*, 44 F.3d 48, 53 (2d Cir. 1994) (holding Conservative Party had standing to challenge opposing candidate's position on the ballot where opponent "could siphon votes from the Conservative Party line and therefore adversely affect the interests of the Conservative Party"); *Schiaffo v. Helstoski*, 492 F.2d 413, 422 (3d Cir. 1974) (holding candidate had standing to challenge opponent's right to send constituent mail postage-free because damage to his "electoral prospects constitutes a noneconomic harm").[2] In fact, another federal district court came to the exact opposite conclusion of this Court in a case brought by the DSCC earlier this month, finding the DSCC had standing to challenge Minnesota's ballot ordering system based on competitive standing. *See Pavek v. Simon*, No. 19-CV-3000 (SRN/DTS), 2020 WL 3183249, at *12-*14 (D. Minn. June 15, 2020). This Court's holding to the contrary was in error and is likely to be reversed on appeal.

Second, this Court held Organizational Plaintiffs to a far greater burden of proof on their theory of organizational standing based on diversion-of-resources than is appropriate on a motion to dismiss or a preliminary injunction (and made multiple clear errors of fact in the process), and hence was also in error. The Court stated that Plaintiffs did not "put forth any evidence of resources being diverted from other states to Arizona," Doc. 73 at 18, but this overlooks the declarations submitted by both DSCC and the DNC in support of Plaintiffs' Motion for a Preliminary Injunction, which the Court should have considered in ruling on the motion to dismiss. *See, e.g.*, *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988) ("[W]hen considering a motion to dismiss pursuant to Rule 12(b)(1) the district court is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction."). DSCC's declaration detailed that, because of the systematic disadvantage

---

[2] At least four of these cases had nothing to do with the inclusion of a candidate on the ballot. *See Green Party of Tenn.*, 767 F.3d at 544; *LaRoque*, 650 F.3d at 786-87; *Smith*, 144 F.3d at 1062; *Schiaffo*, 492 F.2d at 422.

caused by the Ballot Order Statute, DSCC "will have to commit even more resources to support the Democratic U.S. Senate candidate in Arizona" and that because DSCC will have to "divert[] those additional resources to Arizona, it will have less resources to support other Democratic U.S. Senate candidates across the country." Doc. No. 14-5 ¶ 13. Similarly, the DNC described that as a direct result of the Ballot Order Statute it would be forced to "commit even more resources to supporting the State Democratic Party and the election of Democrats in Arizona than it would otherwise have to," Doc. 14-6 ¶ 17, and that it only "has a certain amount of money to spend to support Democrats and state parties across the country." *Id.* at 14. Priorities USA made similar assertions regarding how the Ballot Order Statute would require it to divert resources from other states to Arizona. Doc. 1 ¶ 25 ("Priorities is aware of the Ballot Order Statute and will have to expend and divert additional funds and resources in GOTV, voter persuasion efforts, and other activities in Arizona, at the expense of its efforts in other states, in order to combat the effects of the Ballot Order Statute in getting Democratic candidates elected in Arizona, including in regard to the 2020 general election."). Weeks before this Court issued its Order, the *Pavek* decision from the District of Minnesota found virtually the same allegations more than sufficient for standing. *Pavek*, 2020 WL 3183249, at *10-12. *Pavek* was fully aligned with sound legal precedent.

The allegations made in this case by the Organizational Plaintiffs were more than sufficient to support their standing on a diversion-of-resources theory at both the motion to dismiss and preliminary injunction stage.[3] It is axiomatic that each element of standing must be supported "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *see also*, *e.g.*, *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media et. al.*, 140 S. Ct. 1009, 1014 (2020)

---

[3] The stage of the litigation distinguishes this case from the two the Court relies on for the assertion that Plaintiffs failed to show adequate evidence of a diversion of resources, *see* Doc. 73 at 18, which were both at significantly more advanced stages of litigation. *See ACORN v. Fowler*, 178 F.3d 350, 359 (5th Cir. 1999) (affirming holding that plaintiffs did not demonstrate standing at summary judgment stage); *Jacobson v. Fla. Sec'y of State*, 957 F.3d 1193, 1206 (11th Cir. 2020) (holding plaintiffs did not produce sufficient evidence to demonstrate diversion of resources after full trial on the merits).

1  (noting that, while the essential elements of a claim remain constant through the life of a
2  lawsuit, "[w]hat a plaintiff must do to satisfy those elements may increase as a case
3  progresses from complaint to trial"). When standing is an issue at the motion to dismiss
4  stage, "general factual allegations of injury resulting from the defendant's conduct may
5  suffice, for on a motion to dismiss we presum[e] that general allegations embrace those
6  specific facts that are necessary to support the claim." *Maya v. Centex Corp.*, 658 F.3d 1060,
7  1068 (9th Cir. 2011) (quoting *Lujan*, 504 U.S. at 561 (quotation marks omitted). The same
8  pleading standard applies at the preliminary injunction stage for standing purposes. *See,*
9  *e.g.*, *City & Cty. of S. F. v. U.S. Dep't of Homeland Sec.*, 944 F.3d 773, 787 (9th Cir. 2019)
10 (explaining at preliminary injunction stage, "plaintiffs may rely on the allegations in their
11 Complaint and whatever other evidence they submitted in support of their preliminary-
12 injunction motion to meet their burden").

13       Third, the Court's holding that Organizational Plaintiffs lacked associational
14 standing to bring claims on behalf of Democratic candidates was also in error. Political
15 parties act in elections through the candidates with whom they associate and whom they
16 endorse and promote. Thus, when a law puts a Party's candidate at a disadvantage (much
17 less puts *all* of its candidates at a systemic disadvantage in the State's largest county, as is
18 the case here), it harms not just the candidates themselves, but the Party committees directly.
19 It is for this reason that courts have found that political party committees have standing on
20 behalf of their candidates for office, as "their interests are identical." *Benkiser*, 459 F.3d at
21 587-88. The Court's conclusion that "the Democratic Party is not a Plaintiff in this case,"
22 Doc. 73 at 15, is clear error. As the Complaint alleges, the DNC is "the official national
23 party committee for the Democratic Party," as designated and defined by federal law. Doc.
24 13, at ¶¶ 13, 24 (citing 52 U.S.C. § 30101(14)). DSCC is the national senatorial committee
25 of the Democratic Party, also as designated and defined by federal law. *Id*. ¶ 25 (citing 52
26 U.S.C. § 30101(14)). The state parties, such as the Arizona Democratic Party, are part of
27 the Democratic Party as a result of their recognition by the DNC, and the DNC is composed
28 of, inter alia, high ranking officers of each recognized state party organization as well as all

voters who voluntarily affiliate with the Democratic Party. Democratic Party of the United States, *The Charter & The Bylaws of the Democratic Party of the United States*, art. 2 § 2, *available at* https://democrats.org/wp-content/uploads/2018/10/DNC-Charter-Bylaws-8.25.18-with-Amendments.pdf; *id.* art. 3 § 2(a); *id.* art. 8 § 1.

But, in any event, the Supreme Court has held that an organization need not be a "traditional membership organization" with card-carrying members to establish associational standing. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344-45 (1977) (finding apple growers association "all of the indicia of membership in an organization," including (1) power to elect members of the Commission, (2) power to serve on the Commission, and (3) financing of the Commission's activities). Rather, where an organization represents individuals "and provides the means by which they express their collective views and protect their collective interests," *id.*, "it would exalt form over substance" to deny that organization representational standing. *Id.* Finding that a political party cannot represent the interests of its candidates under a theory of associational standing is precisely the exaltation of form over substance which the *Hunt* court warned against. The Supreme Court has explicitly held that the First Amendment protects "the freedom to join together in furtherance of common political beliefs," *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 214–15 (1986), which "necessarily presupposes the freedom to identify the people who constitute the association." *Democratic Party of United States v. Wisconsin ex rel. LaFollette*, 450 U.S. 107, 122 (1981). The court erred by dismissing a Complaint brought by the DNC and DSCC, both official national committees of the Democratic Party of the United States, based on the Court's conclusion that Democratic candidates and voters who will run and participate in coming Arizona elections are not included within their membership.

Finally, the Court erred in determining that the individual voters who are plaintiffs ("Voter Plaintiffs") lacked standing because the Ballot Order Statute did not burden their right to vote. Whether called a burden on their right to vote, a "dilution" of their votes, or something else, what the Voter Plaintiffs allege is that their right to vote and associate to

-9-

advance their political interests is harmed by the state-mandated head start the Ballot Order Statute gives to the opponents of the candidates they support. This is a cognizable burden on and injury to these voters that flows from the Supreme Court's decision in *Anderson* itself. *Anderson v. Celebrezze*, 460 U.S. 780, 788, 806 (1983) (noting each provision of a state's election code "inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for political ends," and the Court's "primary concern" is "the interests of the voters who chose to associate together to express their support" for candidates and their views). Similarly, the Court's determination that the interests of voters could be neatly separated from those of the candidates they support, Doc. 73 at 10-11, contradicts binding precedent. *See Anderson*, 460 U.S. at 806; *Bullock v. Carter,* 405 U.S. 134, 143 (1972) ("[T]he rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters."); *McLain v. Meier*, 851 F.2d 1045, 1048 (8th Cir. 1988) (relying on *Anderson* in finding that candidate had standing to challenge North Dakota ballot order law due to his "injury as a voter").

### 2. This case presents a justiciable question.

The Court's holding that this case presents a nonjusticiable political question based on the Supreme Court's decision in *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019), is in error. As Plaintiffs detailed in their response briefing, *Rucho*'s plain terms limit it to the partisan gerrymandering context, Doc. 27 at 15, but the Court ignored this limiting language. Unlike in the unique context of partisan gerrymandering, where federal courts agonized over the proper legal test to apply for *decades*, federal courts have been easily and ably deciding First and Fourteenth Amendment challenges similar to the ones Plaintiffs bring here for decades—including to *ballot order statutes specifically*—most recently using the *Anderson-Burdick* balancing test. *See id.* at 2 (citing cases).

The Ninth Circuit's recent decision in *Juliana v. United States*, 947 F.3d 1159 (9th Cir. 2020), holding claims related to climate change non justiciable, is entirely inapposite here and does not justify extending *Rucho* to suddenly render nonjusticiable claims which

1  courts have been deciding using the same judicial standard for decades nonjusticiable. First, in *Juliana* the court was asked to invent a standard for a claim for which there was no previous guidance, specifically, what constituted a "climate system capable of sustaining human life" and how it could potentially hold Defendants to any such standard. 947 F.3d at 1173. Here, by contrast, Plaintiffs ask the Court to hold that an election law systematically favoring one political party is unconstitutional, a straightforward question of equal protection in the voting context which courts have ably discharged both pre- and post-*Anderson-Burdick*. *See* Doc. 27 at 2 (citing cases).

Second, unlike in *Rucho and Juliana*, here the Supreme Court *itself* has directly addressed the justiciability of the question at issue and found it justiciable. In *Mann v. Powell*, 314 F. Supp. 677, 678-79 (N.D. Ill. 1969), *aff'd* 398 U.S. 955 (1970), the Court summarily affirmed an injunction of a scheme that awarded first position to a certain category of incumbents. The appellants in *Mann* expressly made the argument that the case raised a non-justiciable political question, but in summarily affirming the matter on the merits, the Supreme Court clearly disagreed.[4]

### 3.  Plaintiffs are likely to succeed on the merits of their First and Fourteenth Amendment claims.

Plaintiffs are likely to succeed on the merits for the reasons detailed in their motion for a preliminary injunction and will only briefly review those arguments here. *See* Doc. 14 at 10-14. Plaintiffs' claims are evaluated under the *Anderson-Burdick* balancing test, which requires the court to "weigh 'the character and magnitude of the asserted injury to the rights . . . that the plaintiff seeks to vindicate' against 'the precise interests put forward by the

---

[4] *See Powell v. Mann*, Appellants' Jurisdictional Statement, No. 1359, 1970 WL 155703, at *5-6 (U.S., Mar. 27, 1970) (asserting among "questions presented" for Court's review: "(1) Does the complaint state a claim within the judicial Power of United States; or, the judicial power generally? . . . (5) Does the 'political question doctrine' . . . permit federal judicial cognizance of political cases, involving inter- or intra-party election disputes?"); *see also id.* at *21 (arguing Court should find lower court lacked jurisdiction due to "[t]he lack of predeterminable federal standards, based on some neutral principle [which are] too subjective to allow federal courts in the antagonistic climate of pre-election politics").

-11-

State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson*, 460 U.S. at 789); *see also Soltysik v. Padilla*, 910 F.3d 438, 443 (9th Cir. 2018).

First, Plaintiffs are highly likely to succeed on their claim that the Ballot Order Statute violates the Fourteenth Amendment's equal protection guarantee. The Equal Protection Clause requires "that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburn Living Ctr.*, 473 U.S. 432, 439 (1985); *see also Bush v. Gore*, 531 U.S. 98, 104-05 (2000) (holding Equal Protection Clause applies to "the manner of [the] exercise [of voting]" and "once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another"). On its face, the Ballot Order Statute treats similarly-situated major parties differently, thereby burdening Plaintiffs' equal protection and voting rights. Specifically, it gives preferential treatment to major-party candidates "in descending order according to the votes cast for governor for that county in the most recent general election for the office of governor," A.R.S. § 16-502(E), to the systemic and severe disadvantage of the major party candidates whose last gubernatorial candidate failed to win in that county. Pursuant to the Ballot Order Statute, over 80 percent of Arizona's general election ballots will list Republican candidates first in November 2020. Courts have found that favoring one political party over another similarly situated party clearly harms the disadvantaged party and its supporters. *See, e.g.*, *Nat. Law Party of U.S. v. Fed. Elec. Comm'n*, 111 F. Supp. 2d 33, 44, 47 (D.D.C. 2000). Courts have also consistently held that ballot order statutes that selectively grant preferential treatment among otherwise similarly-situated parties violate the Equal Protection Clause. *See, e.g.*, *McLain*, 637 F.2d at 1166 (invalidating statute that reserved first position on the ballot for candidates whose party received most votes in last congressional election); *Sangmeister v. Woodard*, 565 F.2d 460, 468 (7th Cir. 1977) (enjoining award of first position on the ballot to "the incumbent's party or the majority party") (citation omitted); *Mann*, 314 F. Supp. at 679 (invalidating statute that reserved first

position for incumbent candidates under certain circumstances); *Graves v. McElderry*, 946 F. Supp. 1569 (W.D. Okla. 1996) (using *Anderson-Burdick* to strike down law that mandated Democrats be listed first on the ballot); *Netsch v. Lewis*, 344 F. Supp. 1280, 1281 (N.D. Ill. 1972) (grating temporary restraining order regarding enactment of bill granting candidates priority on ballot by reason of incumbency and seniority). Indeed, this was the federal district court's conclusion in *Pavek*, which addressed this very issue earlier this month. *See Pavek*, 2020 WL 3183249, at \*24-\*25.

Plaintiffs are also likely to succeed on their claim that the Ballot Order Statute violates their right to vote and freedom of political association. *See* Doc. 14 at 13-14. The Ballot Order Statute places a meaningful state-mandated thumb on the scale which makes it more difficult for Plaintiffs "to associate in the electoral arena to enhance their political effectiveness as a group." *Anderson*, 460 U.S. at 794. Multiple courts have determined that similar ballot ordering schemes place an undue and unconstitutional burden on the right to vote in the ballot order context. *See, e.g.*, *Pavek*, 2020 WL 3183249, at \*24-\*27; *Graves*, 946 F. Supp. at 1569.

The interests proffered by the state are plainly insufficient to justify the Ballot Order Statute's burdens. As Plaintiffs noted in their reply in support of their motion for a preliminary injunction, Doc. 35 at 9-10, the Secretary offers a hodgepodge of interests that generally justify the idea of having *some* method of ordering the ballot, but none that demonstrate why the burdens on *these* Plaintiffs' rights is justified by *this* particular method of ballot ordering. *Id.* at 9. Rather, the Secretary's interests in a "facially-neutral, manageable, and cost-efficient" ballot that "list[s] the parties in the same order throughout their ballot," Doc. 29 at 12-13, could be accomplished by any number of constitutional ballot ordering systems and do not justify the systematic disfavoring of one major political party which the Ballot Order Statute mandates. The Secretary attempts to sidestep the "means-fit" test *Anderson-Burdick* requires, *see Soltysik*, 910 F.3d at 449, because the Ballot Order Statute's favoritism is indefensible, and Plaintiffs are highly likely to succeed on their claims.

### B. Plaintiffs will be irreparably harmed absent an injunction.

On the issue of irreparable harm, Plaintiffs have presented ample evidence that each election that the Ballot Order Statute remains in effect, it once more irreparably injures their constitutional rights. While she has provided no support for this position, the Secretary has represented throughout these proceedings that any remedial ballot ordering system must be determined by the end of July to be in place for the November 2020 election. *See, e.g.*, Doc. 22 at 2 ("Based on conversations with the Secretary's counsel, Plaintiffs understand that Maricopa County typically programs and re-certifies ballot tabulation software during the months of June and July. Accordingly, Plaintiffs understand the Secretary's position to be that any remedial ballot ordering scheme must be ready to implement by that time frame."). The Secretary has since admitted in her papers that the system currently in place has the ability to rotate all candidates for any given office *today* (indeed, it already rotates candidates on the general election ballot when more than one from a given party run for the same office, *see* A.R.S. § 16-464 (2018)). *See* Doc. 30-2 ¶ 5 ("The approved Voting System allows for rotation of . . . all names in all parties on a general election ballot."). Based on this concession, it seems likely that the system could be modified (or at the very least that a lottery such as that ordered in *Pavek* could be ordered, 2020 WL 3183249 at *30) closer to November. Regardless, it is clear given the Secretary's assertion that time is of the essence for an injunction to be in place for the 2020 election. If such an injunction is not in place, Plaintiffs will once more be harmed by the Ballot Order Statute's systematic favoritism of the other major political party.

In contrast, no harm will come to the Secretary if the Court issues the requested injunction while the appeal is pending. If the Ninth Circuit merits panel agrees with Plaintiffs, then serious, irreparable harm to Plaintiffs' First and Fourteenth Amendment rights will have been avoided because planning will have already been underway for an alternative ordering scheme and one will be able to be put into place for the November election. On the other hand, if the Ninth Circuit disagrees with Plaintiffs on the merits or agrees with this Court that Plaintiffs lack standing and that this case is nonjusticiable, then

1 the worst thing that has happened is that the Secretary has engaged in some unnecessary
2 planning and can revert back to the state's existing ballot ordering scheme. And, as noted,
3 the Secretary's papers demonstrate that full rotation is possible now, under the present
4 systems used in Arizona. Doc. 30-2 ¶ 5.

### C. The remaining equities favor the issuance of an injunction.

The remaining balance of the equities also favors the relief the Plaintiffs seek, including preserving the integrity of the appellate process and the public interest. *Cf. Armstrong v. Manzo*, 380 U.S. 545, 552 (1965) ("A fundamental requirement of due process is the opportunity to be heard. It is an opportunity which must be granted at a meaningful time and in a meaningful manner."). Plaintiffs moved for a preliminary injunction more than a year before the November 2020 election, yet now find themselves at a point in the cycle when the law, if not enjoined, may very well make it impossible for them to receive meaningful relief in time for that election. "It is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quotation marks and citation omitted). If the 2020 general election is conducted under the Ballot Order Statute, Plaintiffs' fundamental rights will be severely burdened. The balance of the equities and the public interest tip sharply in favor of issuing an injunction to protect against that.

### V. Conclusion

For all of the reasons set forth above, as well as those previously set forth in Plaintiffs' briefing and evidence submitted and presented in the record in this matter, Plaintiffs respectfully request that the Court issue an injunction pending appeal. In the alternative, Plaintiffs request that the Court summarily deny the motion without further briefing or argument.

| | | |
|---|---|---|
| 1 | Dated: July 6, 2020 | */s John M. Geise* |

Sarah R. Gonski (Bar No. 032567)
Austin Yost (Bar No. 034602)
**PERKINS COIE LLP**
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788
Telephone: (602) 351-8000
Facsimile: (602) 648-7000
SGonski@perkinscoie.com
AYost@perkinscoie.com

Marc E. Elias (WDC Bar No. 442007)*
Elisabeth C. Frost (WDC Bar No. 1007632)*
Jacki Anderson (WDC Bar No. 1531821)*
John M. Geise (WDC Bar No. 1032700)*
**PERKINS COIE LLP**
700 Thirteenth Street NW, Suite 600
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-6211
MElias@perkinscoie.com
EFrost@perkinscoie.com
JackiAnderson@perkinscoie.com
JGeise@perkinscoie.com

Abha Khanna (WA Bar No. 42612)*
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Telephone: (206) 359-8000
Facsimile: (206) 359-9000
AKhanna@perkinscoie.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 6, 2020, I electronically transmitted the attached document to the Clerk's Office using the ECF System for filing and transmittal of a Notice of Electronic Filing to the ECF registrants.

　　　　　　　　　　　　　　　　　　 */s  John M. Geise*