Linley Wilson (027040)
Kara Karlson (029407)
Dustin D. Romney (034728)
Assistant Attorneys General
2005 North Central Avenue
Phoenix, AZ 85004-1592
(602) 542-4951
linley.wilson@azag.gov
kara.karlson@azag.gov
dustin.romney@azag.gov
adminlaw@azag.gov
*Attorneys for Defendant Arizona Secretary of State Katie Hobbs*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Brian Mecinas, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>Katie Hobbs, in her official capacity as Arizona Secretary of State,<br><br>Defendant. | Case No: CV-19-05547-PHX-DJH<br><br>**DEFENDANT SECRETARY OF STATE'S RESPONSE TO PLAINTIFFS' EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL** |

Defendant Secretary of State Katie Hobbs ("Secretary") respectfully requests that this Court deny Plaintiffs' emergency motion for injunction pending appeal filed on July 6, 2020 ("Motion").

**I.   Introduction**

In an order issued on June 25, 2020 (Doc. 73), this Court granted the Secretary's Motion to Dismiss Plaintiffs' First Amended Complaint challenging the constitutionality of A.R.S. § 16–502(E) ("Ballot Order Statute"). As noted in the Court's order, the Ballot Order Statute was enacted in 1979 "as part of a comprehensive elections code agreed to by the Arizona Democratic and Republican parties and the County Recorders Association." Doc. 73 at 1 & n.1. The statute "establishes the order in which candidates appear on the [general election] ballot in each of Arizona's fifteen counties." *Id*. at 1.

Additionally, "[a] three-letter political party identification—DEM for Democrat and REP for Republican—is listed next to each candidate' name regardless of the candidate's position on the ballot", *id*. at 2 (citing A.R.S. § 16–502(C)), which "provides voters with visual cues when searching for their preferred party on the ballot." *Id*.

As discussed below, the Court's order granting the Secretary's Motion to Dismiss Plaintiffs' Amended Complaint was correct because: (1) all Plaintiffs lack Article III standing to challenge the Ballot Order Statute (*id*. at 8–21); and (2) even assuming any one of the Plaintiffs had established standing, Plaintiffs' claims alleging that the Ballot Order Statute operates unfairly to major-party candidates amount to a nonjusticiable political question under *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019) (*id*. at 21–25). Under either of these "independent ground[s]" (Doc. 73 at 25), the Court correctly granted the Secretary's Motion to Dismiss. This Court also correctly held that even if Plaintiffs had standing, their claims would fail because the Ballot Order Statute does not present any meaningful burden on Plaintiffs' rights. Doc. 73 at 24.

In light of this Court's ruling, Plaintiffs cannot demonstrate they are entitled to the extraordinary relief of a mandatory injunction to enjoin enforcement of the Ballot Order Statute pending appeal. And setting aside the jurisdictional defects inherent in Plaintiffs' Motion, the Motion fails under the requisite preliminary injunction factors.

**A.  The Timing of Plaintiffs' Motion Undermines Their Request for Immediate Relief and Is an Impermissible Attempt to Circumvent Fed. R. App. P. 8(a)(1).**

Plaintiffs waited *eleven* calendar days from the issuance of this Court's order dismissing their Amended Complaint with prejudice to file their Motion. In the Motion, Plaintiffs insist that immediate relief is necessary to avoid irreparable harm and oppose the Secretary's reasonable request for seven calendar days to file a response. *See* Doc. 77 at n.1. Plaintiffs also invited the Court to "summarily deny the motion without awaiting a response" to allow Plaintiffs "to seek the same relief from the Court of Appeals with the benefit of the Court's ruling." *Id*. at 2.

1    Plaintiffs' 11-day delay weighs against their assertion that they are entitled to a
2 mandatory injunction pending appeal to avoid irreparable harm, and their proposal for a
3 summary denial "is in flat contravention of the policy of Federal Rule of Appellate
4 Procedure 8(a)(1)." *See Chevron Corp. v. Donziger*, 37 F. Supp. 3d 650, 651 (S.D. N.Y.
5 2014) (finding contravention of Rule 8 policy where moving party sought an emergency
6 motion for a stay pending appeal but "did not seek relief for two full weeks after the
7 judgment was entered against them" and requested the court to summarily deny the
8 motion "so that it may bypass any reasoned consideration by the district court in favor of
9 initial resort to the Court of Appeals"). Indeed, the United States Supreme Court has
10 emphasized that the district court "is best and most conveniently able to exercise the nice
11 discretion needed to determine th[e] balance of convenience" in deciding whether to
12 grant a request for a stay pending appeal. *Cumberland Tel. Co. v. Pub. Serv. Comm.*,
13 260 U.S. 212, 219 (1922) (cited in the Advisory Committee Note to Rule 8(a)). Rule
14 8(a)(1) plays a particularly important role in a case like this one, where this Court
15 conducted a three-day evidentiary hearing and is therefore more than "familiar with the
16 record" to evaluate the Secretary's Motion to Dismiss, Plaintiffs' Motion for Preliminary
17 Injunction, and Plaintiffs' related Motion here. *See id.*

18    Plaintiffs' delay also deprives the Secretary of adequate time to respond to the
19 Motion. *See Chevron Corp.*, 37 F. Supp. 3d at 651 (stating the opposing party "is
20 entitled to a proper opportunity to respond to defendant's [emergency] motion"). As
21 Plaintiffs themselves observe, "the questions at issue are effectively the same as what the
22 parties have briefed and argued before in the preliminary injunction proceedings[.]"
23 Doc. 77 at n.1. It is simply unreasonable, and contravenes the policy underlying Rule
24 8(a)(1), for Plaintiffs to wait 11 days to file an emergency motion for an injunction
25 pending appeal and expect this Court resolve the Motion (with or without the Secretary's
26 response) within a mere four days. Plaintiffs' Motion undermines the purpose of Rule
27 8(a)(1), and Plaintiffs' request for a summary denial is an improper attempt to
28 circumvent the rule.

And the fact that Plaintiffs have chosen to challenge the constitutionality of the Ballot Order Statute by seeking injunctive relief in advance of the November 2020 election does not give Plaintiffs free reign to circumvent Rule 8(a)(1). As the Secretary noted in her response to Plaintiffs' motion for preliminary injunction, the currently-certified voting systems in all 15 counties in Arizona are capable of rotating *all* candidates' names. Doc. 29 at 17; *see also* Doc. 30-2 at ¶ 4 (explaining the voting system is certified by the EAC); Doc. 32-1 (Certificate of Conformance issued by the U.S. Election Assistance Commission). But the voting systems are "not currently able to rotate the names of candidates of certain parties in a race for any given office, e.g. rotate *only* the Republican and Democratic candidates for Governor, but not the others[,]" Doc. 30-2 at ¶ 6, which is the relief Plaintiffs sought in their Amended Complaint. *See* Doc. 13 at ¶ 63(d) (requesting "a ballot order system that gives similarly situated major-party candidates an equal opportunity to be listed first on the ballot").[1]

Now that this Court has ruled on their claims, Plaintiffs have changed course, stating that they would accept an injunction in the form of a Court order requiring rotation of all candidates' names or some form of a lottery system designed to award the first position on the general election ballot. Doc. 77 at 15. Plaintiffs suggest that "a lottery such as that ordered in *Pavek [v. Simon*, No. 19-cv-3000, 2020 WL 3183249 (D. Minn. June 15, 2020)] could be ordered … closer to November." Doc. 77 at 14. But in *Pavek*, the district court specifically quoted the parties' joint stipulation when reasoning that "the lottery approach is the better option at this preliminary stage because candidate order by random assignment 'can be put into effect by the computer hardware and software that [already] administers Minnesota's elections without any fear of error.'" *Pavek* at * 29. Here, Plaintiffs did *not* ask for a lottery system in their motion for preliminary injunction; instead, they requested an order "to direct the counties to

---

[1] A change requiring rotation of only Democratic and Republican candidates would require a new certificate of conformance from the EAC, which "would typically require three to four months," a timeframe that does not include "internal development time." Doc. 30-2 at 3.

implement a non-discriminatory name rotation system that gives similarly-situated *major-party candidates* an equal opportunity to be placed first on the ballot." Doc. 14 at 21 (emphasis added). Consequently, there is no information in the record about what Plaintiffs' proposed lottery system would entail and whether Arizona's 15 counties could implement such a lottery system in time for the 2020 general election.

In any event, Plaintiffs' shifting positions in this Court about the remedy they seek in lieu of Arizona's 40-year-old Ballot Order Statute undermine Plaintiffs' assertion that they "will be irreparably harmed absent an injunction." Doc. 77 at 15.

### B. This Court Should Issue A Reasoned Decision on Plaintiffs' Motion Or Alternatively, Expressly Deny Plaintiffs' Motion for the Reasons in This Court's Order or This Response.

As noted above, Plaintiffs are now amenable to a variety of ballot-ordering systems, and at least one of these (rotation of all candidates' names) is possible to implement in time before the 2020 general election. Although Plaintiffs have stated that they "intend to seek relief from the Ninth Circuit … by 4 p.m. on Friday, July 10," there is no reason why this Court should feel compelled to issue its decision on Plaintiffs' Motion in less than half the time Plaintiffs took to file their Motion.

If this Court is inclined to issue a reasoned decision on Plaintiffs' Motion, an interim order setting forth the Court's anticipated timeframe would likely benefit the parties and the Ninth Circuit. A few additional days will not cause any irreparable harm to Plaintiffs, who lack standing to bring claims that are neither justiciable nor constitutional in nature. A reasoned decision would assist the Ninth Circuit's consideration of Plaintiffs' Motion because the appellate court will review the Court's ruling under a deferential abuse of discretion standard. *See Rhoades v. Reinke*, 671 F.3d 856, 859 (9th Cir. 2011) ("We review the district court's denial of Roades's emergency motion for preliminary injunction or stay of execution for abuse of discretion."); *S.W. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc) ("We review the district court's decision to grant or deny a preliminary injunction for

1  abuse of discretion … "[o]ur review is limited and deferential."). The Ninth Circuit will
2  apply de novo review to the Court's "interpretation of the underlying legal principles."
3  *See id*. But some of the issues—particularly those surrounding Plaintiffs' allegation of
4  an alleged ballot order effect—are fact-intensive and have been litigated in a contested
5  evidentiary hearing. *See Green Party of Tenn. v. Hargett*, 767 F.3d 533, 551 (6th Cir.
6  2014) ("The effect of preferential ballot ordering on voter behavior involves questions of
7  fact … [and] there is a factual dispute as to whether ballot position sways voters, and if
8  so, how much"); *New Alliance Party v. New York State Bd. of Elections*, 861 F. Supp.
9  282, 290 (D. S.D.N.Y. 1994) ("Position bias is a disputable fact because its existence is
10 dependent upon the circumstances in which it operates."). Given the standard of review
11 that applies to Plaintiffs' Motion at the next stage of these proceedings, this Court should
12 issue a reasoned decision instead of a summary denial.
13       Alternatively, if the Court is inclined to summarily deny Plaintiffs' Motion, the
14 Secretary requests that the Court's ruling expressly rely on relevant portions of its order
15 issued June 25, 2020, and/or the reasons set forth in this Response to aid the Ninth
16 Circuit in applying its deferential standard of review.

**II.   Plaintiffs Have Failed to Satisfy Their High Burden of Showing They Are Entitled to a Mandatory Injunction of the Ballot Order Statute Pending Appeal.**

Plaintiffs are not entitled to the extraordinary relief they seek. *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1977) ("[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.") (quotation omitted); *Sierra Forest Legacy v. Rey*, 691 F. Supp. 2d 1204, 1207 (E.D. Cal. 2010) ("Like any injunction, an injunction pending appeal is an extraordinary remedy that should be granted sparingly."). In evaluating a motion for injunction pending appeal, courts "consider whether the moving party has demonstrated that they are likely to succeed on the merits, that they are likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities

tips in their favor, and that an injunction is in the public interest." *South Bay United Pentecostal Church v. Newsom*, 959 F.3d 938, 939 (9th Cir. 2020) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  The balance of the equities and public interest factors merge when the State is a party.  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

As the Secretary argued in her response to Plaintiffs' motion for preliminary injunction (*see* Doc. 29 at 8), Plaintiffs' burden here is even higher because Plaintiffs seek a mandatory injunction, which "orders a responsible party to take action," as opposed to a prohibitory injunction which merely "preserves the status quo pending a determination of the action on the merits."  *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878–79 (9th Cir. 2009) (citations and quotations omitted).  Plaintiffs ask the Court to enjoin the Ballot Order Statute and order the Secretary to develop and implement an entirely new method of listing candidates on Arizona's ballots.  Doc. 77 at 16.  This type of mandatory injunction "goes well beyond simply maintaining the status quo [p]endente lite [and] is particularly disfavored.'" *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir.1980) (citation omitted).  A mandatory injunction is not issued in doubtful cases, *Marlyn Nutraceuticals, Inc.*, 571 F.3d at 879, and should not be granted "unless the facts and law clearly favor the plaintiff."  *Comm. of Cent. Am. Refugees v. I.N.S.*, 795 F.2d 1434, 1441 (9th Cir. 1986).

As discussed below, neither the facts nor the law "clearly favor" the Plaintiffs to warrant a mandatory injunction pending appeal.[2]

**A.   Plaintiffs Are Unlikely to Succeed on the Merits.**

Plaintiffs argue they are "highly likely to succeed on the merits of their appeal," contending that: (1) this Court's standing and non-justiciability holdings "were in error"; and (2) Plaintiffs are likely to succeed on the merits of their First and Fourteenth Amendment claims.  Doc. 77 at 5.  Plaintiffs are wrong on both accounts.

---

[2] Because these issues have been fully briefed, the Secretary only summarizes them here.

7

### 1. Plaintiffs Cannot Succeed Due to Jurisdictional Flaws.

As the Secretary has argued at length (Doc. 29 at 14–15, Doc. 26 at 10–24), and as this Court correctly held, Plaintiffs' Amended Complaint suffers numerous jurisdictional defects. Because these defects are inherent in Plaintiffs' Motion, Plaintiffs cannot demonstrate they are likely to succeed on the merits.

#### a. This Court Correctly Held that All Plaintiffs Lack Article III Standing.

This Court thoroughly and correctly reasoned in its order that the "Voter Plaintiffs have not established a meaningful infringement on their right to vote caused by the Ballot Order Statute" and "have also not established a concrete injury based on an alleged dilution of their votes[,]" relying on *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018), and other authorities. Doc. 73 at 12–13. Accordingly, "the Voter Plaintiffs have not alleged a concrete injury in fact, but rather a generalized political grievance with the Ballot Order Statute and its alleged effects." *Id*. at 14. Regarding the Committee Plaintiffs, this Court properly rejected Plaintiffs' arguments "that they have alleged sufficient facts to establish associational, organizational, or competitive standing regardless of whether the Voter Plaintiffs have standing." *Id*. at 14–21. *See Jacobson, et al. v. Florida Sec. of State, et al.*, 957 F.3d 1193, 1198 (11th Cir. 2020) (unanimously holding that individual voters and the same Democratic organizations that are the Plaintiffs in this case lack standing to challenge Florida's ballot order law, where "none of them proved an injury in fact").

Plaintiffs argue this Court's standing analysis was in error, but none of their arguments are persuasive. Doc. 77 at 5–11. Plaintiffs first argue that *Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013), supports them. *Id*. at 77. But *Townley* expressly described "[c]ompetitive standing [a]s the notion that 'a candidate or his political party has standing to challenge *the inclusion* of an allegedly ineligible rival on the ballot, on the theory that doing so hurts the candidate's or party's own chances of prevailing in the election.'" 722 F.3d at 1135 (quoting *Drake v. Obama*, 664 F.3d 774, 782 (9th Cir.

8

2011)). That is *not* the type of claim that Plaintiffs raised here. This Court correctly read *Townley* and refused to find that the Committee Plaintiffs have standing under a theory of competitive standing. Doc. 73 (discussing *Townley*, emphasizing that the Ninth Circuit "garner[ed] support from other circuit court opinions that recognize competitive standing" in holding that "for competitive standing to apply, a plaintiff must allege that another candidate has been impermissibly placed on the ballot," and collecting cases).³

Plaintiffs state that the federal district court in *Pavek*, 2020 WL 3183249 at \*\*12–14 "came to the exact opposite conclusion of this Court in a case brought by the DSCC earlier this month, finding the DSCC had standing to challenge Minnesota's ballot ordering system based on competitive standing." Doc. 77 at 7. As the Secretary has argued, the district court in *Pavek* appears to have sided with the now-vacated decision of a Florida district court, *Jacobson v. Lee*, 411 F. Supp. 3d 1249 (N.D. Fla. 2019). *See Pavek* at \*\*26–27; Doc. 72. The *Pavek* court erred when it attempted to distinguish the Eleventh Circuit Court of Appeals' standing analysis discussing organizational standing and associational standing in *Jacobson*, 957 F.3d at 1204–07. *See Pavek* at \*12. Regarding *Pavek*'s "competitive standing" discussion, the district court noted that "[t]he Eighth Circuit does not yet appear to have addressed this theory of standing[,]" *Pavek*, n.12, and although it cited several cases, *Townley* was not among them. *See id*. at \*12. Simply put, the district court's erroneous decision in *Pavek* does not undermine the Eleventh Circuit's sound reasoning in *Jacobson* or this Court's standing analysis.

Plaintiffs insist that they made sufficient allegations to support their "diversion-of-resources theory at both the motion to dismiss and preliminary injunction stage."

---

³ Plaintiffs' citation to *LaRoque v. Holder*, 650 F.3d 777, 786–87 (D.C. Cir. 2011), does not help them because, as they note, the claim in that case was brought by a candidate. *See* Doc. 77 at 6. As the Court aptly put it, Plaintiffs "fail to recognize that the majority of the cases they cite to support their theories of injury involve **candidates** as plaintiffs who were alleging the personal harm of not getting elected." Doc. 73 at 12 (collecting cases).

Doc. 77 at 8. Not so. Their general allegations of expending resources on "Get Out the Vote" assistance, voter persuasion efforts, and making contributions and expenditures are insufficient to confer organizational standing on the Committee Plaintiffs. *See Smith v. Pac. Props. and Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004) (plaintiff may establish injury-in-fact by alleging a "frustration of its organizational mission" and "diversion of its resources" to mitigate the effects of the challenged action).

Plaintiffs further argue that the Court erred in finding that DNC failed to establish standing under associational standing. Doc. 77 at 9–10. The Court correctly reasoned that "Plaintiff DNC has failed to identify its members and their specific alleged injuries; thus, the Court is unable to determine whether 'its members would otherwise have standing to sue in their own right,' which is required for associational standing." Doc. 73 at 16 (quoting *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). The Court continued: "Even accepting as true that the DNC's seven Arizona members are Arizona voters who will be voting in the 2020 Election, the DNC does not allege any specific harm as to those alleged seven unnamed members, nor does it allege that any of the seven are candidates." Doc. 73 at 16. An organization's failure to prove that its members "would otherwise have standing to sue in their own right" is fatal to associational standing. *See Jacobson*, 957 F.3d at 1204 (rejecting associational standing for DNC where "it failed to identify any of its members, much less one who will be injured by the ballot statute" and even accepting as true that the Committee's members "include Democratic voters and candidates in Florida, the Committee still has not proved that one of those unidentified members will suffer an injury").

In light of this Court's correct holding that all Plaintiffs failed to establish Article III standing, Plaintiffs are unlikely to succeed on the merits of their claims for purposes of an injunction of the Ballot Order Statute pending appeal. *See Catecean Cmty. v. Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004) ("A suit brought by a plaintiff without Article III standing is not a 'case or controversy,' and an Article III federal court therefore lacks subject matter jurisdiction over the suit."); *Townley*, 722 F.3d at 1133 (stating that a

party moving for a preliminary injunction must make "a clear showing of each element of standing").

Finally, as the Secretary has argued (Doc. 26 at 15–18), Plaintiffs' claims are also not redressable through this lawsuit and the Secretary is not the proper defendant to this action under Eleventh Amendment immunity. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (plaintiffs lack standing where their alleged injury is not "fairly traceable to the challenged conduct" of the defendant); *Culinary Workers Union, Local 226 v. Del Papa*, 200 F.3d 614, 619 (9th Cir. 1999) (noting that the "case and controversy" analysis is similar to the Eleventh Amendment inquiry). Under Arizona law, the boards of supervisors of Arizona's 15 counties are responsible for preparing, providing, and printing general election ballots. *See* A.R.S. § 16–503. For this reason, Plaintiffs are not entitled to relief because the "line of causation" between the Secretary's actions and Plaintiffs' alleged harm must be more than "attenuated." *See Allen v. Wright*, 468 U.S. 737, 757 (1984), *overruled in part on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014); *Jacobson*, 957 F.3d at 1207–12 (majority panel holding that "any injury [plaintiffs] might suffer" from Florida's ballot order statute "is neither fairly traceable to the Secretary nor redressable by a judgment against her because she does not enforce the challenged law" and county boards of supervisors "are responsible for placing candidates on the ballot in the order the law prescribes").

And the Secretary is entitled to Eleventh Amendment immunity because her only connection to the Ballot Order Statute is an indirect one—her role as Arizona's chief election officer. Plaintiffs' request for a court order directing the precise way in which Arizona should conduct its ballot order process pending appeal implicates the State's "special sovereignty interests" and seeks to impermissibly interfere with Arizona's elections. *See Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 281–82 (1997) (reasoning the "far-reaching and invasive relief" sought weighed in favor of finding that sovereign immunity controlled).

### b. This Court Correctly Held that Plaintiffs' Claims Present Nothing More than a Nonjusticiable Political Question Under *Rucho*.

Setting aside the standing issue, this Court also correctly held that Plaintiffs' claims and the relief sought amounted to a nonjusticiable political question that the Court is unable to redress under *Rucho*, 139 U.S. at 2484–2500. Doc. 73 at 21–25.

Plaintiffs argue that "*Rucho*'s plain terms limit it to the partisan gerrymandering context" and fault the Court for "ignor[ing] this limiting language." Doc. 77 at 11. Plaintiffs do not identify which portion of *Rucho* included "limiting language." *See id*. Instead, Plaintiffs merely refer to their prior briefing, in which they argued (without citing *Rucho*) that "*Rucho*'s reach is unambiguously limited to partisan gerrymandering cases[.]" Doc. 27 at 15. But as the Court noted, the Ninth Circuit extended *Rucho*'s reasoning "to find that claims related to climate change are nonjusticiable." Doc. 73 (citing *Juliana v. United States*, 947 F.3d 1159, 1173 (9th Cir. 2020)). Plaintiffs insist that *Juliana* "is entirely inapposite here," but this Court made clear that although *Juliana* "has nothing to do with Arizona's Ballot Order Statute," the decision "also has little in common with political gerrymandering." Doc. 73 at 23. Accordingly, *Juliana* refutes Plaintiffs' assertion "that the holding in *Rucho* cannot be extended past political gerrymandering cases[.]" *Id*.; *see also Jacobson*, 957 F.3d at 1213 ("No judicially discernable and manageable standards exist to determine what constitutes a 'fair' allocation of the top ballot position, and picking among the competing visions of fairness poses basic questions that are political, not legal") (Pryor, J., concurring) (internal citations omitted). Thus, in light of this Court's correct analysis under *Rucho*, Plaintiffs cannot demonstrate a likelihood of success on the merits of their (nonjusticiable) claims.

### 2. Jurisdictional Defects Aside, Plaintiffs' Claims Fail on the Merits.

Even if Plaintiffs could overcome the Court's holdings on standing and non-justiciability, their claims inevitably fail on the merits. Because Plaintiffs bring a facial attack on the constitutionality of the Ballot Order Statute, "seeking relief that would

1 invalidate the statute in all its applications, they bear a heavy burden of persuasion." *See*
2 *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 200 (2008) (plurality opinion).

3 This Court correctly reasoned that "Plaintiffs fail to establish that the Ballot Order
4 Statute meaningfully burdens them in the ways in which the Supreme Court has
5 recognized as being appropriate for examination under the *Anderson-Burdick*
6 framework." Doc. 73 at 24. In *Burdick*, the Supreme Court recognized that "[e]lection
7 laws will invariably impose some burden upon individual voters," and that as a result,
8 "there must be a substantial regulation of elections if they are to be fair and honest and if
9 some sort of order, rather than chaos, is to accompany the democratic processes."
10 *Burdick*, 504 U.S. at 433 (internal quotation marks and citation omitted). "When a state
11 election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon
12 the First and Fourteenth Amendment rights of voters, 'the State's important regulatory
13 interests are generally sufficient to justify' the restrictions." *Pub. Integrity All., Inc. v.*
14 *City of Tucson*, 836 F.3d 1019, 1024–25 (9th Cir. 2016) (quoting *Burdick*, 504 U.S. at
15 434 (balancing plaintiffs' rights and the State's interests)). "Applying these precepts,
16 [courts] have repeatedly upheld as 'not severe' restrictions that are generally applicable,
17 evenhanded, politically neutral, and protect the reliability and integrity of the election
18 process." *Pub. Integrity*, 836 F.3d at 1024-25 (citation and alterations omitted).

19 Assuming Plaintiffs' claims are justiciable after *Rucho*, the *Anderson/Burdick*
20 framework requires only a showing that the law serves a legitimate state interest because
21 the burden here is minimal, at best. *See Burdick*, 504 U.S. at 434. The Ballot Order
22 Statute easily satisfies this test. It is a politically-neutral statute that was enacted with
23 broad, bipartisan support, and applies equally to all voters. Throughout its 40-year
24 history, the statute has protected the reliability and integrity of the election process by
25 establishing logical, efficient, and manageable rules to determine the order in which
26 candidates' names appear on a general election ballot—at times resulting in Democratic
27 candidates being listed first, and at other times Republican candidates. *See* Doc. 13,
28 ¶ 12. Plaintiffs cannot establish a meaningful, let alone severe, burden under the Equal

1  Protection Clause or on Plaintiffs' right to vote, and Arizona's interest in enforcing the
2  Ballot Order Statute outweighs any burden on Plaintiffs.  *See* Doc. 29 at 9–15;
3  *Libertarian Party of Va. v. Alcorn*, 826 F.3d 708, 716–19 (4th Cir. 2016) (applying
4  *Anderson/Burdick* to ballot order statute and concluding mere ballot order "does not
5  restrict candidate access to the ballot or deny voters the right to vote for the candidate of
6  their choice" and that the law "serves the important state interest of reducing voter
7  confusion and speeding the voting process").

8        Additionally, Plaintiffs' claims fail as a factual matter because the record does not
9  support their assertion that the Ballot Order Statute "places a thumb on the scale in favor
10 of that candidate's election, for no other reason than that they were listed first" because
11 of "position bias" (also referred to as "primacy effect" or "ballot order effect").  Doc. 77
12 at 3.  Plaintiffs failed to put forth any reliable evidence at the evidentiary hearing to show
13 that there is, in fact, such a phenomenon in Arizona's general elections.  *See* Doc. 73
14 (reasoning that Plaintiffs' failure to establish a "burden" on their right to vote means that
15 this Court cannot "weigh it").

16       For example, as the Court noted, Plaintiffs' expert, Dr. Krosnick, "acknowledged
17 on cross-examination that *none of the studies* he reviewed analyzed the existence of any
18 ballot order effect in Arizona" and testified that "listing the party affiliation of the
19 candidates on the ballot [which are included on Arizona's ballots in general elections],
20 all other things equal, reduces the size of the primacy effects." *Id*. at n. 11 (quoting Doc.
21 58 at 51 & 62) (emphasis added).  And Plaintiffs' expert Dr. Rodden specifically
22 testified that he did not examine and did not opine on whether any ballot order effect
23 would be smaller with the use of mail-in ballots (*see* Doc. 57 at 107–08), which
24 significantly weakens the value of Plaintiffs' statistical evidence in a state like Arizona,
25 where approximately 80% of Arizonans who voted in the 2016 general election "cast an
26 early ballot, meaning about 20 percent voted in person on Election Day." *See*
27 *Democratic National Committee v. Reagan*, 329 F. Supp. 3d 824, 825 (D. Ariz. 2018);
28 *see also* Doc. 30-1 (Secretary's expert, Sean Trende, opining in his expert report that

"[i]n a state such as Arizona where at least 75% of votes are consistently cast as early ballots, we might expect that effect to be even smaller to the point of being negligible"). Moreover, Dr. Rodden's testimony at the evidentiary hearing revealed that Dr. Rodden's statistical analysis: (1) was infected with "measurement error," as Dr. Rodden described it; (2) could only provide an average ballot order effect over the course of Arizona's 40-year history and could not estimate what a particular effect would be in any given county; and (3) did not account for over one million Arizona voters registered as Independent or third-party.[4] *See* Doc. 57 at 73, 78, 85–86.

Notably, Plaintiffs do not reference any portion of their experts' reports or transcripts from the evidentiary hearing to support their allegation that the Ballot Order Statute "places a meaningful state-mandated thumb on the scale" in Arizona's general elections. Doc. 77 at 14. *See Hargett*, 767 F.3d at 551 ("there is a factual dispute as to whether ballot position sways voters, and if so, how much"); *New Alliance Party*, 861 F. Supp. at 290 ("Position bias is a disputable fact because its existence is dependent upon the circumstances in which it operates."). Instead, Plaintiffs simply cite outdated and distinguishable cases from other jurisdictions (which considered challenges to other state laws that are materially different from the Ballot Order Statute and operate under vastly different circumstances) while claiming that they "are highly likely to succeed on the merits of their claims." Doc. 77 at 3. Plaintiffs' cursory statements are plainly insufficient to satisfy their burden of showing that "the facts and the law clearly favor" them to justify a mandatory injunction of Arizona's Ballot Order Statute months before the 2020 general election. *See Comm. of Cent. Am. Refugees*, 795 F.2d at 1441.

---

[4] *See* Arizona Voter Registration Statistics https://azsos.gov/elections/voter-registration-historical-election-data (April 1, 2020) (reflecting that nearly one-third of Arizona's currently-registered voters are not registered as Republican or Democratic) (last accessed on July 8, 2020). This Court should take judicial notice of these statistics that are publicly available on the Arizona Secretary of State's website and not subject to reasonable dispute. *See* Fed. R. Evid. 201(b); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998-99 (9th Cir. 2010) (taking judicial notice of official information posted on governmental website, the accuracy of which was not factually challenged).

### III. Plaintiffs Have Not Established Irreparable Harm.

Plaintiffs allege (again without citation to the record) that they "presented ample evidence that each election that the Ballot Order Statute remains in effect, it once more irreparably injures their constitutional rights." Doc. 77 at 14. Not so. Plaintiffs presented incomplete and unreliable evidence, which is insufficient to strike down Arizona's Ballot Order Statute on constitutional grounds. And the statute certainly does not cause Plaintiffs the type of irreparable harm that merits a mandatory injunction pending appeal. Any impact or alleged injury resulting from the Ballot Order Statute in the 2020 general election is purely speculative. "Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Caribbean Marine Services Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).

And although a deprivation of constitutional rights is irreparable harm, that principle does not help Plaintiffs here because, as explained above, their claims present political, not constitutional, questions.

### IV. The Balance of Equities and Public Interest Do Not Support a Mandatory Injunction Pending Appeal.

The balance of equities and public interest factors also do not weigh in favor of granting Plaintiffs' motion. Ironically, Plaintiffs attempt to invoke their right to be heard under due process principles and argue the injunction they seek would "preserv[e] the integrity of the appellate process and the public interest." Doc. 77 at 16. Plaintiffs fail to appreciate that their request for an immediate ruling within four business days, after waiting 11 days to file their Motion, deprives the Secretary of *her* right to a meaningful opportunity to contest the extraordinary relief Plaintiffs seek. The Secretary appreciates that the Court granted the Secretary an opportunity to submit this response without issuing a summary denial. As a consequence of the Court's accommodation of the Secretary's interests in this litigation, however, the Court now has about 28 hours to issue a ruling before Plaintiffs seek relief in the Ninth Circuit. *See supra*, Section I.

16

In any event, enjoining enforcement of the Ballot Order Statute pending appeal would harm the State, contrary to Plaintiffs' assertion. Indeed, close to an election, the need for established rules to permit the election to proceed bars relief under *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006). The equities raised by the timing of Plaintiffs' challenge to Arizona's 40-year old statute weigh against an injunction. Moreover, "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers) (citation omitted); *Coal. for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997) ("[A] state suffers irreparable injury whenever an enactment of its people or their representatives is enjoined."). Allowing the Ballot Order Statute to stay in effect pending appeal is thus in the public interest. *See id*.

All parties to this case have an interest in fair 2020 elections. But it is simply not appropriate to use an injunction to rewrite state statutes in an election year to fit certain litigants' notions of fairness—especially when the state statute at issue is facially neutral and does not abridge any individual's right to vote. Plaintiffs have not established that the equities and public interest favor a preliminary injunction pending appeal.

Respectfully submitted this 9th day of July, 2020.

/s/Linley Wilson
Linley Wilson (027040)
Kara Karlson (029407)
Dustin D. Romney (034728)
Assistant Attorneys General
2005 North Central Avenue
Phoenix, AZ 85004-1592
(602) 542-4951
linley.wilson@azag.gov
kara.karlson@azag.gov
dustin.romney@azag.gov
adminlaw@azag.gov